

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED
in the Middle District of
North Carolina
1/20/2021
1:08
Clerk, US District Court
By: _____ jd

THE UNITED STATES OF AMERICA,
*ex rel.* [UNDER SEAL],

                  Plaintiffs,

v.

[UNDER SEAL],

                  Defendants.

No. 20-CV-784

**[UNDER SEAL]**
**31 U.S.C. § 3730(b)(2)**

## FIRST AMENDED COMPLAINT

2818176 v1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THE UNITED STATES OF AMERICA,
*ex rel.* LESLIE CARICO,

                              Plaintiffs,

        v.

VETERANS GUARDIAN VA CLAIM
CONSULTING, LLC,
SCOTT GREENBLATT,
WILLIAM TAYLOR, and
GREGORY A. VILLAROSA, Ph.D.,

                              Defendants.

No. 20-CV-784

**[UNDER SEAL]**
**31 U.S.C. § 3730(b)(2)**

## FIRST AMENDED COMPLAINT

2818176 v1

1.       Plaintiff-relator Leslie Carico ("Relator") brings this action on behalf of the

United States of America against Veterans Guardian VA Claim Consulting, LLC ("Veterans

Guardian" or "the Company") and Scott Greenblatt ("Greenblatt"), William Taylor ("Taylor"),

and Gregory A. Villarosa, Ph.D. ("Dr. Villarosa" and collectively the "Defendants") for

violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") to recover all

damages, civil penalties and other recoveries provided for under that statute.

## I.       INTRODUCTION

2.       Defendants Scott Greenblatt and Veterans Guardian, the company Greenblatt co-

founded and controls, have for years been submitting to the Department of Veterans Affairs (the

"VA") thousands of fraudulent claims for payment for disability benefits.  Also submitting

fraudulent claims, Defendant Taylor is a co-founder and part owner of Veterans Guardian, and as

its Chief Operating Officer directs its business and financial operations, including the fraudulent

scheme described in this complaint.  Defendant Dr. Villarosa is a physician that prepares false

medical records to enable Defendants' submission of false claims to the VA.

3.       Throughout the relevant time period, Defendants Greenblatt, Taylor and Villarosa

collectively and collaboratively managed and directed the operations of Veterans Guardian.  Dr.

Villarosa worked in particular to ensure that for each client Veterans Guardian referred to him,

Dr. Villarosa, or one of his subordinates, provided Veterans Guardian in return with a completed

mental health disability benefits questionnaire which, as he knew, was eventually  submitted to

the VA by Veteran's Guardian to apply for mental health disability benefits.  Dr. Villarosa was

paid a fee by Veterans Guardian for each of these fraudulent mental health forms per an

agreement he had entered into with the other Defendants. In sum, the underlying agreement was

that Villarosa would be working with Veterans Guardian, Greenblatt and Taylor towards the

same goal: get the application for mental health disability benefits submitted with all necessary documentation. Indeed, without this complicit relationship, Veteran Guardians' business model would have been unsustainable.

4.     Promoting its services nationwide by means of Facebook, its website, referrals, gun shows, and a national team of recruiters, among other means, Veterans Guardian provides so-called "prefiling consulting services" to veterans seeking to increase their monthly VA disability payments. Defendants' business practices, however, are wholly grounded in fraud. With a singular focus on getting veterans assigned to the 100% Permanent and Total level of disability, Defendants have simply discarded any pretense of providing lawful, clinically- based guidance to its veteran clients.  As a consequence, the government has been deceived into paying millions of dollars in unwarranted disability payments, a generous portion of which Defendants placed in their own pockets.

5.     In broadest outline, Veterans Guardian finds a mental disability, typically depression disorder due to chronic pain syndrome, with each of its veteran clients, claims it is secondary to the veterans' pre-existing disabilities and also that it arose at least in part, from their military service. Defendants rely on the diagnosis of a mental disability to obtain a 100% Permanent and Total disability level for each veteran regardless of whether the veteran even has a psychologically based disability and regardless of the extent of any such disability. The payoff for Defendants is that Veterans Guardian takes a commission calculated as five months worth of the increase in disability payment attributable to the fraudulent application for increased benefits that Defendants filed on the veteran's behalf.

6.     Defendants' business model is permeated with fraud and deceit. Defendants refer their clients to a group of individuals who conduct psychological examinations remotely. This

2

2818176 v1

group is led by Dr. Villarosa and includes individuals who lack the educational and clinical background mandated under federal law to conduct these exams. The veterans are carefully prepped for the examination by Veterans Guardian. The documentation which Dr. Villarosa prepares, (and indeed all the documentation composing the packet of materials Defendants submit to the Veterans Administration), is largely auto-populated with diagnoses and symptoms. The disability level assigned to the patient by the examiner is never below 50%. Ever.

7.      In the event that Veteran's Guardian fails to induce the VA to assign the 100% Permanent and Total disability level Defendants pursued with its initial submission, the Company routinely proceeds to tack on another diagnosis such as erectile dysfunction and then resubmit the application. Like the mental diagnoses, there is no clinical support for these supplemental diagnoses. The Company simply informs the client of the addition, adds the supplemental diagnosis and resubmits the claim. Using a four- person team composed of two certified nursing assistants and two employees with no background in providing health care, a disability is simply chosen based upon physical symptoms the veteran has previously complained about. Veterans Guardian also exploits the VA appeals process. If a disability claim is denied, Veterans Guardian appeals it. Significantly, the appeal is reviewed in another state from where the application was originally reviewed (and denied). In Relator's experience, Veterans Guardian appeals enjoy a success rate approaching 99%.

8.      Veterans Guardian in essence hijacks the application process, wresting control of it from the veteran in order to utilize a fraud-laden business model which the Defendants deliberately engineered to ensure that Defendants will enjoy the largest commission possible. Indeed, even clients' signatures are routinely forged.

9.      While perpetrating this fraud on the VA, Veterans Guardian continued its fraudulent practices by submitting false claims to the Small Business Administration to obtain a loan under the Paycheck Protection Program ("PPP"). As a result of its fraudulent submissions, Veterans Guardian induced the SBA to approve a PPP loan to Veterans Guardian in the amount of $485,300.

## II.      JURISDICTION & VENUE

10.     Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3729 *et seq.*, specifically 31 U.S.C. §§ 3732(a) & (b) and also 28 U.S.C. §§ 1331 and 1345.

11.     The Court may exercise personal jurisdiction over the Defendants because one or more transacts business in this District, and/or engaged in the alleged illegal activities and practices in this District. Veterans residing in this District entered into agreements with Veterans Guardian.

12.     Venue in this District is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

## III.      PARTIES

13.     The United States is a real party in interest to the claims in this action. Through the Department of Veterans Affairs, the United States administers the VA disability compensation program.

14.     Relator Leslie Carico is a resident of Pinehurst, North Carolina. Relator Carico earned an Associate's degree from Richmond Community College and also a B.S. in Psychology and Global Organization and Management Studies, and a B.S. in Health Care Administration, both from the University of Maryland. She is currently working towards obtaining a master's degree in School Counseling through Liberty University in Virginia. In addition to over twelve

years managing a chain of eighteen apparel stores, Relator Carico ran her own business in equine management for roughly six years. Relator Carico worked for Veterans Guardian from approximately January 2019 until August 2019. Specifically, she was in charge of documentation control which meant that she oversaw the successful creation of the application package for increased disability benefits that the Company submitted. In this capacity, she acquired firsthand knowledge of how the Company conducts its business and also had regular contact with defendant Greenblatt.

15.     Veterans Guardian is a North Carolina limited liability company with its principal office located at 75 Trotter Hills Circle, Pinehurst, NC 28374. Its website is https://vetsguardian.com. The Company came into being in or around August 2017. It describes itself on its website as a "consulting service providing pre-filing and post-filing consulting services to Veterans submitting claims for VA benefits."

16.     Scott Greenblatt is a co-founder and Chief Executive Officer of Veterans Guardian. At all relevant times, Greenblatt was engaged in directing the day to day operations of the Company and in formulating and enforcing the Company's policies with respect thereto. Relator believes that defendant Greenblatt has an ownership interest in the Company although he may have recently sought to hide that interest by means of a transfer of assets to William Taylor. Greenblatt held Company-wide weekly meetings at which he gave directives and advice on how to induce veterans to sign up with Veterans Guardian.

17.     William Taylor is a co-founder and Chief Operating Officer of Veterans Guardian. In this role he is primarily in charge of managing the Company's business and financial operations.

5

18.     Dr. Villarosa is a psychologist with a business location at 611 Church Street North, Concord, NC 28025.  Dr. Villarosa's NPI is 1720201593.

## IV.  LEGAL BACKGROUND

### A.     The Federal False Claims Act

19.     The federal FCA imposes liability on any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

                                        * * *

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. §§ 3729(a)(1)(A), (B) & (G).

20.     The term "knowingly" means "that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

21.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation.  Pursuant to the Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (note), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3 (2015), the FCA civil penalties were adjusted to $5,500 to $11,000 per violation for violations occurring on or after October 23, 1996.  In accordance with the Federal Civil Penalties Inflation

Adjustment Act of 2015, those same FCA civil penalty amounts were made applicable to all violations occurring on or before November 2, 2015. *See* 28 C.F.R. §§ 85.3 & 85.5 (2016); 81 Fed. Reg. 42491, 42500 (2016). In accordance with the Bipartisan Budget Act of 2015, 28 U.S.C. § 2461 (note) (2015), the Department of Justice has annually adjusted the penalties applicable to violations occurring after November 2, 2015 and assessed or enforced after August 1, 2016. As of the filing of this Complaint, the FCA civil penalty amounts have been adjusted for violations occurring after November 2, 2015 and assessed or enforced after January 29, 2018 to $11,181 to $22,363 per violation. 28 C.F.R. § 85.5 (2018).

## V.    VETERANS DISABILITY COMPENSATION

### A.    Compensation for Service-Related Disabilities

22.    The U.S. Department of Veterans Affairs provides disability compensation payments ("VA Disability Compensation") to veterans that become disabled as a result of personal injury or disease suffered or contracted (or for aggravation of a pre-existing injury suffered or disease contracted) in the line of duty. 38 U.S.C. § 1131.

23.    The amount of VA Disability Compensation to which a veteran is entitled is based on the average impairment of earning capacity resulting from the qualifying injury. 38 U.S.C. § 1155. The severity of a veteran's disability is expressed as a percentage "rating," corresponding to "how much [the] disability decreases your overall health and ability to function." VA Website, "About VA disability ratings," available at https://www.va.gov/disability/about-disability-ratings/.

24.    The Department of Veterans Affairs has adopted a schedule of ratings for VA Disability Compensation that categorizes a veteran's disability rating as either 10%, 20%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, or total (100%). 38 U.S.C. § 1155.

7

25.     A 100% Permanent and Total disability rating is generally protected from being reduced. If a veteran is given a 100% Permanent and Total disability level by the VA certain benefits also come into play. For instance, if a veteran receives such a rating then a comprehensive healthcare benefit for spouses and children of the veteran applies. Eligible dependents can also receive education and training opportunities.

26.     In the event that a veteran has more than one qualifying disability (of less than 100%), a combined ratings table is used to calculate a combined disability rating between 19% and 99% . *See* VA Website, "About VA disability ratings," available at https://www.va.gov/disability/about-disability-ratings/.

27.     The VA Disability Compensation rates are updated annually and can be adjusted if the veteran has a dependent spouse, child, or parent, or if the veteran receives income from other sources.

28.     The amount of a VA Disability Compensation payment varies substantially depending primarily on disability rating. For example, under the 2019 rates, a veteran with a 10% disability rating will receive a monthly payment of $140.05 (regardless of dependents). A veteran with no dependents and a 50% disability will receive $879.36 per month, and with a 90% disability and no dependents will receive $1,833.62 per month. A veteran with a 100% disability rating and no dependents will receive $3,057.13 per month. VA Website, "2019 Veterans disability compensation rates," available at https://www.va.gov/disability/compensation-rates/veteran-rates/.

29.     Mental disorders can qualify as disabling conditions under the VA Disability Compensation program. The standards applicable to such conditions are contained in 38 C.F.R. § 4.16:

8

(a) When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination.

(b) When evaluating the level of disability from a mental disorder, the rating agency will consider the extent of social impairment but shall not assign an evaluation solely on the basis of social impairment.

(c) Neurocognitive disorders shall be evaluated under the general rating formula for mental disorders; neurologic deficits or other impairments stemming from the same etiology (e.g., a head injury) shall be evaluated separately and combined with the evaluation for neurocognitive disorders (see §4.25).

(d) When a single disability has been diagnosed both as a physical condition and as a mental disorder, the rating agency shall evaluate it using a diagnostic code which represents the dominant (more disabling) aspect of the condition (see §4.14).

30.     Federal regulations provide the following chart as a guide for disability ratings for mental disorders.

2818176 v1

| | Rating |
|---|---|
| Total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. | 100 |
| Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. | 70 |
| Occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. | 50 |
| Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). | 30 |
| Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or symptoms controlled by continuous medication. | 10 |
| A mental condition has been formally diagnosed, but symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication. | 0 |

## B. Claims Process for VA Disability Compensation

31. Claims for VA Disability Compensation consist of official government forms,

medical records, and any other supporting documentation of a qualifying disability. The

Department of Veterans Affairs may elect to interview an applicant to obtain further information

about his or her condition. VA Website, "How to file a VA disability claim," available at

https://www.va.gov/disability/how-to-file-claim/.

32. The specific documentation that is required for an application for VA Disability

Compensation will depend on the type of claim being made. For example, a veteran can file an

original claim for benefits, a claim to increase the amount of compensation for a disabling

10

condition that has worsened, or a supplemental claim to provide new evidence in support of an earlier claim that was denied.

33.    The standard form for submission of a claim for VA Disability Compensation is VA Form 21-526EZ ("Application for Disability Compensation and Related Compensation Benefits") ("Form 526EZ").

34.    Form 526EZ requires, among other things, information regarding the claimed disability and how it occurred or worsened, personal information about the veteran, information regarding the veteran's military service, and a description of any other financial compensation the veteran is currently receiving from military service.

35.    The veteran submitting Form 526EZ must provide their signature to affirm the following certification: *I certify that the statements in this document are true and complete to the best of my knowledge.*

36.    In the event that a person legally authorized to act on behalf of a veteran submits Form 526EZ on the veteran's behalf, that person must similarly certify that "*I understand that I may be asked to confirm the truthfulness of the answers to the best of my knowledge under penalty of perjury.*"

37.    Form 526EZ also expressly states that "*The law provides severe penalties which include fine or imprisonment, or both, for the willful submission of any statement or evidence of a material fact, knowing it to be false, or for the fraudulent acceptance of any payment to which you are not entitled.*"

2818176 v1

## C.    Accredited Representatives and Veterans Service Officers

38.    The Department of Veterans Affairs manages an accreditation process for
individuals or entities that wish to represent veterans in their interactions with the agency
regarding VA Disability Compensation.

39.    Attorneys, claims agents, or Veterans Service Officers ("VSOs") can obtain this
accreditation by passing an exam, a background check, and engaging in ongoing education to
remain current in their knowledge of the VA Disability Compensation process.

40.    Accredited individuals or entities are permitted to help veterans obtain supporting
documents, arrange transportation to medical appointments, and may even file claims or appeals
on the veteran's behalf.

41.    Individuals or entities that are not accredited by the Department of Veterans
Affairs are prohibited from representing veterans in their application for VA Disability
Compensation.  VA Website, "Get help filing your claim or appeal," available at
https://www.va.gov/disability/get-help-filing-claim/.

42.    The Department of Veterans Affairs keeps a roster of accredited individuals and
entities that veterans can search on its website.  VA Website, "Accreditation Search," available
at https://www.va.gov/ogc/apps/accreditation/index.asp.

43.    Neither Veterans Guardian nor Greenblatt are accredited by the Department of
Veterans Affairs.

44.    According to the VA.Gov website, non-accredited individuals or entities cannot
assist in the preparation of claims for disability benefits:

> **Question:** Is VA accreditation required to assist a veteran in preparing his or her claim?
>
> **Response:** Yes. Accreditation means the authority granted by VA to assist claimants in the preparation,
> presentation, and prosecution of claims for benefits. 38 C.F.R. § 14.627(a). Unaccredited individuals may

provide other services to veterans so long as they do not assist in the preparation, presentation, and prosecution of claims for benefits.

VA Website, available at https://www.va.gov/ogc/accred_faqs.asp.

## D.    The Paycheck Protection Program.

45.    In March, 2020, the Small Business Administration began the Paycheck Protection Program ("PPP"), in order to provide economic assistance to small businesses who were suffering economic hardship during the pandemic. As part of an application for a loan under the PPP, a small business had to certify that the "current economic uncertainty makes this loan necessary to support the ongoing operations of the" applicant. On April 23, 2020, the SBA stated that PPP applicants must consider their access to other sources of liquidity before certifying to their financial need. The SBA created a "safe harbor" for businesses that had received PPP monies but had, upon further reflection, realized that they had access to other sources of liquidity, or that the loan was not necessary.

46.    The PPP is one of our nation's most aggressive economic responses to the current Covid-19 pandemic. It represents over $500 billion of government support for loans to certain specified entities for the purpose of allowing those entities faced with extreme economic uncertainty to continue to employ their workers during this time of severe economic disruption. PPP loans are below-market rate loans issued by private lenders but guaranteed by the federal government. If borrowers use the proceeds of PPP loans for qualifying purposes such as payroll or rent, the federal government will forgive the repayment of all money so used. A critical aspect of the PPP is its limitation on the types of entities that are eligible for these government-backed loans, and the requirement that each borrower sign a certification of economic necessity.

13

## VI. FACTUAL ALLEGATIONS

### A. Defendants Market Their Fraudulent Disability Application Services To Veterans Across The Country

47.     Veterans Guardian markets its services nationwide through a variety of means including Facebook, the Company's website, referrals, six "Recruiters" (who are compensated on a per client basis) and by sending representatives to attend venues such as gun shows, which are likely to attract large numbers of veterans. There were times while Relator was employed at the Company when the response rate from its Facebook page was so high that the Company turned off its Facebook page in order to catch up with the backlog of interested veterans.

48.     During the 2019 holiday season the Company sent out greeting cards nationwide describing itself as a "medical claims consulting firm" for veterans:

> "We're the experts. We are an evidenced-based medical claims consulting firm helping Veterans win previously denied and new claims to get the benefits Veterans didn't know they qualify for, ENSURING the VA hasn't short-changed their current disability."

49.     During Relator's time at the Company, the volume of clients steadily increased. When Relator was terminated, the Company's monthly enrollment quota was 275 veterans and it anticipated increasing that target to 330 per month.  Relator estimates that Veterans Guardian enrolled about 2,600 veterans from October 2018 until August 2019.

50.     In early February 2020, Relator was contacted by Jim Hill with whom Greenblatt worked as a contractor prior to founding Veterans Guardian. Hill had brought a lawsuit against Greenblatt alleging unethical and unlawful business practices and Greenblatt had just made his final settlement payment to Hill. According to Hill, Greenblatt had told him that Veterans Guardian was now processing 500 disability application packages per month and had approximately 120 employees.

**B.     Intake Personnel Take Veterans' Calls And Assign Each Veteran A Psychological Disability, Typically Depression**

51.     While Relator was employed at Veterans Guardian there were approximately 20 intake personnel handling veteran calls, all at the headquarters in Pinehurst. By the time she left in August 2019, the Company had plans to hire 15 more. The intake process was carefully designed to: 1) successfully enroll as many veterans as possible, and 2) facilitate completion of the application process quickly and efficiently, if possible, within 48 hours of the veteran's encounter with the Company's designated psychological examiner.

52.     During Relator's tenure at Veteran's Guardian, the Company utilized a sophisticated cloud-based customer communications platform called *Salesforce.* Supplying features to facilitate easy customer communication and information input, *Salesforce* (www.salesforce.com) enables the intake person to see on a nationwide map exactly where the veteran's home was located.

53.     In the weeks before Relator officially began working at the Company, she observed the intake process for several days to familiarize herself with it. To induce veterans inquiring about the Company's services to sign up, intake personnel (referred to as "Claims Strategists" to the public) offered veterans a free evaluation of the amount by which Veterans Guardian believed it could increase their disability level and thus their benefits. Claims Strategists were instructed to tell prospective customers that the Veterans Administration could not be trusted to deal with veterans fairly when it came to veterans' benefits and that to receive the benefits to which they are fairly entitled, misrepresentations may have to be made to the VA. In the event that the veteran expressed concern over the cost of the service – a flat fee of $295 dollars plus 5 times any increase in their current monthly disability payment - the intake person would explain that the veteran could benefit by as much as $100,000 over the next ten years thus

making a payment of $5,000 for example more than reasonable. Moreover, the Company instructs veterans to make sure that when they communicated with the VA using the ebenefits platform, they should be sure to check the small box that says the veteran is seeking to receive all increased benefits to which they are retroactively entitled as well. Veterans Guardian never concluded that the disability level a prospective client had been given by the VA was reasonable. Specifically, the Company invariably concluded that it was too low.

54.     After speaking with the veteran for several minutes, the Claims Strategist, who generally had no background in diagnosing mental illness, would decide which diagnosis the veteran should be given. Virtually every veteran was designated as either depressed (most of the clients were diagnosed as depressed) or suffering from Post Traumatic Stress Disorder ("PTSD"). During the initial call the veteran would be asked to provide the Company with a copy of the correspondence from the VA setting forth their original diagnosis and level of disability.

55.     The veteran would also be directed to contact Dr. Villarosa or someone else in his practice in order to be clinically evaluated. Dr. Villarosa is a local clinical psychologist that the Company routinely relies upon to clinically evaluate Veterans Guardian clients for mental illness. Veterans Guardian had a computer link enabling it to communicate directly with Dr. Villarosa's offices.

56.     Occasionally a veteran would object to being classified as having a mental disorder. In those instances defendant Greenblatt would give the intake person a canned "pitch" to make to the veteran to convince him or her to be designated as suffering from mental illness (generally focused on telling the veteran that the VA cannot be trusted to pay a fair amount and that this is money to which they are entitled) and on some occasions Greenblatt called them

himself to make the pitch. All veterans enrolling with Veteran's Guardian would sign an agreement which either Greenblatt or Taylor would execute on the Company's behalf.

57.     After intake was completed, document control specialists such as Relator, Allie Hill and Frederick Phillip (the team leader who was terminated during Relator's tenure) would begin preparing the application package for the VA. Curtis DeBruhl, whose LinkedIn webpage identifies him as a UPS driver, handled preparation of the PTSD application packages.

58.     At the outset, document control specialists would write up a summary about the veteran and send that write up directly to Dr. Villarosa.

**C.     A Veterans Guardian Affiliated Individual Conducts A Psychological Exam Of The Veteran Client Remotely And A VA Mental Health Form With Auto-Populated Information Is Prepared**

59.     The veteran would then meet with Dr. Villarosa, or one of his associates, remotely for approximately 40-45 minutes. Dr. Villarosa was paid $295 per patient by Veterans Guardian – the same amount that the veteran paid in a flat fee to Veterans Guardian. In fact, the monthly debit card statement of client WP reveals that the $295 which the veteran paid ostensibly to Veterans Guardian actually went directly to Dr. Villarosa.

60.     Dr. Villarosa and his associates were the only clinicians that Veterans Guardian used for the preparation of medical reports for its submission of disability benefits claims. Likewise, Relator does not believe Dr. Villarosa had any meaningful source of clients beyond Veterans Guardian referrals. This is a highly suspicious, interdependent relationship. For all practical purposes, Dr. Villarosa relies wholly on Veterans Guardian to sustain his practice, a circumstance which necessarily incentivizes him to forgo his objectivity. At the same time, Veterans Guardian needs Dr. Villarosa to prepare the mental health forms included in the submissions to the Veterans Administration.

61.     Other individuals worked with Dr. Villarosa and also met remotely with veterans including Dr. Villarosa's wife Barbara Angello and their daughter. One of Dr. Villarosa's colleagues, Ross Whitmore, conducted veteran interviews and falsely held himself out to veterans as a psychologist. In truth, he was not a psychologist, nor did he have a background in diagnosing or treating mental health issues. During Relator's employment with Veteran's Guardian Whitmore left Dr. Villarosa's practice and went to work with Veteran's Guardian.

62.     Notably, the federal form for veterans seeking benefits for mental illness limits the categories of health care providers who can conduct an initial examination of a veteran for a mental disorder to licensed psychiatrists, doctorate level psychologists or mental health providers possessing a similar level of academic and clinical experience. Whitmore and other members of Dr. Villarosa's practice did not satisfy the federal requirements for conducting these examinations.

63.     Shortly after two individuals in the employ of Dr. Villarosa quit his practice, one of whom was Whitmore, Veterans Guardian instituted an internal program to prepare veterans for their remote session with the psychologist. Company employees Joanna Oakley, Ross Whitmore and Terry Mundy were on this team. They would direct the veteran to looked tired and shabby during the interview. Veterans were advised not to shave and to use a cane or a wheelchair if they had one. They were directed to use certain buzz words or phrases in the course of responding to questions such as "depressed," "sad," and "no motivation." They were also advised not to characterize their family history or dynamics as contributing to their depression or mental stress. This is because such comments would make it more challenging to demonstrate that the veteran's psychological problems were due to his/her military service.

2818176 v1

64.     The federal form which Dr. Villarosa's office would typically complete in connection with its examination of the patient is VA Form 21-0960P-2 "Mental Disorders (Other Than PTSD and Eating Disorders) Disability Benefits Questionnaire" ("the Mental Health Form") which is applicable when diagnosing and describing depressive disorder due to chronic pain syndrome with depressive features. The goal in completing the form was to establish that the veteran suffers from depression, that it is impacting his ability to function and that the depression was caused by injuries suffered during his/her military experience. A similar form, VA Form 21-0960P-3, was used in cases of PTSD.

65.     An assistant to Dr. Villarosa would auto-populate much of the information contained in the Mental Health Form. For instance, the diagnosis and diagnosis code would already be filled in. Section III of the Mental Health Form lists thirty-one different symptoms which the psychologist is called up to checkmark if applicable. In the case of Veterans Guardian clients, the entire checklist was auto-populated with checkmarks and the exact same checkmarks were entered for every patient. Likewise, Section IV of the Mental Health Form, asking for all other symptoms attributable to their mental disorder, was auto-populated with the same additional symptoms for each Veterans Guardian client. Section VI of the Mental Health Form included a space to supply a "Medical Opinion" and a "Rationale For Medical Opinion." These fields were completed not by Dr. Villarosa, or one of his colleagues, but by Relator, or by another document control specialist.

66.     The addendum to the Mental Health Form contained biographical information on the veteran and the results of a mental health exam. The addendum was auto-populated with general family background information, employment history and clinical observations. For each

19

veteran Dr. Villarosa's office would then tweak the language to incorporate that veteran's particular place of birth, job history and the like.

67.     It was Dr. Villarosa who was primarily responsible for the disability level assigned to the veteran attributable to his/her psychological illness. That level was always 50% or more. Upon information and belief, 50% was considered a "safe" minimum because the VA often assigned a 50% level and it was one which could be achievable even if the client's case was weak. Relator was never able to discern a rational relationship between the disability level assigned to the veteran and the veteran's symptomology. The Form was usually auto-signed by Dr. Villarosa and this occurred even when another individual had conducted the examination. An example of this is attached hereto as Exhibit 1. This Mental Health Form was auto-signed by Dr. Dr. Villarosa even though Mr. Whitmore actually conducted the examination of the veteran.

**D.     Defendants Control The Content Of The VA Form 526EZ And Routinely Fabricate The Veteran's BDI Depression Score**

68.     The veteran's Form 526EZ was prepared by Relator or another document control specialist. In particular, the "Remarks" section of the Form was carefully completed to align with the psychologist's diagnosis and satisfactorily describe a "lifestyle impact" claim, often referred to in shorthand internally as an "LIC" claim. Essentially, this means the applicant is claiming that pre-existing service-related disabilities have caused him/her to become increasingly depressed and anxious.

69.     The Beck Depression Inventory (BDI) form is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression. BDI items are rated on a 4-point scale ranging from 0 to 3 based on the severity of each item. The maximum (worst) total score is 63. Veterans Guardian provided this form to each veteran being diagnosed with depression and instructed them to complete it on their own. However, when the veteran returned

the completed form and the score was below 25 in the case of veterans diagnosed with depression, and 30, in the case of veterans diagnosed with PTSD, document control specialists, such as Relator, were instructed by Defendant Greenblatt and the Operations Manager, Mike Pierce, to increase the scores in order to get above that threshold. In Relator's experience, scores were changed well over 50% of the time. One score Company employees were *not* to change was that for suicidal thoughts (question #9 on the form). This is because an assertion that one is experiencing suicidal thoughts can trigger an automatic 100% disability with respect to mental health and an expectation that the veterans' other answers on the form would be consistent with such an answer.

70.     Once the package was complete (including the Mental Health Form, the Form 526EZ, and the Beck Inventory Form) it was mailed to the veteran for their signature. Veterans sometimes complained about the fact that their BDI score had been increased. In response, the Company would return the BDI scores back to what the client had originally entered, get the approval of the veteran and when the Company received the approved and signed package from the veteran, the Company would raise the BDI numbers to the higher, fabricated numbers without disclosing this to the veteran.

71.     Sometimes veterans would voice complaints about misrepresentations which they saw in the application separate and apart from the BDI score. Some generally complained that the application inflated the extent of the veterans' depression or their limitations in functioning day to day. For instance, in or around May of 2019, one veteran, SL, refused to sign off on the application package because it contained "too many errors and untrue statements." Another veteran, WW, was very upset by his application because he feared it would threaten his security clearance and imperil his ability to obtain a gun permit.

72.     Employees were instructed by Fred Phillips and Terry Mundy on how to lift a signature from another document and apply it to the application. For instance, they typically utilized this method of forgery if a disability application was being appealed. The Company would scramble to file the appeal paperwork, attach the Mental Health Form, and transfer the client's signature from the original application to the appeal and then fax the package to the VA. Both Mike Pierce and Terry Mundy directed Relator at some point to lift a veteran's signature and apply it to another document.

**E.      The Application For Disability Benefits Submitted By Defendants To The VA Makes No Mention Of Veterans Guardian Whatsoever**

73.     The Department of Veterans Affairs has implemented centralized mail processing for compensation claims, including disability claims. The Company sent each application package via eFax to that mail processing center in Janesville, Wisconsin. Nowhere on the fax coversheet or indeed anywhere in the entire application package was Veterans Guardian identified, much less the fact that it had overseen and exercised control over the preparation and contents of the application. In short, its entire role was concealed.

74.     A Compensation & Pension (C&P) examination is a medical examination of a veteran's disability, performed by a VA healthcare professional, or a VA contracted provider. The VA uses C&P exams to gather more evidence on a veteran's claimed condition before issuing a decision and assigning a rating. It was not uncommon for clients of Veterans Guardian to be contacted by the VA before a decision was made on their application in order to schedule a C&P exam. As was the case with the remote encounter with Dr. Villarosa's office, the Company's in-house team would carefully prep the veteran on what to say, how to look and how to act during the meeting with the VA health provider in order to achieve a favorable decision.

75.     In the event that the client still did not achieve a 100% Permanent and Total disability level once its application for an increased disability payment based on psychological issues was approved, Veteran's Guardian deploys yet another strategy for reaching the 100% Permanent and Total mark.  It tacks on another non-psychological diagnosis such as headaches or erectile dysfunction or any other physical complaint the client has described that Veterans Guardian will then claim is triggered by the client's psychological disability. For example, PTSD can cause erectile dysfunction, gastroesophageal reflux disease and sleep apnea. Veterans Guardian then resubmits the application. There is no clinically based support for these supplemental diagnoses.  No physician reviews the legitimacy of the complaint or its cause and no physician documentation is required.  The Company simply informs the client of the addition and then submits the supplemental application. Internally, these claims are often referred to in shorthand as "General Medicine" claims, meaning that a medical condition of some sort has been added to the original application which identified a mental health disability.  Such "Gen Med" claims are also utilized in the case of veteran clients who come to Veterans Guardian already having been diagnosed with a mental illness for which they are receiving VA benefits.

76.     Additionally, Veterans Guardian exploits the VA appeals process. If a disability claim is denied, Veterans Guardian automatically appeals it. Significantly, the appeal is reviewed in another state from where the application was originally reviewed (and denied). In Relator's experience, appeals enjoy a success rate of close to 99%.

77.     Defendants' efforts to increase its clients' disability benefits through deceit have been highly successful. Relator estimates that during her tenure at the Company at least 90% of clients achieved an increase in their disability benefits and many, over half, were assigned to the 100% Permanent and Total disability level. The Company closely monitored the status of its

clients' applications. It had access to the clients' social security number and took advantage of this information to contact the VA to regularly inquire as to the status.

**F.    Relator Is Retaliated Against For Voicing Her Concerns Over The Company's Fraudulent Business Practices And Its Invalid Psychological Assessments**

78.    In May 2019, Relator was given a raise for good performance. Soon thereafter, Relator began to express her concern over the dishonest methods being employed by the Defendants to prepare applications for clients. She expressed her views to one co-worker who then reported Relator's views to William Taylor. Allie Hill shared Relator's concerns and discussed them with Relator. In June, during a Company-wide meeting, Relator was called out for her disloyalty. An employee was also assigned to "watch" her documents. Also around this time Relator began refusing to forge signatures and questioning the validity of diagnoses. She researched and printed out peer-reviewed studies in psychology journals and used these to point out to William Taylor, Scott Greenblatt and others employed at the Company the diagnosis errors that Defendants were making according to the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). In response to her efforts to bring to light Veterans Guardian's problematic business practices, Relator perceived that she was treated as a pariah within the Company.

79.    In July 2019, Relator told Taylor she was tired of being harassed and that she was going to expose the Company as a fraud. He promptly fired her. Her last day of work was August 2, 2019.

80.    On or about August 13, 2019, Relator submitted a formal complaint to the U.S. Department of Veterans Affairs Office of Inspector General ("OIG") notifying the OIG that she believed the Defendants were engaged in fraudulent activity with respect to the submission of applications for veterans' disability benefits. This claim was subsequently assigned claim

number 2019-28400 by the OIG. Relator has supplied the OIG with additional information relevant to her complaint on at least two occasions.

81.     Throughout the relevant time period and through the present, Defendants have submitted applications for veterans' disability benefits which are materially false and fraudulent in at least the following respects:

a.    Defendants, who were not accredited under 38 C.F.R. 14.629, had unlawfully presided over the preparation, presentation, and content of the application for disability benefits in violation of 38 C.F.R. 14.627(a);

b.    Intake personnel assigned each veteran a diagnosis of a mental health illness, generally depression, within minutes of speaking with the veteran on the phone and this initial "diagnosis" determined the trajectory of the entire process of preparing the veteran's disability application package;

c.    Defendants falsely inflated the veteran's BDI depression score in order to increase the likelihood that his/her claim for disability would be approved and at the highest percentage level;

d.    Dr. Villarosa was not independent from Veterans Guardian and thus his clinical judgment was materially impaired. When clients paid the initial $295 fee, that fee went directly to Dr. Villarosa who was incentivized to find a mental illness. In addition, it functioned as a pool of money that Veterans Guardian, Greenblatt and Taylor directed to Villarosa to induce him prepare fraudulent mental health forms which were then used by Veterans Guardian, Greenblatt and Taylor to arrange for veterans to receive federal assistance for physical and mental disabilities to which they were not entitled. Making matters worse, Veterans Guardian keeps five

25

months of any federal disability increase to which a veteran became entitled as a consequence of the fraudulent application for veteran's benefits that the defendants jointly prepared.

    e. Dr. Villarosa and others in his office who conducted psychological examinations of veteran clients did not exercise clinical judgment when rendering psychological assessments as evidenced by at least the following facts: (1) Using an irrational, binary decision-making process, virtually every client was diagnosed with either depression or PTSD; (2) The veteran client's disability was always assigned a level of 50% or higher; and (3) Dr. Villarosa and his colleagues auto-populated the Mental Health Form with the same symptoms of depression among the 31 listed for each veteran client and with the same additional symptoms as well;

    f. Defendants added supplemental diagnoses such as headaches and erectile dysfunction to applications with no clinical basis for doing so solely to increase the client's disability level;

    g. Defendants deceived clients into signing the application and then inflated their BDI depression score without disclosing this change to them;

    h. Defendants concealed from the Veterans Administration their pivotal role in determining the content of the disability application package; and

    i. individuals conducting psychological exams of veteran clients were not qualified by law to do so.

    82.    The federal anti-kickback statute has been violated by Defendants in several respects. For example:

a.  Defendant Villarosa knowingly and willfully solicited or received remuneration from the remaining Defendants (including kickbacks and bribes) directly or indirectly, overtly or covertly, in cash or in kind, in return for preparing a bogus mental health form relating to claims that may be paid in whole or part by funds from the Veterans Administration, and for recommending goods, services, or items associated with falsified mental health disabilities for which payment may be made in whole or in part under a Federal health care program; and

b.  The remaining Defendants knowingly and willfully offered and paid remuneration (including kickbacks and bribes) directly or indirectly, overtly or covertly, in cash or kind, to Dr. Villarosa in return for his furnishing a bogus mental health form relating to claims that may be paid in whole or part by funds from the Veterans Administration, and also in return for recommending goods, services and items associated with falsified mental health disabilities for which payment may be made in whole or in part under a Federal health care program.

83.  "[A] claim that includes items or services resulting from a violation of [the federal anti-kickback statute] constitutes a false or fraudulent claim for purposes of" the federal False Claims Act. 42 U.S.C. § 1320a-7b(g).

## G.  Veterans Guardian Improperly Applied For And Received A Loan Under The Small Business Administration's Payroll Protection Program.

84.  Veterans Guardian has a regular relationship with First Bank, a North Carolina community bank with corporate headquarters in Southern Pines, N.C. As part of that relationship, Veterans Guardian regularly has lines of credit and/ or loans from First Bank. As is alleged more fully above, Veterans Guardian is an economically successful business, with regular recurring income related to the increased payments it obtains for its clients.

85.     Throughout the Covid-19 pandemic, Veterans Guardian has a regular source of income, as it regularly processes disability applications and receives payments, over time, related to applicants for whom it has successfully increased their disability payments. Veterans Guardian does not require its clients to appear in its offices in order to process their applications. Veterans Guardian's clients are located throughout the United States, and the company has, for its entire existence, relied upon the phone, mail service and the internet to communicate with its current and potential clients. Veterans Guardian employees contact potential clients by phone and communicate with clients via phone and the company's website. See, ¶ ¶ 51 through 58, supra. Veterans Guardian employees also have a computer link that enables them to communicate directly with Dr. Villarosa's office for any patient needs.

86.     During the entire time during which Relator was employed at Veteran's Guardian Dr. Villarosa has seen patients remotely. Dr. Villarosa's unlawful relationship with the other defendants is continuing  and it is far more likely than not that he continues to see Veterans Guardian clients remotely because a virtual encounter means less of an investment of time for the client and especially because of the Covid 19 pandemic.

87.     Veterans Guardian applied for a PPP loan, and on April 15, 2020, was approved for a loan in the amount of $485,300 through First Bank.  Veterans Guardian had no economic need for a PPP loan, as it was a continually functioning business throughout the pandemic.  The then-current economic conditions were not uncertain for Veterans Guardian. With a steady stream of income and regular relationship with First Bank, Veterans Guardian had other sources of liquidity. Indeed, in a recent Facebook video defendant Taylor states that Veterans Guardian is growing steadily, as it now has 150 employees and works with over 1000 veterans per month. See, https://fb.watch/2PeYOPGcg9/.

2818176 v1

88. Veterans Guardian's certification on its PPP loan was false. The actions of Defendants have undermined the government's response to the Covid 19 pandemic and have defrauded the United States into guaranteeing a $485,300 loan to which Veterans Guardian was not entitled. And in any event, the PPP program was not designed to provide loans backed by the federal Government to business enterprises whose business model is grounded in defrauding the federal Government.

## VII. COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

89.     Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

90.     By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

91.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

### Count II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

92.     Relator re-alleges and incorporates each allegation in paragraphs 1 through 86 as if fully set forth herein and further alleges as follows:

93.     By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

94.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

### Count III
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

95.     Relator re-alleges and incorporates each allegation in paragraphs 1 through 86 as if fully set forth herein and further alleges as follows:

96.     By virtue of the facts described above, the Defendants have "conspire[d] to commit a violation of subparagraph[s] (A), (B), …or (G)," in violation of 31 U.S.C. § 3729(a)(1)(C)

97.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

### Count IV
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

98.     Relator re-alleges and incorporates each allegation in paragraphs 1 through 86 as if fully set forth herein and further alleges as follows:

99.     By virtue of the acts described above, Defendants have "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit" money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

## Count V
### Federal False Claims Act
### Plaintiff Leslie Carico v. All Defendants
### 31 U.S.C. § 3730(h)

100.    Plaintiff Carico re-alleges and incorporates each allegation in paragraphs 1 through 86 as if fully set forth herein and further alleges as follows:

101.    As a result of the complaints alleged above, Plaintiff Carico engaged in 'protected activities' by acting in furtherance of an action under the False Claims Act.

102.    Defendants were Plaintiff Carico's employer and knew of the protected activities she took in furtherance of an action under the False Claims Act.

103.    Defendants took adverse actions against Plaintiff Carico, and Defendants' unlawful retaliation would not have occurred in the absence of the wrongful action or actions of the Defendants.

104.    As a result of the Defendant's actions, Plaintiff Carico was discharged, threatened, harassed, and discriminated against in the terms and conditions of her employment because of lawful acts she undertook.

### PRAYER FOR RELIEF

**WHEREFORE,** Relator demands that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the United States plus civil penalties of no more than $22,363 and no less than $11,181 for each violation after November 2, 2015, and any other recoveries or relief provided for under the FCA.

Further, Relator requests that she receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and

31

costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

Further, Relator requests that she receive all damages necessary to make her whole stemming from the unlawful retaliation perpetrated against her, including reinstatement with the same seniority status that she would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including but not limited to emotional distress and pain and suffering, and including litigation costs and reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED: Januray 19, 2021

Respectfully submitted,

By:

Jay J. Chaudhuri (Bar No. 27747)
COHEN MILSTEIN SELLERS & TOLL PLLC
407 North Person Street
Raleigh, NC 27601
(919) 890-0560
jchaudhuri@cohenmilstein.com


Jeanne A. Markey
Gary L. Azorsky
Raymond M. Sarola
COHEN MILSTEIN SELLERS & TOLL PLLC
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(267) 479-5700
jmarkey@cohenmilstein.com
gazorsky@cohenmilstein.com
rsarola@cohenmilstein.com

2818176 v1

David K. Haynes
THE COCHRAN FIRM
1100 New York Avenue
Suite 340
Washington, DC 20005
(202) 682-5800
dhaynes@cohcranfirm.com

*Counsel for Relator*

33

**CERTIFICATE OF SERVICE**

I hereby certify that I will cause a copy of the above First Amended Complaint to be served

on the following counsel by mail:

The Honorable Jeffrey Rosen
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

Rebecca A Mayer
Cassie L. Crawford
Assistant U.S. Attorneys
United States Attorney's Office
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401

DATED:  January 19, 2021

Jay J. Chaudhari

2818176 v1