**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>*ex rel.* LESLIE CARICO,<br><br>       Plaintiffs,<br><br>  v.<br><br>VETERANS GUARDIAN VA CLAIM<br>CONSULTING, LLC,<br>SCOTT GREENBLATT,<br>WILLIAM TAYLOR, and<br>GREGORY A. VILLAROSA, Ph.D.,<br><br>      Defendants. | Civil Action No. 20-784-WO-LPA |

**[PROPOSED] SECOND AMENDED COMPLAINT**



1.      Plaintiff-relator Leslie Carico ("Relator") brings this action on behalf of the United States of America against Veterans Guardian VA Claim Consulting, LLC ("Veterans Guardian" or "the Company") and Scott Greenblatt ("Greenblatt"), William Taylor ("Taylor"), and Gregory A. Villarosa, Ph.D. ("Dr. Villarosa" and collectively the "Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") to recover all damages, civil penalties and other recoveries provided for under that statute.

## I.      INTRODUCTION

2.      Defendants Scott Greenblatt and Veterans Guardian, the company Greenblatt co-founded and controls, have for years been submitting to the Department of Veterans Affairs (the "VA") thousands of fraudulent claims for payment for disability benefits.  Also submitting fraudulent claims, Defendant Taylor is a co-founder and part owner of Veterans Guardian, and as its Chief Operating Officer directs its business and financial operations, including the fraudulent scheme described in this complaint.  Defendant Dr. Villarosa is a physician that prepares false medical records to enable and cause Defendants' submission of false claims to the VA as well.

3.      Throughout the relevant time period, Defendants Greenblatt, Taylor and Villarosa collectively and collaboratively managed and directed the operations of Veterans Guardian.  Dr. Villarosa worked in particular to ensure that for each client Veterans Guardian referred to him, Dr. Villarosa, or one of his subordinates, provided Veterans Guardian in return with a completed mental health disability benefits questionnaire which, as he knew, was eventually submitted to the VA by Veteran's Guardian to apply for mental health disability benefits.  In exchange, Dr. Villarosa was paid a fee engineered by Veterans Guardian for each of these fraudulent mental health forms per an agreement he had entered into with the other Defendants. Veterans Guardian referred each of its new veteran clients to Dr. Villarosa for mental health evaluations and as part

of contracting with Veterans Guardian, the veteran would be directed to pay $295 directly to Dr. Villarosa. In sum, the underlying agreement was that Villarosa would be working with Veterans Guardian, Greenblatt and Taylor towards the same goal: get the application for mental health disability benefits submitted with all necessary documentation. Indeed, without this complicit relationship, Veteran Guardians' business model would have been unsustainable.

4.      Promoting its services nationwide by means of Facebook, its website, referrals, gun shows, and a national team of recruiters, among other means, Veterans Guardian provides so-called "prefiling consulting services" to veterans seeking to increase their monthly VA disability payments. Defendants' business practices, however, are wholly grounded in fraud. With a singular focus on getting veterans assigned to the 100% Permanent and Total level of disability, Defendants have simply discarded any pretense of providing lawful, clinically based guidance to its veteran clients. As a consequence, the government has been deceived into paying millions of dollars in unwarranted disability payments, a generous portion of which Defendants placed in their own pockets.

5.      In broadest outline, Veterans Guardian finds a mental disability, typically depression disorder due to chronic pain syndrome, with each of its veteran clients, claims it is secondary to the veterans' pre-existing disabilities and also, that it arose at least in part, from their military service. Defendants rely on the diagnosis of a mental disability to obtain a 100% Permanent and Total disability level for each veteran regardless of whether the veteran even has a psychologically based disability and regardless of the extent of any such disability. The payoff for Defendants is that Veterans Guardian takes a commission calculated as five months' worth of the increase in disability payment attributable to the fraudulent application for increased benefits that Defendants filed on the veteran's behalf.

2

6.     Defendants' business model is permeated with fraud and deceit. Defendants refer their clients to a group of individuals who conduct psychological examinations remotely. This group is led by Dr. Villarosa and includes individuals who lack the educational and clinical background mandated under federal law to conduct these exams. The veterans are carefully prepped for the examination by Veterans Guardian and Dr. Villarosa participated in the decision for Veterans Guardian to prepare them. The documentation which Dr. Villarosa prepares, (and indeed all the documentation composing the packet of materials Defendants submit to the Veterans Administration), is largely auto-populated with diagnoses and symptoms. The disability level assigned to the patient by the examiner is never below 50%. Ever.

7.     In the event that Veteran's Guardian fails to induce the VA to assign the 100% Permanent and Total disability level Defendants pursued with its initial submission, the Company routinely proceeds to tack on another diagnosis such as erectile dysfunction and then resubmit the application. Like the mental diagnoses, there is no clinical support for these supplemental diagnoses.  The Company simply informs the client of the addition, adds the supplemental diagnosis and resubmits the claim. Using a four-person team composed of two certified nursing assistants and two employees with no background in providing health care, a disability is simply chosen based upon physical symptoms the veteran has previously complained about.  Veterans Guardian also exploits the VA appeals process. If a disability claim is denied, Veterans Guardian appeals it. Significantly, the appeal is reviewed in another state from where the application was originally reviewed (and denied). In Relator's experience, Veterans Guardian appeals enjoy a success rate approaching 99%.

8.     Veterans Guardian in essence hijacks the application process, wresting control of it from the veteran in order to utilize a fraud-laden business model which the Defendants

3

deliberately engineered to ensure that Defendants will enjoy the largest commission possible. Indeed, even clients' signatures are routinely forged.

9. While perpetrating this fraud on the VA, Veterans Guardian continued its fraudulent practices by submitting false claims to the Small Business Administration to obtain a loan under the Paycheck Protection Program ("PPP"). As a result of its fraudulent submissions, Veterans Guardian induced the SBA to approve a PPP loan to Veterans Guardian in the amount of $485,300.

## II. JURISDICTION & VENUE

10. Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3729 *et seq*., specifically 31 U.S.C. §§ 3732(a) & (b) and also 28 U.S.C. §§ 1331 and 1345.

11. The Court may exercise personal jurisdiction over the Defendants because one or more transacts business in this District, and/or engaged in the alleged illegal activities and practices in this District. Veterans residing in this District entered into agreements with Veterans Guardian.

12. Venue in this District is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

## III. PARTIES

13. The United States is a real party in interest to the claims in this action. Through the Department of Veterans Affairs, the United States administers the VA disability compensation program.

14. Relator Leslie Carico is a resident of Pinehurst, North Carolina. Relator Carico earned an Associate's degree from Richmond Community College and also a B.S. in Psychology and Global Organization and Management Studies, and a B.S. in Health Care Administration,

both from the University of Maryland. She has a master's degree in interdisciplinary studies from Liberty University in Virginia. She is currently working towards obtaining another master's degree in School Counseling through Liberty University. In addition to over twelve years managing a chain of eighteen apparel stores, Relator Carico ran her own business in equine management for roughly six years. Relator Carico worked for Veterans Guardian from approximately January 2019 until August 2019. Specifically, she was in charge of documentation control which meant that she oversaw the successful creation of the application package for increased disability benefits that the Company submitted. In this capacity, she acquired firsthand knowledge of how the Company conducts its business and also had regular contact with defendant Greenblatt.

15.     Veterans Guardian is a North Carolina limited liability company with its principal office located at 75 Trotter Hills Circle, Pinehurst, NC 28374. Its website is https://vetsguardian.com. The Company came into being in or around August 2017. It describes itself on its website as a "consulting service providing pre-filing and post-filing consulting services to Veterans submitting claims for VA benefits."

16.     Scott Greenblatt is a co-founder and Chief Executive Officer of Veterans Guardian. At all relevant times, Greenblatt was engaged in directing the day-to-day operations of the Company and in formulating and enforcing the Company's policies with respect thereto. Relator believes that Defendant Greenblatt has an ownership interest in the Company although he may have recently sought to hide that interest by means of a transfer of assets to William Taylor. Greenblatt held Company-wide weekly meetings at which he gave directives and advice on how to induce veterans to sign up with Veterans Guardian.

17.     William Taylor is a co-founder and Chief Operating Officer of Veterans Guardian.  In this role he is primarily in charge of managing the Company's business and financial operations.

18.     Dr. Villarosa is a psychologist with a prior business location at 611 Church Street North, Concord, NC 28025.  Dr. Villarosa's NPI is 1720201593.

## IV.  LEGAL BACKGROUND

### A.     The Federal False Claims Act

19.     The federal FCA imposes liability on any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

* * *

31 U.S.C. §§ 3729(a)(1)(A) and (B).

20.     The term "knowingly" means "that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

21.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation.  Pursuant to the Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (note), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3 (2015), the FCA civil penalties were adjusted to $5,500 to $11,000 per violation for violations

6

occurring on or after October 23, 1996.  In accordance with the Federal Civil Penalties Inflation

Adjustment Act of 2015, those same FCA civil penalty amounts were made applicable to all

violations occurring on or before November 2, 2015.  *See* 28 C.F.R. §§ 85.3 & 85.5 (2016); 81

Fed. Reg. 42491, 42500 (2016).  In accordance with the Bipartisan Budget Act of 2015, 28

U.S.C. § 2461 (note) (2015), the Department of Justice has annually adjusted the penalties

applicable to violations occurring after November 2, 2015 and assessed or enforced after August

1, 2016.  As of the filing of this Complaint, the FCA civil penalty amounts have been adjusted

for violations occurring after November 2, 2015 and assessed or enforced after February 12,

2024 to $13,946 to $27,894 per violation.  28 C.F.R. § 85.5 (2024).

## V.      VETERANS DISABILITY COMPENSATION

### A.      Compensation for Service-Related Disabilities

22.      The U.S. Department of Veterans Affairs provides disability compensation

payments ("VA Disability Compensation") to veterans that become disabled as a result of

personal injury or disease suffered or contracted (or for aggravation of a pre-existing injury

suffered or disease contracted) in the line of duty.  38 U.S.C. § 1131.

23.      The amount of VA Disability Compensation to which a veteran is entitled is

based on the average impairment of earning capacity resulting from the qualifying injury.  38

U.S.C. § 1155.  The severity of a veteran's disability is expressed as a percentage "rating,"

corresponding to "how much [the] disability decreases your overall health and ability to

function."  VA Website, "About VA disability ratings," available at

https://www.va.gov/disability/about-disability-ratings/.

24.     The Department of Veterans Affairs has adopted a schedule of ratings for VA Disability Compensation that categorizes a veteran's disability rating as either 10%, 20%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, or total (100%).  38 U.S.C. § 1155.

25.     A 100% Permanent and Total disability rating is generally protected from being reduced. If a veteran is given a 100% Permanent and Total disability level by the VA certain benefits also come into play. For instance, if a veteran receives such a rating then a comprehensive healthcare benefit for spouses and children of the veteran applies.  Eligible dependents can also receive education and training opportunities.

26.     In the event that a veteran has more than one qualifying disability (of less than 100%), a combined ratings table is used to calculate a combined disability rating between 19% and 99% . *See* VA Website, "About VA disability ratings," available at https://www.va.gov/disability/about-disability-ratings/.

27.      The VA Disability Compensation rates are updated annually and can be adjusted if the veteran has a dependent spouse, child, or parent, or if the veteran receives income from other sources.

28.     The amount of a VA Disability Compensation payment varies substantially depending primarily on disability rating.  For example, under the 2019 rates, a veteran with a 10% disability rating will receive a monthly payment of $140.05 (regardless of dependents).  A veteran with no dependents and a 50% disability will receive $879.36 per month, and with a 90% disability and no dependents will receive $1,833.62 per month.  A veteran with a 100% disability rating and no dependents will receive $3,057.13 per month.  VA Website, "2019 Veterans disability compensation rates," available at https://www.va.gov/disability/compensation-rates/veteran-rates/.

29.     Mental disorders can qualify as disabling conditions under the VA Disability

Compensation program.  The standards applicable to such conditions are contained in 38 C.F.R.

§ 4.16:

> (a) When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination.

> (b) When evaluating the level of disability from a mental disorder, the rating agency will consider the extent of social impairment but shall not assign an evaluation solely on the basis of social impairment.

> (c) Neurocognitive disorders shall be evaluated under the general rating formula for mental disorders; neurologic deficits or other impairments stemming from the same etiology (e.g., a head injury) shall be evaluated separately and combined with the evaluation for neurocognitive disorders (see §4.25).

> (d) When a single disability has been diagnosed both as a physical condition and as a mental disorder, the rating agency shall evaluate it using a diagnostic code which represents the dominant (more disabling) aspect of the condition (see §4.14).

30.     Federal regulations provide the following chart as a guide for disability ratings for

mental disorders.

9

| | Rating |
|---|---|
| Total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. | 100 |
| Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. | 70 |
| Occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. | 50 |
| Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). | 30 |
| Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or symptoms controlled by continuous medication. | 10 |
| A mental condition has been formally diagnosed, but symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication. | 0 |

## B.    Claims Process for VA Disability Compensation

31.    Claims for VA Disability Compensation consist of official government forms, medical records, and any other supporting documentation of a qualifying disability.  The Department of Veterans Affairs may elect to interview an applicant to obtain further information about his or her condition. VA Website, "How to file a VA disability claim," available at https://www.va.gov/disability/how-to-file-claim/.

32.    The specific documentation that is required for an application for VA Disability Compensation will depend on the type of claim being made.  For example, a veteran can file an original claim for benefits, a claim to increase the amount of compensation for a disabling

10

condition that has worsened, or a supplemental claim to provide new evidence in support of an earlier claim that was denied.

33.     The standard form for submission of a claim for VA Disability Compensation is VA Form 21-526EZ ("Application for Disability Compensation and Related Compensation Benefits") ("Form 526EZ").

34.     Form 526EZ requires, among other things, information regarding the claimed disability and how it occurred or worsened, personal information about the veteran, information regarding the veteran's military service, and a description of any other financial compensation the veteran is currently receiving from military service.

35.     The veteran submitting Form 526EZ must provide their signature to affirm the following certification:  *I certify that the statements in this document are true and complete to the best of my knowledge.*

36.     In the event that a person legally authorized to act on behalf of a veteran submits Form 526EZ on the veteran's behalf, that person must similarly certify that "*I understand that I may be asked to confirm the truthfulness of the answers to the best of my knowledge under penalty of perjury.*"

37.     Form 526EZ also expressly states that "*The law provides severe penalties which include fine or imprisonment, or both, for the willful submission of any statement or evidence of a material fact, knowing it to be false, or for the fraudulent acceptance of any payment to which you are not entitled.*"

### C. Only Accredited Representatives and Veterans Service Officers Can Represent Veterans In Their Application For VA Disability Compensation

38.     The Department of Veterans Affairs manages an accreditation process for individuals or entities that wish to represent veterans in their interactions with the agency regarding VA Disability Compensation.

39.     Attorneys, claims agents, or Veterans Service Officers ("VSOs") can obtain this accreditation by passing an exam, a background check, and engaging in ongoing education to remain current in their knowledge of the VA Disability Compensation process.

40.     Accredited individuals or entities are permitted to help veterans obtain supporting documents, arrange transportation to medical appointments, and may even file claims or appeals on the veteran's behalf.

41.     Individuals or entities that are not accredited by the Department of Veterans Affairs are prohibited from representing veterans in their application for VA Disability Compensation.  VA Website, "Get help filing your claim or appeal," available at https://www.va.gov/disability/get-help-filing-claim/.

42.     The Department of Veterans Affairs keeps a roster of accredited individuals and entities that veterans can search on its website.  VA Website, "Accreditation Search," available at https://www.va.gov/ogc/apps/accreditation/index.asp.

43.     Neither Veterans Guardian nor Greenblatt nor Taylor are accredited by the Department of Veterans Affairs.

44.     According to the VA.Gov website, non-accredited individuals or entities cannot assist in the preparation of claims for disability benefits:

**Question:**  Is VA accreditation required to assist a veteran in preparing his or her claim?

12

**Response:** Yes.  Accreditation means the authority granted by VA to assist claimants in the preparation, presentation, and prosecution of claims for benefits.  38 C.F.R. § 14.627(a).  Unaccredited individuals may provide other services to veterans so long as they do not assist in the preparation, presentation, and prosecution of claims for benefits.

VA Website, available at https://www.va.gov/ogc/accred_faqs.asp.

**D.      The Paycheck Protection Program.**

45.    In March, 2020, the Small Business Administration began the Paycheck Protection Program ("PPP"), in order to provide economic assistance to small businesses who were suffering economic hardship during the pandemic.  As part of an application for a loan under the PPP, a small business had to certify that the "current economic uncertainty makes this loan necessary to support the ongoing operations of the" applicant.  On April 23, 2020, the SBA stated that PPP applicants must consider their access to other sources of liquidity before certifying to their financial need.  The SBA created a "safe harbor" for businesses that had received PPP monies but had, upon further reflection, realized that they had access to other sources of liquidity, or that the loan was not necessary.

46.    The PPP is one of our nation's most aggressive economic responses to the current Covid-19 pandemic.  It represents over $500 billion of government support for loans to certain specified entities for the purpose of allowing those entities faced with extreme economic uncertainty to continue to employ their workers during this time of severe economic disruption.  PPP loans are below-market rate loans issued by private lenders but guaranteed by the federal government.  If borrowers use the proceeds of PPP loans for qualifying purposes such as payroll or rent, the federal government will forgive the repayment of all money so used.  A critical aspect of the PPP is its limitation on the types of entities that are eligible for these government-backed loans, and the requirement that each borrower sign a certification of economic necessity.

13

## VI. FACTUAL ALLEGATIONS

**A.      Defendants Market Their Fraudulent Disability Application Services To Veterans Across The Country**

47.      Veterans Guardian markets its services nationwide through a variety of means including Facebook, the Company's website, referrals, six "Recruiters" (who are compensated on a per client basis) and by sending representatives to attend venues such as gun shows, which are likely to attract large numbers of veterans. There were times while Relator was employed at the Company when the response rate from its Facebook page was so high that the Company turned off its Facebook page in order to catch up with the backlog of interested veterans.

48.      During the 2019 holiday season the Company sent out greeting cards nationwide describing itself as a "medical claims consulting firm" for veterans:

> "We're the experts. We are an evidenced-based medical claims consulting firm helping Veterans win previously denied and new claims to get the benefits Veterans didn't know they qualify for, ENSURING the VA hasn't short-changed their current disability."

49.      During Relator's time at the Company, the volume of clients steadily increased. When Relator was terminated, the Company's monthly enrollment quota was 275 veterans and it anticipated increasing that target to 330 per month.  Relator estimates that Veterans Guardian enrolled about 2,600 veterans from October 2018 until August 2019.

50.      In early February 2020, Relator was contacted by Jim Hill with whom Greenblatt worked as a contractor prior to founding Veterans Guardian. Hill had brought a lawsuit against Greenblatt alleging unethical and unlawful business practices and Greenblatt had just made his final settlement payment to Hill. According to Hill, Greenblatt had told him that Veterans Guardian was now processing 500 disability application packages per month and had approximately 120 employees.

14

**B.** **Intake Personnel Take Veterans' Calls And Assign Each Veteran A Psychological Disability, Typically Depression**

51.     While Relator was employed at Veterans Guardian there were approximately 20 intake personnel handling veteran calls, all at the headquarters in Pinehurst. By the time she left in August 2019, the Company had plans to hire 15 more. The intake process was carefully designed to: 1) successfully enroll as many veterans as possible, and 2) facilitate completion of the application process quickly and efficiently, if possible, within 48 hours of the veteran's encounter with the Company's designated psychological examiner.

52.     During Relator's tenure at Veteran's Guardian, the Company utilized a sophisticated cloud-based customer communications platform called *Salesforce.* Supplying features to facilitate easy customer communication and information input, *Salesforce* (www.salesforce.com) enables the intake person to see on a nationwide map exactly where the veteran's home was located.

53.     In the weeks before Relator officially began working at the Company, she observed the intake process for several days to familiarize herself with it. To induce veterans inquiring about the Company's services to sign up, intake personnel (referred to as "Claims Strategists" to the public) offered veterans a free evaluation of the amount by which Veterans Guardian believed it could increase their disability level and thus their benefits. Claims Strategists were instructed to tell prospective customers that the Veterans Administration could not be trusted to deal with veterans fairly when it came to veterans' benefits and that to receive the benefits to which they are fairly entitled, misrepresentations may have to be made to the VA. In the event that the veteran expressed concern over the cost of the service – a flat fee of $295 dollars (which went to Defendant Dr. Villarosa) plus 5 times any increase in their current monthly disability payment - the intake person would explain that the veteran could benefit by as

much as $100,000 over the next ten years thus making a payment of $5,000 for example more than reasonable. Moreover, the Company instructs veterans to make sure that when they communicated with the VA using the benefits platform, they should be sure to check the small box that says the veteran is seeking to receive all increased benefits to which they are retroactively entitled as well. Veterans Guardian never concluded that the disability level a prospective client had been given by the VA was reasonable. Specifically, the Company invariably concluded that it was too low.

54.    After speaking with the veteran for several minutes, the Claims Strategist, who generally had no background in diagnosing mental illness, would decide which diagnosis the veteran should be given. Virtually every veteran was designated as either depressed (most of the clients were diagnosed as depressed) or suffering from Post Traumatic Stress Disorder ("PTSD"). During the initial call the veteran would be asked to provide the Company with a copy of the correspondence from the VA setting forth their original diagnosis and level of disability.

55.    The veteran would also be directed to contact Dr. Villarosa or someone else in his practice in order to be clinically evaluated. Dr. Villarosa is a local clinical psychologist that the Company routinely relies upon to clinically evaluate Veterans Guardian clients for mental illness. Veterans Guardian had a computer link enabling it to communicate directly with Dr. Villarosa's offices.

56.    Occasionally a veteran would object to being classified as having a mental disorder.  In those instances, Defendant Greenblatt would give the intake person a canned "pitch" to make to the veteran to convince him or her to be designated as suffering from mental illness (generally focused on telling the veteran that the VA cannot be trusted to pay a fair amount and

that this is money to which they are entitled) and on some occasions Greenblatt called them himself to make the pitch. All veterans enrolling with Veteran's Guardian would sign an agreement which either Greenblatt or Taylor would execute on the Company's behalf.

57. After intake was completed, document control specialists such as Relator, Allie Hill and Frederick Phillip (the team leader who was terminated during Relator's tenure) would begin preparing the application package for the VA. Curtis DeBruhl, whose LinkedIn webpage identifies him as a UPS driver, handled preparation of the PTSD application packages.

58. At the outset, document control specialists would write up a summary about the veteran and send that write up directly to Dr. Villarosa.

## C. A Veterans Guardian Affiliated Individual Conducts A Psychological Exam Of The Veteran Client Remotely And A VA Mental Health Form With Auto-Populated Information Is Prepared

59. The veteran would then meet with Dr. Villarosa, or one of his associates, remotely for approximately 40-45 minutes. Dr. Villarosa was paid $295 per patient– the same amount that the veteran paid in a flat fee to Veterans Guardian. In fact, the monthly debit card statement of client WP reveals that the $295 which the veteran paid ostensibly to Veterans Guardian actually went directly to Dr. Villarosa.

60. Dr. Villarosa and his associates were the only clinicians that Veterans Guardian used for the preparation of medical reports for its submission of disability benefits claims. Likewise, Relator does not believe Dr. Villarosa had any meaningful source of clients beyond Veterans Guardian referrals. This is a highly suspicious, interdependent relationship. For all practical purposes, Dr. Villarosa relies wholly on Veterans Guardian to sustain his practice, a circumstance which necessarily incentivizes him to forgo his objectivity. At the same time, Veterans Guardian needs Dr. Villarosa to prepare the mental health forms included in the submissions to the Veterans Administration.

17

61.     Other individuals worked with Dr. Villarosa and also met remotely with veterans including Dr. Villarosa's wife Barbara Angello and their daughter. One of Dr. Villarosa's colleagues, Ross Whitmore, conducted veteran interviews and falsely held himself out to veterans as a psychologist. In truth, he was not a psychologist, nor did he have a background in diagnosing or treating mental health issues. During Relator's employment with Veteran's Guardian Whitmore left Dr. Villarosa's practice and went to work with Veteran's Guardian.

62.     Notably, the federal form for veterans seeking benefits for mental illness limits the categories of health care providers who can conduct an initial examination of a veteran for a mental disorder to licensed psychiatrists, doctorate level psychologists or mental health providers possessing a similar level of academic and clinical experience. Whitmore and other members of Dr. Villarosa's practice did not satisfy the federal requirements for conducting these examinations.

63.     Shortly after two individuals in the employ of Dr. Villarosa quit his practice, one of whom was Whitmore, Veterans Guardian instituted an internal program to prepare veterans for their remote session with the psychologist. Dr. Villarosa helped conceive of the idea of having Veterans Guardian prep veterans for the session.  Company employees Joanna Oakley, Ross Whitmore and Terry Mundy were assigned to the preparation team. They would direct the veteran to looked tired and shabby during the interview. Veterans were advised not to shave and to use a cane or a wheelchair if they had one. They were directed to use certain buzz words or phrases in the course of responding to questions such as "depressed," "sad," and "no motivation." They were also advised not to characterize their family history or dynamics as contributing to their depression or mental stress. This is because such comments would make it

more challenging to demonstrate that the veteran's psychological problems were due to his/her military service.

64.     The federal form which Dr. Villarosa's office would typically complete in connection with its examination of the patient is VA Form 21-0960P-2 "Mental Disorders (Other Than PTSD and Eating Disorders) Disability Benefits Questionnaire" ("the Mental Health Form") which is applicable when diagnosing and describing depressive disorder due to chronic pain syndrome with depressive features. The goal in completing the form was to establish that the veteran suffers from depression, that it is impacting his ability to function and that the depression was caused by injuries suffered during his/her military experience. A similar form, VA Form 21-0960P-3, was used in cases of PTSD.

65.     An assistant to Dr. Villarosa would auto-populate much of the information contained in the Mental Health Form. For instance, the diagnosis and diagnosis code would already be filled in. Section III of the Mental Health Form lists thirty-one different symptoms which the psychologist is called upon to checkmark if applicable. In the case of Veterans Guardian clients, the entire checklist was auto-populated with checkmarks and the exact same checkmarks were entered for every patient. Likewise, Section IV of the Mental Health Form, asking for all other symptoms attributable to their mental disorder, was auto-populated with the same additional symptoms for each Veterans Guardian client. Section VI of the Mental Health Form included a space to supply a "Medical Opinion" and a "Rationale For Medical Opinion." At the beginning of Relator's tenure, these fields were completed not by Dr. Villarosa, or one of his colleagues, but by Relator, or by another document control specialist after receiving notes from Dr. Villarosa or his secretary.

66.     The addendum to the Mental Health Form contained biographical information on the veteran and the results of a mental health exam. The addendum was auto-populated with general family background information, employment history and clinical observations. For each veteran Dr. Villarosa's office would then tweak the language to incorporate that veteran's particular place of birth, job history and the like.

67.     It was Dr. Villarosa who was primarily responsible for the disability level assigned to the veteran attributable to his/her psychological illness.  That level was always 50% or more. Upon information and belief, 50% was considered a "safe" minimum because the VA often assigned a 50% level and it was one which could be achievable even if the client's case was weak. Relator was never able to discern a rational relationship between the disability level assigned to the veteran and the veteran's symptomology. The Form was usually auto-signed by Dr. Villarosa and this occurred even when another individual had conducted the examination. An example of this is attached hereto as Exhibit 1.  This Mental Health Form was auto-signed by Dr. Dr. Villarosa even though Mr. Whitmore actually conducted the examination of the veteran. During Relator's tenure, Dr. Villarosa attended several in-person meetings at Veterans Guardian providing guidance to Veterans Guardian staff on how to complete application packets for submission to the VA.

68.     Dr. Villarosa's role in Veterans Guardian's fraudulent practices did not stop there. During Relator's tenure, a veteran's application for increased disability benefits was denied by the VA apparently because the Global Assessment of Function (GAF) score, a part of the veteran's application indicating his level of disability assigned by the physician, was too low and thus inconsistent with the remainder of the application. After this denial, Dr. Villarosa, Greenblatt, and Relator participated in a conference call in which they discussed how denials

20

based on GAF score inconsistency could be avoided in the future. Villarosa and Greenblatt decided that henceforth the GAF score on an application would no longer be made low enough to place the applicant in the "serious symptoms" category thus avoiding VA scrutiny. The strategy was to place the veteran in the moderate category of disability, regardless of the veteran's actual ability to function per the GAF scoring system.

**D.    Defendants Control The Content Of The VA Form 526EZ And Routinely Fabricate The Veteran's BDI Depression Score**

69.     The veteran's Form 526EZ was prepared by Relator or another document control specialist. In particular, the "Remarks" section of the Form was carefully completed to align with the psychologist's diagnosis and satisfactorily describe a "lifestyle impact" claim, often referred to in shorthand internally as an "LIC" claim. Essentially, this means the applicant is claiming that pre-existing service-related disabilities have caused him/her to become increasingly depressed and anxious.

70.     The Beck Depression Inventory (BDI) form is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression. BDI items are rated on a 4-point scale ranging from 0 to 3 based on the severity of each item. The maximum (worst) total score is 63. Veterans Guardian provided this form to each veteran being diagnosed with depression and instructed them to complete it on their own. However, when the veteran returned the completed form and the score was below 25 in the case of veterans diagnosed with depression, and 30, in the case of veterans diagnosed with PTSD, document control specialists, such as Relator, were instructed by Defendant Greenblatt and the Operations Manager, Mike Pierce, to increase the scores in order to get above that threshold. In Relator's experience, scores were changed well over 50% of the time. One score Company employees were *not* to change was that for suicidal thoughts (question #9 on the form). This is because an assertion that one is

21

experiencing suicidal thoughts can trigger an automatic 100% disability with respect to mental health and an expectation that the veterans' other answers on the form would be consistent with such an answer.

71.    Once the package was complete (including the Mental Health Form, the Form 526EZ, and the Beck Inventory Form) it was mailed to the veteran for their signature. Veterans sometimes complained about the fact that their BDI score had been increased. In response, the Company would return the BDI scores back to what the client had originally entered, get the approval of the veteran and when the Company received the approved and signed package from the veteran, the Company would raise the BDI numbers to the higher, fabricated numbers without disclosing this to the veteran.

72.    Sometimes veterans would voice complaints about misrepresentations which they saw in the application separate and apart from the BDI score. Some generally complained that the application inflated the extent of the veterans' depression or their limitations in functioning day to day. For instance, in or around May of 2019, one veteran, SL, refused to sign off on the application package because it contained "too many errors and untrue statements." Another veteran, WW, was very upset by his application because he feared it would threaten his security clearance and imperil his ability to obtain a gun permit.

73.    Employees were instructed by Fred Phillips and Terry Mundy on how to lift a signature from another document and apply it to the application. For instance, they typically utilized this method of forgery if a disability application was being appealed. The Company would scramble to file the appeal paperwork, attach the Mental Health Form, and transfer the client's signature from the original application to the appeal and then fax the package to the VA.

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 23 of 61

Both Mike Pierce and Terry Mundy directed Relator at some point to lift a veteran's signature and apply it to another document.

E.    **The Application For Disability Benefits Submitted By Defendants To The VA Makes No Mention Of Veterans Guardian Whatsoever**

74.    The Department of Veterans Affairs has implemented centralized mail processing for compensation claims, including disability claims. The Company sent each application package via eFax to that mail processing center in Janesville, Wisconsin. Nowhere on the fax coversheet or indeed anywhere in the entire application package was Veterans Guardian identified, much less the fact that it had overseen and exercised control over the preparation and contents of the application. In short, its entire role was concealed.

75.    A Compensation & Pension (C&P) examination is a medical examination of a veteran's disability, performed by a VA healthcare professional, or a VA contracted provider. The VA uses C&P exams to gather more evidence on a veteran's claimed condition before issuing a decision and assigning a rating. It was not uncommon for clients of Veterans Guardian to be contacted by the VA before a decision was made on their application in order to schedule a C&P exam. As was the case with the remote encounter with Dr. Villarosa's office, the Company's in-house team would carefully prep the veteran on what to say, how to look and how to act during the meeting with the VA health provider in order to achieve a favorable decision.

76.    In the event that the client still did not achieve a 100% Permanent and Total disability level once its application for an increased disability payment based on psychological issues was approved, Veteran's Guardian deploys yet another strategy for reaching the 100% Permanent and Total mark.  It tacks on another non-psychological diagnosis such as headaches or erectile dysfunction or any other physical complaint the client has described that Veterans Guardian will then claim is triggered by the client's psychological disability. For example, PTSD

can cause erectile dysfunction, gastroesophageal reflux disease and sleep apnea. Veterans Guardian then resubmits the application. There is no clinically based support for these supplemental diagnoses. No physician reviews the legitimacy of the complaint or its cause and no physician documentation is required. The Company simply informs the client of the addition and then submits the supplemental application. Internally, these claims are often referred to in shorthand as "General Medicine" claims, meaning that a medical condition of some sort has been added to the original application which identified a mental health disability. Such "Gen Med" claims are also utilized in the case of veteran clients who come to Veterans Guardian already having been diagnosed with a mental illness for which they are receiving VA benefits.

77. Additionally, Veterans Guardian exploits the VA appeals process. If a disability claim is denied, Veterans Guardian automatically appeals it. Significantly, the appeal is reviewed in another state from where the application was originally reviewed (and denied). In Relator's experience, appeals enjoy a success rate of close to 99%.

78. Defendants' efforts to increase its clients' disability benefits through deceit have been highly successful. Relator estimates that during her tenure at the Company at least 90% of clients achieved an increase in their disability benefits and many, over half, were assigned to the 100% Permanent and Total disability level. The Company closely monitored the status of its clients' applications. It had access to the clients' social security number and took advantage of this information to contact the VA to regularly inquire as to the status.

79. Two representative examples of Defendants' fraud are as follows.

80. **First,** veteran GM engaged Veterans Guardian when he received an initial disability rating of 50%.

81.     GM's daughter, SM, held power of attorney over GM and used Veterans Guardian's services to submit a Gen Med claim, as described in ¶ 76, to supplement GM's initial claim.

82.     Veterans Guardian's staff instructed GM's daughter to exaggerate and/or fabricate her father's conditions and symptoms in specific ways to maximize his disability rating.

83.     Veterans Guardian prepared GM's claim through the process detailed in this Complaint and presented it to the Government for payment.

84.     The Government, without knowledge of the falsity of the claim, reclassified GM to a 100% disability rating and increased his monthly benefit payment from roughly $1,000 to $3,000.

85.     **Second**, veteran MS came to Veterans Guardian after receiving an initial 60% disability rating.

86.     Veterans Guardian staff instructed MS to exaggerate his medical symptoms and conditions to fit Defendants' false diagnosis of pain-related depression.

87.     While MS expressed some concerns about these false statements and records, he allowed Veterans Guardian to submit his LIC claims, as referenced in ¶ 69.

88.     Veterans Guardian prepared MS's claim through the process detailed in this Complaint and presented it to the Government for payment.

89.     The Government, without knowledge of the falsity of the claim, reclassified MS to a 100% disability rating and increased his monthly benefit payment from roughly $1,300 to $3,000.

90.     These examples highlight Veterans Guardian's knowing and insidious scheme to coerce veterans into fabricating and exaggerating medical conditions to increase the amount of money the VA will pay the veteran, and consequently Veterans Guardian.

**F.     Relator Is Retaliated Against For Voicing Her Concerns Over The Company's Fraudulent Business Practices And Its Invalid Psychological Assessments**

91.     In May 2019, Relator was given a raise for good performance. Soon thereafter, Relator began to express her concern over the dishonest methods being employed by the Defendants to prepare applications for clients. She expressed her views to one co-worker who then reported Relator's views to William Taylor.  Allie Hill shared Relator's concerns and discussed them with Relator. In June, during a Company-wide meeting, Relator was called out for her disloyalty. An employee was also assigned to "watch" her documents. Also around this time Relator began refusing to forge signatures and questioning the validity of diagnoses. She researched and printed out peer-reviewed studies in psychology journals and used these to point out to William Taylor, Scott Greenblatt and others employed at the Company the diagnosis errors that Defendants were making according to the Diagnostic and Statistical Manual of Mental Disorders (DSM–5).  In response to her efforts to bring to light Veterans Guardian's problematic business practices, Relator perceived that she was treated as a pariah within the Company.

92.     In July 2019, Relator told Taylor she was tired of being harassed and that she was going to expose the Company as a fraud. He promptly fired her. Her last day of work was August 2, 2019.

93.     On or about August 13, 2019, Relator submitted a formal complaint to the U.S. Department of Veterans Affairs Office of Inspector General ("OIG") notifying the OIG that she believed the Defendants were engaged in fraudulent activity with respect to the submission of applications for veterans' disability benefits. This claim was subsequently assigned claim

number 2019-28400 by the OIG. Relator has supplied the OIG with additional information relevant to her complaint on at least two occasions.

94.     Throughout the relevant time period and through the present, Defendants have submitted applications for veterans' disability benefits which are materially false and fraudulent in at least the following respects:

      a.   Defendants, who were not accredited under 38 C.F.R. 14.629, have unlawfully presided over the preparation, presentation, and content of the application for disability benefits in violation of 38 C.F.R. 14.627(a);

      b.   Intake personnel assigned each veteran a diagnosis of a mental health illness, generally depression, within minutes of speaking with the veteran on the phone and this initial "diagnosis" determined the trajectory of the entire process of preparing the veteran's disability application package;

      c.   As detailed in paragraph 70 herein, Defendants falsely inflated the veteran's BDI depression score in order to increase the likelihood that his/her claim for disability would be approved and at the highest percentage level;

      d.   Dr. Villarosa was not independent from Veterans Guardian and thus his clinical judgment was materially impaired. When clients paid the initial $295 fee, that fee went directly to Dr. Villarosa who was incentivized to find a mental illness. In addition, it functioned as a pool of money that Veterans Guardian, Greenblatt and Taylor directed to Villarosa to induce him prepare fraudulent mental health forms which were then used by Veterans Guardian, Greenblatt and Taylor to arrange for veterans to receive federal assistance for physical and mental disabilities to which they were not entitled. Making matters worse,  Veterans Guardian  keeps five

months of any federal disability increase to which a veteran became entitled as a consequence of the fraudulent application for veteran's benefits that the defendants jointly prepared.

e.  Dr. Villarosa and others in his office who conducted psychological examinations of veteran clients did not exercise clinical judgment when rendering psychological assessments as evidenced by at least the following facts: (1) Using an irrational, binary decision-making process, virtually every client was diagnosed with either depression or PTSD; (2) The veteran client's disability was always assigned a level of 50% or higher; and (3) Dr. Villarosa and his colleagues auto-populated the Mental Health Form with the same symptoms of depression among the 31 listed for each veteran client and with the same additional symptoms as well;

f.  Defendants Veterans Guardian, Greenblatt, and Taylor provided Dr. Villarosa with what functioned as valuable kickbacks and bribes in return for bogus Mental Health Forms and other false documentation that was presented to the VA. These kickbacks and bribes were the steady stream of tens of thousands of mental health examination referrals they directed his way and the $295 per referral which accompanied each one.

g.  Defendants added supplemental diagnoses such as headaches and erectile dysfunction to applications with no clinical basis for doing so solely to increase the client's disability level;

h.  Defendants deceived clients into signing the application and then inflated their BDI depression score without disclosing this change to them;

28

i. Defendants concealed from the Veterans Administration their pivotal role in determining the content of the disability application package; and

j. individuals conducting psychological exams of veteran clients were not qualified by law to do so.

## G. Veterans Guardian Improperly Applied For And Received A Loan Under The Small Business Administration's Payroll Protection Program.

95. Veterans Guardian has a regular relationship with First Bank, a North Carolina community bank with corporate headquarters in Southern Pines, N.C. As part of that relationship, Veterans Guardian regularly has lines of credit and/ or loans from First Bank. As is alleged more fully above, Veterans Guardian is an economically successful business, with regular recurring income related to the increased payments it obtains for its clients.

96. Throughout the Covid-19 pandemic, Veterans Guardian has a regular source of income, as it regularly processes disability applications and receives payments, over time, related to applicants for whom it has successfully increased their disability payments. Veterans Guardian does not require its clients to appear in its offices in order to process their applications. Veterans Guardian's clients are located throughout the United States, and the company has, for its entire existence, relied upon the phone, mail service and the internet to communicate with its current and potential clients. Veterans Guardian employees contact potential clients by phone and communicate with clients via phone and the company's website. See, ¶¶ 51 through 58, supra. Veterans Guardian employees also have a computer link that enables them to communicate directly with Dr. Villarosa's office for any patient needs.

97. During the entire time during which Relator was employed at Veteran's Guardian Dr. Villarosa has seen patients remotely. Dr. Villarosa's unlawful relationship with the other defendants is continuing and it is far more likely than not that he continues to see Veterans

Guardian clients remotely because a virtual encounter means less of an investment of time for the client and especially because of the Covid 19 pandemic.

98.     Veterans Guardian applied for a PPP loan, and on April 15, 2020, was approved for a loan in the amount of $485,300 through First Bank.  Veterans Guardian had no economic need for a PPP loan, as it was a continually functioning business throughout the pandemic.  The then-current economic conditions were not uncertain for Veterans Guardian.  With a steady stream of income and regular relationship with First Bank, Veterans Guardian had other sources of liquidity. Indeed, in a recent Facebook video defendant Taylor states that Veterans Guardian is growing steadily, as it now has 150 employees and works with over 1000 veterans per month. See, https://fb.watch/2PeYOPGcg9/.

99.   Veterans Guardian's certification on its PPP loan was false.  The actions of Defendants have undermined the government's response to the Covid 19 pandemic and have defrauded the United States into guaranteeing a $485,300 loan to which Veterans Guardian was not entitled. And in any event, the PPP program was not designed to provide loans backed by the federal Government to business enterprises whose business model is grounded in defrauding the federal Government.

## VII. COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

100.     Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

101.     By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

102.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

103.     Relator re-alleges and incorporates each allegation in paragraphs 1 through 99 as if fully set forth herein and further alleges as follows:

104.     By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

105.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

106.     Relator re-alleges and incorporates each allegation in paragraphs 1 through 99 as if fully set forth herein and further alleges as follows:

107.     By virtue of the facts described above, the Defendants have "conspire[d] to commit a violation of subparagraph[s] (A), (B), …or (G)," in violation   of 31 U.S.C.  § 3729(a)(1)(C)

108.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count IV**
**Federal False Claims Act**
**31 U.S.C. § 3730(h)**
**(As to Defendants Veterans Guardian, Scott Greenblatt, and William Taylor)**

109.     Plaintiff Carico re-alleges and incorporates each allegation in paragraphs 1 through 99 as if fully set forth herein and further alleges as follows:

110.     As a result of the complaints alleged above, Plaintiff Carico engaged in 'protected activities' by acting in furtherance of an action under the False Claims Act.

111.     Defendants were Plaintiff Carico's employer and knew of the protected activities she took in furtherance of an action under the False Claims Act.

112.     Defendants took adverse actions against Plaintiff Carico, and Defendants' unlawful retaliation would not have occurred in the absence of the wrongful action or actions of the Defendants.

113.     As a result of the Defendants' actions, Plaintiff Carico was discharged, threatened, harassed, and discriminated against in the terms and conditions of her employment because of lawful acts she undertook.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relator demands that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the United States plus civil penalties of no more than $27,894 and no less than $13,946 for each violation after November 2, 2015, and any other recoveries or relief provided for under the FCA.

Further, Relator requests that she receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

Further, Relator requests that she receive all damages necessary to make her whole stemming from the unlawful retaliation perpetrated against her, including reinstatement with the same seniority status that she would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including but not limited to emotional distress and pain and suffering, and including litigation costs and reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED: September 9, 2024          Respectfully submitted,

/s/ John L. Warren III
John L. Warren III (*Special Appearance*)
LAW OFFICE OF BILL NETTLES
2008 Lincoln Street
Columbia, South Carolina 29201
Telephone: (803) 814-2826
jw@billnettleslaw.com

*Counsel for Relator Leslie Carico*

I have reviewed and approve:          /s/ Gary W. Jackson
Gary W. Jackson (NC Bar No. 13976)
LAW OFFICES OF JAMES SCOTT FARRIN

33

280 South Mangum Street, Suite 400
Durham, North Carolina 27703
Telephone: (919) 688-4991
gjackson@farrin.com

*LR 83.1(d) Counsel for Relator Leslie Carico*

Jay J. Chaudhuri (NC Bar No. 27747)
COHEN MILSTEIN SELLERS & TOLL PLLC
407 North Person Street
Raleigh, NC 27601
(919) 890-0560
jchaudhuri@cohenmilstein.com

Jeanne A. Markey
Gary L. Azorsky
Raymond M. Sarola
Casey Preston
Adnan Toric
COHEN MILSTEIN SELLERS & TOLL PLLC
100-120 N. 18th Street, Suite 1820
Philadelphia, PA 19103
(267) 479-5700
jmarkey@cohenmilstein.com
gazorsky@cohenmilstein.com
rsarola@cohenmilstein.com
cpreston@cohenmilstein.com
atoric@cohenmilstein.com

William N. Nettles
Frances C. Trapp
LAW OFFICE OF BILL NETTLES
2008 Lincoln Street
Columbia, SC 29201
(803) 814-2826
bill@billnettleslaw.com
fran@billnettleslaw.com

*Counsel for Relator Leslie Carico*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ John L. Warren III
John L. Warren III (*Special Appearance*)
LAW OFFICE OF BILL NETTLES
2008 Lincoln Street
Columbia, South Carolina 29201
Telephone: (803) 814-2826
jw@billnettleslaw.com

*Counsel for Relator Leslie Carico*

**USE THIS COVER SHEET TO SEND CLAIM MATERIALS TO THE VA CLAIMS INTAKE CENTER**
**\*\*\* EFFECTIVE JANUARY 2017 – PLEASE DO NOT USE PREVIOUS VERSIONS\*\*\***



# Centralized Intake Coversheet

To: Department of Veterans Affairs Claims Intake Center
PO BOX 4444, Janesville, WI 53547-4444
Fax: 844-531-7818

- **Claimant Last Name:** ▓▓▓▓▓
- **Claimant First Name:** ▓▓▓▓
- **Claimant C-File #:** ▓▓▓▓▓
- **Claimant Zip Code:** ▓▓▓
- **VSO Contact Email:** Veteran's Email: ▓▓▓▓▓▓▓
- **Fax Date (MM/DD/YYYY – if applicable): #** _____
- **of Pages to Include Coversheet:** 25 _____
- **Emergent Claim Categories (if applicable)**

☐ "TERM" Terminally ill claimants

☐ "SERW" Veterans seriously injured in service but not in receipt of benefits

☐ "FINH" Claimants suffering from extreme financial hardship

☐ "FPOW" Former prisoners of war and their survivors

☐ "HOME" Homeless Veterans

☐ "SUIC" Suicidal claimants

☐ "ALS" Diagnose with Amyotrophic Lateral Sclerosis (ALS) or Lou Gehrig's Disease

☐ "AGE" Greater than 85 years of age

☐ "HONR" Awarded the Medal of Honor

☐ Visually Impaired Veteran

- **List Forms Included:**

☐ 00381 VA 21-0781 Statement in Support of Claim for Service Connection for Post-Traumatic Stress Disorder (PTSD)

☐ 00295 VA 21-22 Appointment of Veterans Serv. Org.

☐ 00111 VA 21-2680 Request for Aid and Attendance / Housebound Status

☑ 00115 VA 21-4138 Statement In Support of Claim

☐ 00386 VA 21-4140-1 Employment Questionnaire

☐ 00131 VA 21-526 Veterans Application for Compensation

☐ 00532 VA 21-526b, Veteran Supplemental Claim

☑ 00533 VA 21-526EZ, Fully Developed Claim (Compensation)

☐ 00142 VA 21-674 Request for Approval of School Attendance

☐ 00148 VA 21-686c Declaration of Status of Dependents

☐ 00158 VA 21-8940 Veteran's Application for Increased Compensation Based of Unemployability

☐ 00173 VA 572 Request for Change of Address / Cancellation

☐ 00420 DD 214 Certified Original - Certificate of Release

☐ 00025 Birth Certificate

☐ 00091 Divorce Decree

☐ 00061 Marriage Certificate / License

☐ Other:  **Phone:** ▓▓▓▓▓

**IMPORTANT: Verify on Fax Confirmation Sheet the Claims Evidence is sent to**
▓▓▓▓▓▓

*Disclaimer: VA Directive 6609, "Mailing of Sensitive Personal Information," dated May 20, 2011 states that access to Veterans' records is limited to authorized persons only. Information may not be disclosed from this file unless permitted by all applicable legal authorities, enforced by 38 C.F.R. §§ 1.460 – 1.599 and 45 C.F.R. Parts 160 and 164. The Privacy Act contains provisions for criminal penalties for knowingly and willfully disclosing information from the Veterans' file unless properly authorized to do so.*

**PLAINTIFF'S EXHIBIT**
**1**

OMB Control No. 2900-0075
Respondent Burden: 15 minutes
Expiration Date: 12/31/2020

## Department of Veterans Affairs

| | VA DATE STAMP (DO NOT WRITE IN THIS SPACE) |
|---|---|

# STATEMENT IN SUPPORT OF CLAIM

**INSTRUCTIONS:** Read the Privacy Act and Respondent Burden on Page 2 before completing the form. Complete as much of Section I as possible. The information requested will help process your claim for benefits. If you need any additional room, use the second page.

### SECTION I: VETERAN/BENEFICIARY'S IDENTIFICATION INFORMATION

**NOTE:** You will *either* complete the form online or by hand. Please print the information request in ink, neatly, and legibly to help process the form.

1. VETERAN/BENEFICIARY'S NAME *(First, Middle Initial, Last)*

2. VETERAN'S SOCIAL SECURITY NUMBER

3. VA FILE NUMBER *(If applicable)*

4. VETERAN'S DATE OF BIRTH *(MM/DD/YYYY)*
   Month     Day     Year

5. VETERAN'S SERVICE NUMBER *(If applicable)*

6. TELEPHONE NUMBER *(Include Area Code)*

7. E-MAIL ADDRESS *(Optional)*

8. MAILING ADDRESS *(Number and street or rural route, P.O. Box, City, State, ZIP Code and Country)*

No. & Street

Apt./Unit Number          City

State/Province **N C**   Country **U S**   ZIP Code/Postal Code

### SECTION II: REMARKS

*(The following statement is made in connection with a claim for benefits in the case of the above-named veteran/beneficiary.)*

1) Mental Health Condition: Depressive Disorder D/T Chronic Pain Syndrome With Depressive Features Secondary to Service Connected:

    a) Ankylosis with left foot instability, status post left 2nd toe fracture and arthroplasty claimed as limitation of motion
    b) Status post left foot bunionectomy with residual hallux valgus
    c) Residual left foot scars, paresthesia or plantar nerve of heel (bone donor site) and scars of 1st and 2nd toes
    d) Degenerative joint disease, right 1st and left 2nd metatarsophalangeal joints

2) I have enclosed the following as evidence in support of the above claim: (If you do not have the items listed below PLEASE CONTACT ME to replace the missing item prior to deciding my claim.)

    1) VA FORM 21-4138 (2 Pages)
    2) VA FORM 21-526EZ (4 Pages)
    3) VA FORM 21-0960P-2 + Addendum (7 Pages)
    4) Beck's Depression Inventory (3 Pages)
    5) McGill Pain Questionnaire (1 Page)
    6) VHA Pain Primer Information (6 Pages)
    7) DD214 (1 Page)

************** TOTAL PAGES: 24 PAGES *****************

Case 1:20-cv-00784-WO-LPA     Document 61-1     Filed 09/09/24     Page 38 of 61

## SECTION II: REMARKS *(Continued)*
*(The following statement is made in connection with a claim for benefits in the case of the above-named veteran/beneficiary.)*

## SECTION III: DECLARATION OF INTENT

**I CERTIFY THAT** the statements on this form are true and correct to the best of my knowledge and belief.

| 9. SIGNATURE *(Sign in ink)* | 10. DATE SIGNED *(MM/DD/YYYY)* |
|---|---|

**PENALTY**: The law provides severe penalties which include fine or imprisonment, or both, for the willful submission of any statement or evidence of a material fact, knowing it to be false.

**PRIVACY ACT INFORMATION**: The VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA Programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58VA21/22/28, Compensation, Pension, Education, and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. Your obligation to respond is required to obtain or retain benefits. VA uses your SSN to identify your claim file. Providing your SSN will help ensure that your records are properly associated with your claim file. Giving us your SSN account information is voluntary. Refusal to provide your SSN by itself will not result in the denial of benefits. The VA will not deny an individual benefits for refusing to provide his or her SSN unless the disclosure of the SSN is required by Federal Statute of law in effect prior to January 1, 1975, and still in effect. The requested information is considered relevant and necessary to determine maximum benefits under the law. The responses you submit are considered confidential (38 U.S.C. 5701). Information submitted is subject to verification through computer matching programs with other agencies.

**RESPONDENT BURDEN**: We need this information to obtain evidence in support of your claim for benefits (38 U.S.C. 501(a) and (b)). Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 15 minutes to review the instructions, find the information, and complete this form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at **www.reginfo.gov/public/do/PRAMain**. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 39 of 61

OMB Control No. 2900-0747
Respondent Burden: 25 minutes
Expiration Date: 11/30/2017

**Department of Veterans Affairs**

# APPLICATION FOR DISABILITY COMPENSATION AND RELATED COMPENSATION BENEFITS

**VA DATE STAMP
(DO NOT WRITE IN THIS SPACE)**

IMPORTANT: Please read the Privacy Act and Respondent Burden on page 10 before completing the form.

## SECTION I: IDENTIFICATION AND CLAIM INFORMATION

**1. VETERAN/SERVICE MEMBER NAME** *(First, Middle Initial, Last)*

**2. VETERAN'S SOCIAL SECURITY NUMBER**

**3. HAVE YOU EVER FILED A CLAIM WITH VA?**
[X] YES    [ ] NO    *(If "Yes," provide your file number in Item 4)*

**4. VA FILE NUMBER**

**5. DATE OF BIRTH (MM,DD,YYYY)**
Month    Day    Year

**6. SEX**
[X] MALE    [ ] FEMALE

**7. VETERAN'S SERVICE NUMBER** *(If applicable)*

**8A. ARE YOU CURRENTLY HOMELESS OR AT RISK OF BECOMING HOMELESS?**
[ ] YES    [X] NO    *(If "Yes," complete Items 8B & 8C)*

**8B. POINT OF CONTACT** *(Name of person that VA can contact in order to get in touch with you)*

**8C. POINT OF CONTACT TELEPHONE NUMBER** *(Include Area Code)*

**9A. SERVICE** *(Check all that apply)*
[X] ARMY    [ ] NAVY    [ ] MARINE CORPS    [ ] AIR FORCE    [ ] COAST GUARD

**9B. COMPONENT** *(Check all that apply)*
[X] ACTIVE    [ ] RESERVES    [ ] NATIONAL GUARD

**10A. CURRENT MAILING ADDRESS** *(Number and street or rural route, P.O. Box, City, State, ZIP Code and Country)*

No. & Street

Apt./Unit Number      City

State/Province **N C**    Country **U S**    ZIP Code/Postal Code

**10B. FORWARDING ADDRESS AND EFFECTIVE DATE** *(Provide the date you will be living at this address)*

No. & Street

Apt./Unit Number      City

State/Province    Country    ZIP Code/Postal Code

**EFFECTIVE DATE:**
Month    Day    Year

**11. PREFERRED TELEPHONE NUMBER**

**12A. PREFERRED E-MAIL ADDRESS** *(If applicable)*

**12B. ALTERNATE E-MAIL ADDRESS** *(If applicable)*

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 40 of 61

VETERANS SOCIAL SECURITY NO.

13. LIST THE DISABILITY(IES) YOU ARE CLAIMING *(If applicable, identify whether a disability is due to a service-connected disability, is due to confinement as a Prisoner of War, is due to exposure to Agent Orange, Asbestos, Mustard Gas, Ionizing Radiation, or Gulf War Environmental Hazards, or is related to benefits under 38 U.S.C. 1151).*

Please list your contentions below. See the following examples, for more information:
- Example 1: Hearing loss
- Example 2: Diabetes-Agent Orange (exposed 12/72, Da Nang)
- Example 3: Left knee – secondary to right knee

| | DISABILITIES |
|---|---|
| 1. | **Depressive Disorder Due to Chronic Pain Syndrome With Depressive Features Secondary To the Following Service Connected Disabilities:** |
| 2. | **- Ankylosis with left foot instability, status post left 2nd toe fracture and arthroplasty claimed as limitation of motion** |
| 3. | **- Status post left foot bunionectomy with residual hallux valgus** |
| 4. | **-Residual left foot scars, paresthesia or plantar nerve of heel (bone donor site) and scars of 1st and 2nd toes** |
| 5. | **- Degenerative joint disease, right 1st and left 2nd metatarsophalangeal joints** |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | |
| 12. | |
| 13. | |
| 14. | |
| 15. | |
| 16. | |
| 17. | |
| 18. | |
| 19. | |
| 20. | |

14. LIST VA MEDICAL CENTER(S) (VAMC) AND DEPARTMENT OF DEFENSE (DOD) MILITARY TREATMENT FACILITIES (MTF) WHERE YOU RECEIVED TREATMENT AFTER DISCHARGE FOR YOUR CLAIMED DISABILITY(IES) AND PROVIDE TREATMENT DATES:

| A. NAME AND LOCATION | B. DATE(S) OF TREATMENT |
|---|---|
| | |
| | |
| | |
| | |

VA FORM 21-526EZ, FEB 2016

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 41 of 61

**NOTE:** IF YOU WISH TO CLAIM ANY OF THE FOLLOWING, COMPLETE AND ATTACH THE REQUIRED FORM(S) AS STATED BELOW (VA forms are available at www.va.gov/vaforms).

| For: | Required Form(s): |
|---|---|
| Dependents | VA Form 21-686c and, if claiming a child aged 18-23 years and in school, VA Form 21-674 |
| Individual Unemployability | VA Form 21-8940 and 21-4192 |
| Post-Traumatic Stress Disorder | VA Form 21-0781 and 21-0781a |
| Specially Adapted Housing or Special Home Adaptation | VA Form 26-4555 |
| Auto Allowance | VA Form 21-4502 |
| Veteran/Spouse Aid and Attendance benefits | VA Form 21-2680 or, if based on nursing home attendance, VA Form 21-0779 |

## SECTION II: SERVICE INFORMATION

**15A. DID YOU SERVE UNDER ANOTHER NAME?**
☐ YES  *(If "Yes," complete Item 15B)*  ☒ NO  *(If "No," skip to Item 16A)*

**15B. PLEASE LIST THE OTHER NAME(S) YOU SERVED UNDER:**

**16A. MOST RECENT ACTIVE SERVICE ENTRY DATE (MM,DD,YYYY)**

| Month | Day | Year |
|---|---|---|
| 0 3 | 2 2 | 2 0 0 1 |

**16B. RELEASE DATE OR ANTICIPATED DATE OF RELEASE FROM ACTIVE SERVICE (MM,DD,YYYY)**

| Month | Day | Year |
|---|---|---|
| 0 7 | 0 7 | 2 0 0 9 |

**16C. DID YOU SERVE IN A COMBAT ZONE SINCE 9-11-2001?**
☒ YES  ☐ NO

**16D. PLACE OF LAST OR ANTICIPATED SEPARATION**
**FORT BRAGG, NC**

**17A. ARE YOU CURRENTLY SERVING OR HAVE YOU EVER SERVED IN THE RESERVES OR NATIONAL GUARD?**
☐ YES  ☒ NO  *(If "Yes," complete Items 17B thru 17F)*
*(If "No," skip to Item 18A)*

**17B. COMPONENT**
☐ NATIONAL GUARD
☐ RESERVES

**17C. OBLIGATION TERM OF SERVICE**

| | Month | Day | Year |
|---|---|---|---|
| From: | | | |
| To: | | | |

**17D. CURRENT OR LAST ASSIGNED NAME AND ADDRESS OF UNIT:**

**17E. CURRENT OR ASSIGNED PHONE NUMBER OF UNIT** *(Include Area Code)*
(          )

**17F. ARE YOU CURRENTLY RECEIVING INACTIVE DUTY TRAINING PAY?**
☐ YES  ☐ NO

**18A. ARE YOU CURRENTLY ACTIVATED ON FEDERAL ORDERS WITHIN THE NATIONAL GUARD OR RESERVES?**
☐ YES  ☒ NO
*(If "Yes," complete Items 18B & 18C)*

**18B. DATE OF ACTIVATION: (MM,DD,YYYY)**

| Month | Day | Year |
|---|---|---|
| | | |

**18C. ANTICIPATED SEPARATION DATE: (MM,DD,YYYY)**

| Month | Day | Year |
|---|---|---|
| | | |

**19A. HAVE YOU EVER BEEN A PRISONER OF WAR?**
☐ YES  ☒ NO
*(If "Yes," complete Item 19B)*

**19B. DATES OF CONFINEMENT (MM,DD,YYYY)**

| From: | | | To: | | |
|---|---|---|---|---|---|
| Month | Day | Year | Month | Day | Year |
| | | | | | |

## SECTION III: SERVICE PAY

**20A. DID/DO YOU RECEIVE ANY TYPE OF SEPARATION/SEVERANCE/RETIRED PAY?**
☒ YES  ☐ NO  *(If "Yes," complete Items 20B and 20C)*

**20B. LIST AMOUNT** *(If known)*
$ 72,204.00

**20C. LIST TYPE** *(If known)*
DISABILITY

**IMPORTANT:** Submission of this application constitutes an election of VA compensation in lieu of military retired pay if it is determined you are entitled to both benefits. If you are entitled to receive military retired pay, your retired pay may be reduced by the amount of any VA compensation that you are awarded. VA will notify the Military Retired Pay Center of all benefit changes. Receipt of military retired pay or Voluntary Separation Incentive (VSI) and VA compensation at the same time may result in an overpayment, which may be subject to collection. However, if you *do not* want to receive VA compensation in lieu of military retired pay, you should check the box in Item 21. Please note that if you check the box in Item 21, you *will not* receive VA compensation, if granted.

☐ **21. I want military retired pay instead of VA compensation**

**IMPORTANT:** You may elect to keep the training pay for inactive duty training days you received from the military service department. However, to be legally entitled to keep your training pay, you must waive VA benefits for the number of days equal to the number of days for which you received training pay. In most instances, it will be to your advantage to waive your VA benefits and keep your training pay.

If you waive VA benefits to receive training pay by checking the box in Item 22, VA will adjust your VA award to withhold future benefits equal to the total number of inactive duty for training days waived and at the monthly rate in effect for the fiscal year period for which you received training pay. Your normal VA rate will be restored when the sufficient numbers of days' benefits have been withheld.

☐ **22. I elect to waive VA benefits for the days I accrued inactive duty training pay in order to retain my inactive duty training pay.**

## SECTION IV: DIRECT DEPOSIT INFORMATION

The Department of Treasury requires all Federal benefit payments be made by electronic funds transfer (EFT), also called direct deposit. Please attach a voided personal check or deposit slip or provide the information requested below in Items 23, 24 and 25 to enroll in direct deposit. If you do not have a bank account, you must receive your payment through Direct Express Debit MasterCard. To request a Direct Express Debit MasterCard you must apply at www.usdirectexpress.com or by telephone at 1-800-333-1795. If you elect not to enroll, you must contact representatives handling waiver requests for the Department of Treasury at 1-888-224-2950. They will encourage your participation in EFT and address any questions or concerns you may have.

23. ACCOUNT NUMBER *(Check the appropriate box and provide the account number, or simply write "Established" if you have a direct deposit with VA)*

[X] CHECKING     [ ] SAVINGS     [ ] I CERTIFY THAT I DO NOT HAVE AN ACCOUNT WITH A FINANCIAL INSTITUTION OR CERTIFIED PAYMENT AGENT

Account No.: **ESTABLISHED**     Account No.:

| 24. NAME OF FINANCIAL INSTITUTION *(Please provide the name of the bank where you want your direct deposit)* | 25. ROUTING OR TRANSIT NUMBER *(The first nine numbers located at the bottom left of your check)* |
|---|---|
| **ESTABLISHED** | **ESTABLISHED** |

## SECTION V: CLAIM CERTIFICATION AND SIGNATURE

I certify and authorize the release of information. I certify that the statements in this document are true and complete to the best of my knowledge. I authorize any person or entity, including but not limited to any organization, service provider, employer, or government agency, to give the Department of Veterans Affairs any information about me, and I waive any privilege which makes the information confidential.

I certify I have received the notice attached to this application titled, *Notice to Veteran/Service Member of Evidence Necessary to Substantiate a Claim for Veterans Disability Compensation and Related Compensation Benefits.*

I certify I have enclosed all the information or evidence that will support my claim, to include an identification of relevant records available at a Federal facility such as a VA medical center; OR, I have no information or evidence to give VA to support my claim; OR, I have checked the box in Item 26, indicating that I do not want my claim considered for rapid processing in the Fully Developed Claim (FDC) Program because I plan to submit further evidence in support of my claim.

ALTERNATE SIGNER: By signing on behalf of the claimant, I certify that I am a court-appointed representative; OR, an attorney in fact or agent authorized to act on behalf of a claimant under a durable power of attorney; OR, a person who is responsible for the care of the claimant, to include but not limited to a spouse or other relative; OR, a manager or principal officer acting on behalf of an institution which is responsible for the care of an individual; AND, that the claimant is under the age of 18; OR, is mentally incompetent to provide substantially accurate information needed to complete the form, or to certify that the statements made on the form are true and complete; OR, is physically unable to sign this form.

I understand that I may be asked to confirm the truthfulness of the answers to the best of my knowledge under penalty of perjury. I also understand that VA may request further documentation or evidence to verify or confirm my authorization to sign or complete an application on behalf of the claimant if necessary. Examples of evidence which VA may request include: Social Security Number (SSN) or Taxpayer Identification Number (TIN); a certificate or order from a court with competent jurisdiction showing your authority to act for the claimant with a judge's signature and date/time stamp; copy of documentation showing appointment of fiduciary; durable power of attorney showing the name and signature of the claimant and your authority as attorney in fact or agent; health care power of attorney, affidavit or notarized statement from an institution or person responsible for the care of the claimant indicating the capacity or responsibility of care provided; or any other documentation showing such authorization.

26. The FDC Program is designed to rapidly process compensation or pension claims received with the evidence necessary to decide the claim. VA will automatically consider a claim submitted on this form for rapid processing under the FDC Program. Check the box below ONLY if you DO NOT want your claim considered for rapid processing under the FDC Program because you plan on submitting further evidence in support of your claim.

[ ] I DO NOT want my claim considered for rapid processing under the FDC Program because I plan to submit further evidence in support of my claim.

| 27A. VETERAN/SERVICE MEMBER/ALTERNATE SIGNER SIGNATURE (REQUIRED) | 27B. DATE SIGNED |
|---|---|
| | |

## SECTION VI: WITNESSES TO SIGNATURE

| 28A. SIGNATURE OF WITNESS *(If veteran signed above using an "X")* | 28B. PRINTED NAME AND ADDRESS OF WITNESS |
|---|---|
| | |
| 29A. SIGNATURE OF WITNESS *(If veteran signed above using an "X")* | 29B. PRINTED NAME AND ADDRESS OF WITNESS |
| | |

## SECTION VII: POWER OF ATTORNEY (POA) SIGNATURE

I certify that the claimant has authorized the undersigned representative to file this supplemental claim on behalf of the claimant and that the claimant is aware and accepts the information provided in this document. I certify that the claimant has authorized the undersigned representative to state that the claimant certifies the truth and completion of the information contained in this document to the best of claimant's knowledge.

NOTE: A POA's signature *will not* be accepted unless at the time of submission of this claim a valid VA Form 21-22, *Appointment of Veterans Service Organization as Claimant's Representative*, or VA Form 21-22a, *Appointment of Individual As Claimant's Representative*, indicating the appropriate POA is of record with VA.

| 30A. POA/AUTHORIZED REPRESENTATIVE SIGNATURE | 30B. DATE SIGNED |
|---|---|
| | |

PRIVACY ACT NOTICE: The form will be used to determine allowance to compensation benefits (38 U.S.C. 5101). The responses you submit are considered confidential (38 U.S.C. 5701). VA may disclose the information that you provide, including Social Security numbers, outside VA if the disclosure is authorized under the Privacy Act, including the routine uses identified in the VA system of records, 58VA21/22/28, Compensation, Pension, Education, and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. The requested information is considered relevant and necessary to determine maximum benefits under the law. Information submitted is subject to verification through computer matching programs with other agencies. VA may make a "routine use" disclosure for civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration. Your obligation to respond is required in order to obtain or retain benefits. Information that you furnish may be utilized in computer matching programs with other Federal or State agencies for the purpose of determining your eligibility to receive VA benefits, as well as to collect any amount owed to the United States by virtue of your participation in any benefit program administered by the Department of Veterans Affairs. Social Security information: You are required to provide the Social Security number requested under 38 U.S.C. 5101(c)(1). VA may disclose Social Security numbers as authorized under the Privacy Act, and specifically may disclose them for purposes stated above.

RESPONDENT BURDEN: We need this information to determine your eligibility for compensation. Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 25 minutes to review the instructions, find the information, and complete this form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at www.reginfo.gov/public/do/PRAMain. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

VA FORM 21-526EZ, FEB 2016

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 43 of 61

OMB Approved No. 2900-0779
Respondent Burden: 30 Minutes
Expiration Date: 05/31/2021

**Department of Veterans Affairs** | **MENTAL DISORDERS (OTHER THAN PTSD AND EATING DISORDERS) DISABILITY BENEFITS QUESTIONNAIRE**

**IMPORTANT** - THE DEPARTMENT OF VETERANS AFFAIRS (VA) *WILL NOT PAY* OR *REIMBURSE* ANY EXPENSES OR COST INCURRED IN THE PROCESS OF COMPLETING AND/OR SUBMITTING THIS FORM. PLEASE READ THE PRIVACY ACT AND RESPONDENT BURDEN INFORMATION BEFORE COMPLETING FORM.

NAME OF PATIENT/VETERAN

PATIENT/VETERAN'S SOCIAL SECURITY NUMBER

**PSYCHIATRIST/PSYCHOLOGIST/EXAMINER** - Your patient is applying to the U. S. Department of Veterans Affairs (VA) for disability benefits. VA will consider the information you provide on this questionnaire as part of their evaluation in processing the veteran's claim. Please note that this questionnaire is for disability evaluation, not for treatment purposes. VA reserves the right to confirm the authenticity of ALL DBQs completed by private health care providers.

NOTE: If the veteran experiences a mental health emergency during the interview, please terminate the interview and obtain help, using local resources as appropriate. You may also contact the Veterans Crisis Line at 1-800-273-TALK (8255). Stay on the Crisis Line until help can link the veteran to emergency care.

NOTE: In order to conduct an INITIAL examination for mental disorders, the examiner must meet one of the following criteria: a board-certified or board-eligible psychiatrist; a licensed doctorate-level psychologist; a doctorate-level mental health provider under the close supervision of a board-certified or board-eligible psychiatrist or licensed doctorate-level psychologist; a psychiatry resident under close supervision of a board-certified or board-eligible psychiatrist or licensed doctorate-level psychologist; or a clinical or counseling psychologist completing a one-year internship or residency (for purposes of a doctorate-level degree) under close supervision of a board-certified or board-eligible psychiatrist or licensed doctorate-level psychologist. In order to conduct a REVIEW examination for mental disorders, the examiner must meet one of the criteria from above, OR be a licensed clinical social worker (LCSW), a nurse practitioner, a clinical nurse specialist, or a physician assistant, under close supervision of a board-certified or board-eligible psychiatrist or licensed doctorate-level psychologist. This Questionnaire is to be completed for both initial and review mental disorder(s) claims.

### SECTION I: DIAGNOSIS

1A. DOES THE VETERAN NOW HAVE OR HAS HE OR SHE EVER BEEN DIAGNOSED WITH A MENTAL DISORDER(S)?

[X] YES [ ] NO

NOTE: If the veteran has a diagnosis of an eating disorder, complete VA Form 21-0960P-1, Eating Disorders Disability Benefits Questionnaire, in lieu of this questionnaire.
NOTE: If the veteran has a diagnosis of PTSD, VA Form 21-0960P-4, Initial PTSD Disability Benefits Questionnaire, must be completed by a VHA staff or contract examiner in lieu of this questionnaire.

If the veteran currently has one or more mental disorders that conform to DSM-IV criteria, provide all diagnoses:

DIAGNOSIS #1 DEPRESSIVE DISORDER DUE TO CHRONIC PAIN SYNDROME WITH DEPRESSIVE FEATURES

ICD CODE: 293.83 [F06.31]     INDICATE THE AXIS CATEGORY: [X] AXIS I   [ ] AXIS II

COMMENTS, IF ANY:

DIAGNOSIS #2

ICD CODE:     INDICATE THE AXIS CATEGORY: [ ] AXIS I   [ ] AXIS II

COMMENTS, IF ANY:

DIAGNOSIS #3

ICD CODE:     INDICATE THE AXIS CATEGORY: [ ] AXIS I   [ ] AXIS II

COMMENTS, IF ANY:

IF ADDITIONAL DIAGNOSES THAT PERTAIN TO MENTAL HEALTH DISORDERS, LIST USING ABOVE FORMAT:

1B. AXIS III - MEDICAL DIAGNOSES *(TO INCLUDE TBI)*:

ICD CODE: 338.40 [G89.4]   COMMENTS, IF ANY: CHRONIC PAIN SYNDROME: DID NOT EXIST PRIOR TO ENLISTMENT

1C. AXIS IV - PSYCHOSOCIAL AND ENVIRONMENTAL PROBLEMS *(DESCRIBE, IF ANY)*:

Family, Occupational, Social

1D. AXIS V - CURRENT GLOBAL ASSESSMENT OF FUNCTIONING *(GAF)* SCORE: 50

COMMENTS, IF ANY:

Case 1:20-cv-00784-WO-LPA   Document 61-1   Filed 09/09/24   Page 44 of 61

## 2. DIFFERENTIATION OF SYMPTOMS

2A. DOES THE VETERAN HAVE MORE THAN ONE MENTAL DISORDER DIAGNOSED?

☐ YES  ☒ NO  *(If "Yes," complete Item 2B)*

2B. IS IT POSSIBLE TO DIFFERENTIATE WHAT SYMPTOM(S) IS/ARE ATTRIBUTABLE TO EACH DIAGNOSIS?

☐ YES  ☐ NO  ☒ NOT APPLICABLE

*(If "No," provide reason that it is not possible to differentiate what portion of each symptom is attributable to each diagnosis)*

*(If "Yes," list which symptoms are attributable to each diagnosis)*

2C. DOES THE VETERAN HAVE A DIAGNOSED TRAUMATIC BRAIN INJURY (TBI)?

☒ YES  ☐ NO  ☐ NOT SHOWN IN RECORDS REVIEWED  *(If "Yes," complete Item 2D)*

*Comments, if any:*
VETERAN CURRENTLY 40% SC FOR THIS CONDITION

2D. IS IT POSSIBLE TO DIFFERENTIATE WHAT SYMPTOM(S) IS/ARE ATTRIBUTABLE TO EACH DIAGNOSIS?

☐ YES  ☒ NO  ☐ NOT APPLICABLE

*(If "No," provide reason that it is not possible to differentiate what portion of each symptom is attributable to each diagnosis)*
Overlap of symptomatology limits accuracy of differentiation and attribution of symptoms.

*(If "Yes," list which symptoms are attributable to each diagnosis)*

## 3. OCCUPATIONAL AND SOCIAL IMPAIRMENT

3A. WHICH OF THE FOLLOWING BEST SUMMARIZES THE VETERAN'S LEVEL OF OCCUPATIONAL AND SOCIAL IMPAIRMENT WITH REGARD TO ALL MENTAL DIAGNOSES? *(Check only one)*

☐ No mental disorder diagnosis

☐ A mental condition has been formally diagnosed, but symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication

☐ Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by medication

☐ Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation

☒ Occupational and social impairment with reduced reliability and productivity

☐ Occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood

☐ Total occupational and social impairment

3B. FOR THE INDICATED LEVEL OF OCCUPATIONAL AND SOCIAL IMPAIRMENT, IS IT POSSIBLE TO DIFFERENTIATE WHAT PORTION OF THE OCCUPATIONAL AND SOCIAL IMPAIRMENT INDICATED IN ITEM 3A IS CAUSED BY EACH MENTAL DISORDER?

☐ YES  ☐ NO  ☒ NO OTHER MENTAL DISORDER HAS BEEN DIAGNOSED

*(If "No," provide reason that it is not possible to differentiate what portion of the indicated level of occupational and social impairment is attributable to each diagnosis)*

*(If "Yes," list which portion of the indicated level of occupational and social impairment is attributable to each diagnosis)*

3C. IF A DIAGNOSIS OF TBI EXISTS, IS IT POSSIBLE TO DIFFERENTIATE WHAT PORTION OF THE OCCUPATIONAL AND SOCIAL IMPAIRMENT INDICATED IN ITEM 3A IS CAUSED BY THE TBI?

☐ YES  ☒ NO  ☐ NO DIAGNOSIS OF TBI

*(If "No," provide reason that it is not possible to differentiate what portion of the indicated level of occupational and social impairment is attributable to each diagnosis)*
Given the overlap of symptoms, there is limited ability to accurately differentiate or apportion the level of occupational and social impairment attributable to each diagnosis.

*(If "Yes," list which portion of the indicated level of occupational and social impairment is attributable to each diagnosis)*

| SECTION II: CLINICAL FINDINGS: |
|---|

**1. EVIDENCE REVIEW**
IF ANY RECORDS *(EVIDENCE)* WERE REVIEWED, PLEASE LIST

Relevant medical records/VA service connected disability ratings.

**NOTE:** Initial examinations require pre-military, military, and post-military history. If this is a review examination only indicate any relevant history since prior exam.

**2. HISTORY**
2A. RELEVANT SOCIAL/MARITAL/FAMILY HISTORY *(PRE-MILITARY, MILITARY, AND POST-MILITARY)*

See Addendum

2B. RELEVANT OCCUPATIONAL AND EDUCATIONAL HISTORY *(PRE-MILITARY, MILITARY, AND POST-MILITARY)*

See Addendum

2C. RELEVANT MENTAL HEALTH HISTORY, TO INCLUDE PRESCRIBED MEDICATIONS AND FAMILY MENTAL HEALTH *(PRE-MILITARY, MILITARY, AND POST-MILITARY)*

The veteran has no history of mental health treatment. He has never been advised to obtain such treatment. He takes no psychiatric medications. He endorsed passive suicidal ideation, but denied wishing for death, a plan or intent.

2D. RELEVANT LEGAL AND BEHAVIORAL HISTORY *(PRE-MILITARY, MILITARY, AND POST-MILITARY)*

The veteran denied a history of legal problems. He's hasn't had any moving violations in the last three years. His emotional issues affect his driving ability. He has to take frequent breaks on longer trips. He also gets easily irritated with other drivers and will yell, swear and run them off the road. No actual confrontations were reported.

2E. RELEVANT SUBSTANCE ABUSE HISTORY *(PRE-MILITARY, MILITARY, AND POST-MILITARY)*

The veteran denied the use or abuse of tobacco or illicit drugs. He has never overused prescription medications. The veteran reports drinking 8 or more beers 5/7 days. He has never been involved in any substance use treatment program.

2F. SENTINEL EVENT(S) *(OTHER THAN STRESSORS)*

No sentinel events per the Joint Commission criteria. The veteran reported pain has increased severely since being in the military. Level of exercise has decreased. Flexibility has changed markedly. As the pain has increased, emotional issues have worsened

2G. OTHER *(If any)*

SEE ADDENDUM

## SECTION III: SYMPTOMS

3. FOR VA RATING PURPOSES, CHECK ALL SYMPTOMS THAT APPLY TO THE VETERAN'S DIAGNOSES

- [X] Depressed mood
- [X] Anxiety
- [X] Suspiciousness
- [ ] Panic attacks that occur weekly or less often
- [X] Panic attacks more than once a week
- [ ] Near-continuous panic or depression affecting the ability to function independently, appropriately and effectively
- [X] Chronic sleep impairment
- [X] Mild memory loss, such as forgetting names, directions or recent events
- [X] Impairment of short and long term memory, for example, retention of only highly learned material, while forgetting to complete tasks
- [ ] Memory loss for names of close relatives, own occupation, or own name
- [X] Flattened affect
- [X] Circumstantial, circumlocutory or stereotyped speech
- [X] Speech intermittently illogical, obscure, or irrelevant
- [ ] Difficulty in understanding complex commands
- [X] Impaired judgment
- [ ] Impaired abstract thinking
- [ ] Gross impairment in thought processes or communication
- [X] Disturbances of motivation and mood
- [X] Difficulty in establishing and maintaining effective work and social relationships
- [X] Difficulty adapting to stressful circumstances, including work or a work like setting
- [ ] Inability to establish and maintain effective relationships
- [ ] Suicidal ideation
- [ ] Obsessional rituals which interfere with routine activities
- [X] Impaired impulse control, such as unprovoked irritability with periods of violence
- [ ] Spatial disorientation
- [ ] Persistent delusions or hallucinations
- [ ] Grossly inappropriate behavior
- [ ] Persistent danger of hurting self or others
- [X] Neglect of personal appearance and hygiene
- [X] Intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene
- [ ] Disorientation to time or place

## SECTION IV: OTHER SYMPTOMS

4. DOES THE VETERAN HAVE ANY OTHER SYMPTOMS ATTRIBUTABLE TO MENTAL DISORDERS THAT ARE NOT LISTED ABOVE?

[X] YES  [ ] NO  *(If "Yes," describe)*

THE VETERAN EXHIBITS THE FOLLOWING SYMPTOMS ASSOCIATED WITH THE CHRONIC PAIN DISORDER:

REDUCED ACTIVITY
IRRITABILITY
IMPAIRED SLEEP
FATIGUE
ANXIETY
GUILT/HOPELESSNESS
SOCIAL WITHDRAWAL
LESS INTEREST IN SEX
LOW SELF-ESTEEM
RELATIONSHIP PROBLEMS
MEMORY/COGNITIVE IMPAIRMENT
PAIN BEHAVIORS
LOSS OF EMPLOYMENT OPPORTUNITIES
KINESIOPHOBIA (AVOIDANCE OF MOVEMENTS/ACTIVITIES FOR FEAR OF RE-INJURY OR INCREASED PAIN)

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 47 of 61

PATIENT/VETERAN'S SOCIAL SECURITY NO. ████████████████

## SECTION V: COMPETENCY

5. IS THE VETERAN CAPABLE OF MANAGING HIS OR HER FINANCIAL AFFAIRS?

[X] YES  [ ] NO   *(If "No," explain)*

## SECTION VI: REMARKS

6. REMARKS *(If any)*

```
********    MEDICAL OPINION   ******  RATIONALE FOR MEDICAL OPINION ********
```

MEDICAL OPINION:

THE VETERAN'S CURRENT MENTAL HEALTH CONDITION, DEPRESSIVE DISORDER DUE TO CHRONIC PAIN
SYNDROME, WITH DEPRESSIVE FEATURES, IS MORE LIKELY THAN NOT (MORE THAN A 50%/50%
PROBABILITY) A CONTINUATION OF, RELATED TO, SECONDARY TO, OR AGGRAVATED BY THE MILITARY
SERVICE CONNECTED ANKYLOSIS WITH LEFT FOOT INSTABILITY SP LEFT 2ND TOE FRACTURE AND
ARTHROPLASTY, SP LEFT FOOT BUNIONECTOMY WITH RESIDUAL HALLUX VALGUS, LEFT FOOT RESIDUAL
SCARS PARESTHESIA OR PLANTAR NERVE OF HEELAND SCARS OF 1ST AND 2ND TOES, AND RIGHT 1ST AND
2ND METATARSOPHALENGEAL JOINT DJD.


RATIONALE  FOR MEDICAL OPINION:
PER VETERAN INTERVIEW AND MEDICAL RECORD REVIEW, AND RECENT MENTAL HEALTH EVALUATION AND
CHRONIC PAIN ASSESSMENTS, APPLIED TO THE VHA PAIN PRIMER LITERATURE AND CONTEMPORANEOUS
CHRONIC PAIN MEDICAL LITERATURE AND DSM-5, THIS VETERAN HAS SYMPTOMATOLOGY CONSISTENT WITH
DEPRESSIVE DISORDER DUE TO CHRONIC PAIN SYNDROME, WITH DEPRESSIVE FEATURES, WHICH IS
REPORTED AND RECOGNIZED TO BE SECONDARY TO THE SERVICE CONNECTED CONDITIONS.

## SECTION VII: PSYCHIATRIST/PSYCHOLOGIST/EXAMINER CERTIFICATION AND SIGNATURE

**CERTIFICATION** - To the best of my knowledge, the information contained herein is accurate, complete and current.

| 7A. PSYCHIATRIST/PSYCHOLOGIST/EXAMINER SIGNATURE & TITLE *(Sign in ink)* | 7B. PSYCHIATRIST/PSYCHOLOGIST/EXAMINER PRINTED NAME |
|---|---|
| *G.A.Villarosa, Ph.D.* *Clinical Psychologist* | Gregory A.Villarosa, Ph.D. |
| **7C. DATE SIGNED** 11/08/2018 | **7D.** PSYCHIATRIST/PSYCHOLOGIST/EXAMINER PHONE AND FAX NUMBER P (704)305-1909;  F (980)258-0053 |
| **7E.** NATIONAL PROVIDER IDENTIFIER (NPI) NUMBER NC PP#1667/NPI#1720201593 | **7F.** PSYCHIATRIST/PSYCHOLOGIST/EXAMINER/ ADDRESS 816 Treva Anne Dr., Concord, NC  28027 |

**NOTE** - VA may request additional medical information, including additional examinations, if necessary to complete VA's review of the veteran's application.

**IMPORTANT** - Psychiatrist/psychologist please fax the completed form to _____

*(VA Regional Office FAX No.)*

**NOTE** - A list of VA Regional Office FAX Numbers can be found at www.benefits.va.gov/disabilityexams or obtained by calling 1-800-827-1000.

**PRIVACY ACT NOTICE:** VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58/VA21/22/28, Compensation, Pension, Education and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. Your obligation to respond is voluntary. VA uses your SSN to identify your claim file. Providing your SSN will help ensure that your records are properly associated with your claim file. Giving us your SSN account information is voluntary. Refusal to provide your SSN by itself will not result in the denial of benefits. VA will not deny an individual benefits for refusing to provide his or her SSN unless the disclosure of the SSN is required by a Federal Statute of law in effect prior to January 1, 1975, and still in effect. The requested information is considered relevant and necessary to determine maximum benefits under the law. The responses you submit are considered confidential (38 U.S.C. 5701). Information submitted is subject to verification through computer matching programs with other agencies.

**RESPONDENT BURDEN:** We need this information to determine entitlement to benefits (38 U.S.C. 501). Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 30 minutes to review the instructions, find the information, and complete the form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at www.reginfo.gov/public/do/PRAMain. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

VA FORM 21-0960P-2, MAY 2018

**Addendum: Section II: Clinical Findings---History**

**2A. (SOCIAL/MARITAL/FAMILY)** The veteran was raised in Illinois by his mother and father. His father worked on the railroad, and his mother worked as a nurse while he was growing up. He has one brother and one sister, he is the second of three children. He got along fairly well with his family as he was growing up. He reported no educational, social, or occupational issues prior to his enlistment. Since his time in the military, problems with chronic medical conditions and emotional issues, he has been more distant and detached from family. He rarely has contact with his family members. Any interactions with them have been superficial and limited in personal self-disclosure.

The veteran has been married three times. His first marriage lasted 6 years they had no children together. This marriage ended prior to his current chronic medical and emotional issues. His second marriage lasted 5 years and they had no children together. He currently has been married for 1 year and they have no children together. As his chronic medical conditions and emotional issues increased, the veteran became more emotionally distant. He is irritable regularly and they argue more than usual. His chronic medical conditions and chronic pain are so severe that he rarely has sex with his wife or his ex-wife. This has become a point of contentions in the marriage. He is irritated and tired at the end of his work day and lacks the motivation to be productive. He has limited interactions with his wife and will isolate himself to prevent conflicts and arguments. The veteran reports this has been an issue for many years.

The veteran has no close friends with whom he socializes. Most interactions with people in a social setting are superficial. He rarely goes anywhere because of his chronic medical conditions, emotional issues and poor mobility. When at home after work, he is isolated and has limited social interactions. A picture of significant social isolation and withdrawal was evident

**2B. (OCCUPATIONAL/EDUCATIONAL)** The veteran graduated from high school and joined the military. He reported no educational, social, or occupational issues prior to his enlistment. He successfully completed Basic Training and Technical Training with no issues. At the end of his military career, chronic medical conditions, pain and his emotional issues greatly affected his functioning. He had significant difficulty paying attention and concentrating on the job. He got into frequent conflicts with peers, was short tempered and confrontational. He received formal discipline for these behaviors. His job productivity and ability to meet mission demands was unchanged but at the cost of every other facet of his life.

Since leaving the military, his chronic medical conditions, pain and emotional issues continue to affect his functioning. He is irritable regularly and continues to struggle with professional relationships. He currently works as a K-9 trainer. He has been written up multiple times from arguing with his peers and supervisors. He has been passed over for promotions and raises despite his technical expertise.

*[signature]* , Ph.D

**(NC PP#1667)**

**Gregory A. Villarosa, Ph.D.**
**816 Treva Anne Drive**
**Concord, NC 28027**
**704-305-1909**

SS# ███████    **Assessment Date: 11-13-2018**

**2G. (OTHER--MENTAL STATUS EXAM)** On interview, the veteran looked his stated age of 44 years. He was of average stature and an appropriate weight. He was unkempt in appearance. He reported not showering or shaving for three or four consecutive days. Because of his chronic medical conditions and emotional issues, the veteran often neglected performing activities of daily living. Recent mood was described as "often suspicious, anxious, and depressed." The veteran reported feeling anxious about the negative impact of his emotional issues, and chronic medical conditions on his ability to remain employed. He reports having panic attacks more than once a week regarding these issue. He is suspicious of everyone and what ulterior motive they may have.

Significant problems with sleep onset and maintenance insomnia were indicated. He endorsed mental and physical fatigue due to his sleep problems. As a result, he is irritable, agitated and has difficulty functioning at work and at home. Mild memory loss, impairment of short and long term memory were endorsed by the veteran. He reports having to write things down to ensure he remembers them. Despite his efforts he forgets work tasks or task at home and is unable to complete them.

Speech was circumstantial or irrelevant. He would digress to irrelevant details and have to be redirected to stay on topic. His chronic medical conditions, and emotional issues have decreased his motivation and impaired his ability to adapt to stressful professional or personal situations. The veteran reported difficulty establishing and maintaining effective relationships of any kind. He endorsed impaired judgment and impulse control, demonstrated by excessive shopping. He was $70K in debt and was forced to declare bankruptcy in 2018. His emotional issues have seriously affected his occupational performance.

He reports having the same issues he had while on active duty. He has received formal discipline, precluding him from raises and promotions. Decreased energy and variable appetite were reported. Problems with attention and concentration due to chronic medical conditions as noted earlier. Anhedonia was suggested including a lack of sexual interests. He denied wishing for death or suicidal ideation with a plan or intent.

*Gregory A. Villarosa, Ph.D*    (NC PP#1667)

**Gregory A. Villarosa, Ph.D.**
**816 Treva Anne Drive**
**Concord, NC 28027**
**704-305-1909**

# Beck's Depression Inventory ███████████████

This depression inventory can be self-scored. The scoring scale is at the end of the questionnaire.

1.
- 0   I do not feel sad.
- 1   I feel sad
- 2   I am sad all the time and I can't snap out of it.
- **(3)**   I am so sad and unhappy that I can't stand it.

2.
- 0   I am not particularly discouraged about the future.
- 1   I feel discouraged about the future.
- 2   I feel I have nothing to look forward to.
- **(3)**   I feel the future is hopeless and that things cannot improve.

3.
- 0   I do not feel like a failure.
- 1   I feel I have failed more than the average person.
- 2   As I look back on my life, all I can see is a lot of failures.
- **(3)**   I feel I am a complete failure as a person.

4.
- 0   I get as much satisfaction out of things as I used to.
- 1   I don't enjoy things the way I used to.
- 2   I don't get real satisfaction out of anything anymore.
- **(3)**   I am dissatisfied or bored with everything.

5.
- 0   I don't feel particularly guilty
- 1   I feel guilty a good part of the time.
- **(2)**   I feel quite guilty most of the time.
- 3   I feel guilty all of the time.

6.
- 0   I don't feel I am being punished.
- 1   I feel I may be punished.
- 2   I expect to be punished.
- **(3)**   I feel I am being punished.

7.
- 0   I don't feel disappointed in myself.
- **(1)**   I am disappointed in myself.
- 2   I am disgusted with myself.
- 3   I hate myself.

8.
- 0   I don't feel I am any worse than anybody else.
- 1   I am critical of myself for my weaknesses or mistakes.
- **(2)**   I blame myself all the time for my faults.
- 3   I blame myself for everything bad that happens.

9.
- **(0)**   I don't have any thoughts of killing myself.
- 1   I have thoughts of killing myself, but I would not carry them out.
- 2   I would like to kill myself.
- 3   I would kill myself if I had the chance.

10.
- 0   I don't cry any more than usual.
- 1   I cry more now than I used to.
- 2   I cry all the time now.
- **(3)**   I used to be able to cry, but now I can't cry even though I want to.

11.
- 0     I am no more irritated by things than I ever was.
- 1     I am slightly more irritated now than usual.
- 2     I am quite annoyed or irritated a good deal of the time.
- **(3)**     I feel irritated all the time.

12.
- 0     I have not lost interest in other people.
- 1     I am less interested in other people than I used to be.
- **(2)**     I have lost most of my interest in other people.
- 3     I have lost all of my interest in other people.

13.
- 0     I make decisions about as well as I ever could.
- 1     I put off making decisions more than I used to.
- **(2)**     I have greater difficulty in making decisions more than I used to.
- 3     I can't make decisions at all anymore.

14.
- 0     I don't feel that I look any worse than I used to.
- 1     I am worried that I am looking old or unattractive.
- **(2)**     I feel there are permanent changes in my appearance that make me look unattractive
- 3     I believe that I look ugly.

15.
- 0     I can work about as well as before.
- 1     It takes an extra effort to get started at doing something.
- **(2)**     I have to push myself very hard to do anything.
- 3     I can't do any work at all.

16.
- 0     I can sleep as well as usual.
- 1     I don't sleep as well as I used to.
- **(2)**     I wake up 1-2 hours earlier than usual and find it hard to get back to sleep.
- 3     I wake up several hours earlier than I used to and cannot get back to sleep.

17.
- 0     I don't get more tired than usual.
- 1     I get tired more easily than I used to.
- 2     I get tired from doing almost anything.
- **(3)**     I am too tired to do anything.

18.
- 0     My appetite is no worse than usual.
- **(1)**     My appetite is not as good as it used to be.
- 2     My appetite is much worse now.
- 3     I have no appetite at all anymore.

19.
- 0     I haven't lost much weight, if any, lately.
- 1     I have lost more than five pounds.
- **(2)**     I have lost more than ten pounds.
- 3     I have lost more than fifteen pounds.

20. <span style="background:black; color:black;">████████████████</span>

    **⓪**    I am no more worried about my health than usual.

    1    I am worried about physical problems like aches, pains, upset stomach, or constipation.

    2    I am very worried about physical problems and it's hard to think of much else.

    3    I am so worried about my physical problems that I cannot think of anything else.

21.

    0    I have not noticed any recent change in my interest in sex.

    1    I am less interested in sex than I used to be.

    **②**    I have almost no interest in sex.

    3    I have lost interest in sex completely.

## INTERPRETING THE BECK DEPRESSION INVENTORY

Now that you have completed the questionnaire, add up the score for each of the twenty-one questions by counting the number to the right of each question you marked. The highest possible total for the whole test would be sixty-three. This would mean you circled number three on all twenty-one questions. Since the lowest possible score for each question is zero, the lowest possible score for the test would be zero. This would mean you circles zero on each question. You can evaluate your depression according to the Table below.

Total Score    **44**    Levels of Depression

| | |
|---|---|
| 1-10 | These ups and downs are considered normal |
| 11-16 | Mild mood disturbance |
| 17-20 | Borderline clinical depression |
| 21-30 | Moderate depression |
| 31-40 | Severe depression |
| over 40   **X** | Extreme depression |

# The McGill Pain Questionnaire

**Patient Name:** ▮▮▮▮▮▮
**Patient ID / SSN #:** ▮▮▮▮▮
**Pain Site(s):** left foot/heel

## Part 1  Where Is Your Pain?

Please mark on the drawing below, the areas where you feel pain. Put E if external, or I if internal, near the areas which you mark. Put EI if both external and internal.



## Part 2  What Does Your Pain Feel Like?

**1**
☐Flickering
☐Quivering
☒Pulsing
☒Throbbing
☒Beating
☒Pounding

**2**
☐Jumping
☐Flashing
☒Shooting

**3**
☐Pricking
☒Boring
☒Drilling
☒Stabbing
☐Lancinating

**4**
☐Sharp
☒Cutting
☒Lacerating

**5**
☒Pinching
☐Pressing
☒Gnawing
☐Camping
☒Crushing

**6**
☐Tugging
☐Pulling
☒Wrenching

**7**
☐Hot
☐Burning
☐Scalding
☐Searing

**8**
☐Tingling
☐Itchy
☒Smarting
☐Stinging

**9**
☐Dull
☒Sore
☒Hurting
☒Aching
☒Heavy

**10**
☐Tender
☒Taut
☐Rasping
☒Splitting

**11**
☐Tiring
☒Exhausting

**12**
☒Sickening
☒Suffocating

**13**
☐Fearful
☒Frightful
☐Terrifying

**14**
☐Punishing
☒Grueling
☒Cruel
☒Vicious
☒Killing

**15**
☒Wretched
☐Blinding

**16**
☐Annoying
☒Troublesome
☒Miserable
☒Intense
☒Unbearable

**17**
☒Spreading
☒Radiating
☒Penetrating
☒Piercing

**18**
☒Tight
☐Numb
☐Drawing
☒Squeezing
☐Tearing

**19**
☐Cool
☐Cold
☐Freezing

**20**
☒Nagging
☒Nauseating
☒Agonizing
☐Dreadful
☒Torturing

## Part 3  How Does Your Pain Change With Time?

1. Which word or words would you use to describe the pattern of your pain?

**1**
☒Continuous
☒Steady
☒Constant

**2**
☐Rhythmic
☐Periodic
☐Intermittent

**3**
☐Brief
☐Momentary
☐Transient

2. What kind of things relieve your pain?
Not doing anything. Pool activities.

3. What kind of things increase your pain?
Walking, exercise, almost everything.

## Part 4  How Strong Is Your Pain?

People agree that the following 5 worst represent pain of increasing intensity. They are:

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Mild | Discomforting | Distressing | Horrible | Excruciating |

To answer each question below, write the number of the most appropriate word in the space beside the question.

| Question | |
|---|---|
| 1. Which word describes your pain right now? | 4 |
| 2. Which word describes it as its worst? | 5 |
| 3. Which word describes it when it is least? | 4 |
| 4. Which word describes the worst toothache you ever had? | 5 |
| 5. Which word describes the worst headache you ever had? | 5 |
| 6. Which word describes the worst stomach ache you ever had | 4 |

Source: Reprinted from McGill Pain Questionnaire from PAIN, V1; 277-299, 1975 with permission from International Association for the Study of Pain

# VHA Pain Management

## Chronic Pain Primer

### Definition of Chronic Pain

**CHRONIC PAIN** (non-cancer pain) generally refers to intractable pain that exists for three or more months and does not resolve in response to treatment. There is some variation in terms of the required pain duration, in that some conditions may become chronic in as little as one month, while some pain specialists adhere to the six-month pain duration criteria employed in the past.

### Chronic Pain VS "Psychogenic Pain"

Perhaps no other issue has done as much damage to individuals with chronic pain as this one. Many health care professionals fail to recognize the complexity of pain and believe that it can be dichotomized based on the presence or absence of physical findings, secondary gain, or prior emotional problems. As a result, countless individuals have been informed that "The pain is all in your head". And if these same individuals react with anger and hurt, we (health care staff) are ready to compound the problem by labeling the individual as hostile, demanding, or aggressive.

In actuality, the correspondence between physical findings (e.g., MRI, CT, or X-ray results) and pain complaints is fairly low (generally, 40% to 60%). Individuals may have abnormal tests (e.g., MRI shows a "bulging disk" or a herniation) with no pain, or substantial pain with negative results. This is because chronic pain can develop in the absence of the gross skeletal changes we are able to detect with current technology. Muscle strain and inflammation are common causes of chronic pain, yet may be extremely difficult to detect. Other conditions may be due to systemic problems (e.g., HIV-related pain or sickle cell pain), trauma to nerves (e.g., post-thoracotomy pain), circulatory difficulties (e.g., diabetic neuropathy), CNS dysfunction (e.g., central pain syndromes), or many others. Yet, in each of these cases we may be unable to "see" the cause of the problem. Instead, we have to rely on the person's report of their pain, coupled with behavioral observations and indirect medical data. This does not mean that the pain is psychogenic. Rather, it means that we are less able to detect or understand its cause.

In actuality, healthy individuals feigning pain for secondary gain purposes are relatively rare. And in most cases, clear monetary motives will be evident. Additionally, the presence of secondary gain does not at all indicate that an individual's pain is less "real". In this country most individuals with chronic pain

receive at least some type of benefit (not necessarily monetary) for pain complaints. Therefore, exaggeration of pain or related problems is to be expected. Unfortunately, many less aware practitioners use the presence of secondary gain or pain amplification as an indication that the person's pain is not "real".

## Factors Influencing the Experience of Pain

Pain is a complex response by the organism to a number of factors.

*Physiological/Biological Factors*

- Site of injury or source of painful stimuli
- Intensity of stimulation/degree of tissue damage
- Type and density of receptors present
- Biologically-based individual differences in pain threshold and sensitivity
- Amount of competing sensory (large fiber) activity

*Psychological Factors*

- Emotional status of the individual (in general, negative emotions increase pain; positive emotions reduce pain)
- Attentional effects
- Individual beliefs and expectations regarding the experience of pain (pain can be experienced with no noxious stimulation if it is expected)
- The individual's belief regarding their ability to establish control over the pain
- The individual's history of pain experiences and pain sensations (cultural and learning effects)
- General physical health of the person with pain

As pain duration increases, more of these factors begin to influence the experience of pain. Thus, successful chronic pain treatment often involves multiple specialties delivering a range of interventions for a variety of related problems.

## Chronic Pain Assessment

The presence of chronic pain does not always mean that the individual with pain is in distress. Surprisingly, pain may be experienced, but may not be perceived as unpleasant. Therefore, when measuring chronic pain, one needs both quantitative, qualitative, and distress measures.

***Quantitative measures*** are used to judge the "amount" of pain. The best quantitative measure is a scaled self-report of pain. Many of these scales exist. They include verbal descriptive scales, nonverbal scales, scales for children, and number scales. The easiest and perhaps best-validated quantitative measure is the pain Visual Analog Scale (VAS), using either a 0-100 or 0-10 reference line. A typical 10-point VAS, and the version we use, follows:

PAIN

The line length is 10 cm. Scoring the response simply involves measuring the distance between the "no pain" endpoint and the individual's response, in centimeters (e.g., a score of 5.2).

Measures of tissue damage, autonomic levels, and reports of others have not been found to be very reliable or accurate quantitative measures. In fact, correlations between *medical staff* estimates of an individual's pain level and the person's own rating generally are quite low. Behavioral measures of pain (e.g., facial expressions, postural changes, etc.) are accurate but usually require much more time to score.

*Qualitative measures* are used to differentiate between possible etiologies. Suggestions for gathering some qualitative pain information follow:

- Have the person describe the pain in their own terms. If they have difficulty, provide a verbal list of possible descriptors as examples (e.g., "Is the pain throbbing, aching, pulsating, cutting, burning, shooting, stabbing, pounding, or burning?").
- Determine if it is constant or intermittent. If it is intermittent, ask how often it is present, and what, if anything, seems to trigger it.
- Ask what makes the pain better, and what makes it worse.

*Distress measures* provide us with information as to how much the pain interferes with the person's life. The more it interferes, the more unpleasant it is perceived. Distress measures include assessment of emotional distress, marital/family dysfunction due to pain, financial pressures due to pain, and a variety of other indicators.

In order to effectively diagnose and treat chronic pain we typically need to incorporate measures from all three of these pain domains (i.e., quantitative, qualitative, and distress) at a minimum. At present there are no universally accepted means of measuring these pain domains.


## Chronic Pain Syndromes

*In deciding how to treat chronic pain, it is important to distinguish between* **CHRONIC PAIN** *and a* **CHRONIC PAIN SYNDROME**. A chronic pain syndrome differs from chronic pain in that people with a chronic pain syndrome, over time, develop a number of related life problems beyond the sensation of pain itself. It is important to distinguish between the two because they respond to different types of treatment.

Most individuals with chronic pain (estimates are about 75% nationally) do not develop the more complicated and distressful chronic pain syndrome. Although they may experience the pain for the remainder of their lives, little change in their daily regimen of activities, family relationships, work, or other life components occurs. Many of these individuals may never seek treatment for pain. Those that do often require less intensive, single-modality interventions.

The 25% who do develop chronic pain syndromes tend to experience increasing physical, emotional, and social deterioration over time. They may abuse pain medications (usually narcotics and/or muscle relaxants), and typically require more intensive, multimodal treatment to stop the cycle of increasing

dysfunction. Based on past VA experience, and the prevalence of other complex problems among individuals served by the VA, it is likely that the percentage of veterans with chronic pain who develop a chronic pain syndrome is higher than in the general population.

**Symptoms Of Chronic Pain Syndromes**

- Reduced activity
- Impaired sleep
- Depression
- Suicidal ideation
- Social withdrawal
- Irritability
- Fatigue
- Memory and cognitive impairment
- Poor self-esteem
- Less interest in sex
- Relationship problems
- Pain behaviors
- Kinesiophobia, or the avoidance of certain movements or activities due to fear of reinjury or re-experiencing the pain.
- Helplessness
- Hopelessness
- Alcohol abuse
- Medication abuse
- Guilt
- Anxiety
- Misbehavior by children in the home
- Loss of employment

There are at present no empirical methods of determining whether or not a chronic pain syndrome is present. Distinctions between the two are based on clinical judgments. Generally, the more of the above symptoms the individual reports or the more severe the symptoms are, the more severe the chronic pain syndrome is. However, the above are symptoms of a chronic pain syndrome *only when they are primarily or mostly due to the pain itself.* For example, individuals with a history of substance abuse or depression which preceded their chronic pain would not meet the requirement that their symptoms be primarily due to their pain.

## How Do Chronic Pain Syndromes Develop?

As individuals try to cope with chronic pain, they adopt predictable patterns of behavior which appear to provide short-term relief. Unfortunately, the long-term effects of these patterns tends to be increased pain and more daily impairment. Typically, this results from the **chronic pain cycle**:

**pain > less activity > weaker muscles > more pain > less activity > weaker muscles**

The deterioration is exacerbated by **Kinesiophobia**, or avoidance of certain movements or activities due to fear of reinjury or re-experiencing the pain. Kinesiophobia leads to more *protective behaviors*, or changes in posture, gait, or movement that reduce the pain for the short term. Unfortunately, over time

they may lead to increased muscle weakness, reduced circulation, muscle spasms and inflammation, reduced flexibility, and, in some cases, muscle atrophy.

## Models of Treatment

There are four primary models of chronic pain service delivery, which are based on the results of the *International Association for the Study of Pain* (IASP) Task Force on Guidelines for Desirable Characteristics for Pain Treatment Facilities. These models are represented both in the private sector and in the VA.

*Single service clinics or modality-oriented clinics* are outpatient clinics that provide a specific type of treatment for pain but do not provide comprehensive assessment or management. Most often they are staffed by individuals from a single discipline with some expertise in a range of pain interventions falling within their areas of specialty training. Examples include a nerve block clinic, a transcutaneous nerve stimulation (TENS) clinic, or a biofeedback clinic. In general, these approaches are best suited for individuals with chronic pain, but without a chronic pain syndrome. The goal of treatment is pain reduction.

The next level of intervention occurs within a *pain clinic*. These outpatient clinics specifically focus on the diagnosis and management of individuals with chronic pain. They are staffed by individuals from one or more disciplines with specialized training in chronic pain. They may focus only on selected pain problems (e.g., a "headache clinic", or a "back pain clinic"), or on more general pain conditions. They may refer to outside consultants or staff for services not available within the clinic. They are most appropriate for individuals with more severe pain but without a chronic pain syndrome. However, those with mild chronic pain syndromes also may be appropriate.

As we increase in treatment intensity and complexity, we next come to the *multidisciplinary (or interdisciplinary) pain clinic*. This level of intervention includes a specific outpatient or inpatient program of treatment which typically includes at a minimum physical restoration, medical, educational, and psychological services delivered by an identifiable team of individuals from a range of disciplines with extensive training and experience in chronic pain interventions. These pain programs are most suited for those with mild to moderate chronic pain syndromes who require more global and intensive treatment of their pain and their related areas of dysfunction. Goals include improvement in pain, activity level, flexibility, strength, endurance, and psychosocial functioning.

The final type of treatment delivery is provided through a *multidisciplinary (or interdisciplinary) pain center*. The pain center is the largest and most complex type of pain treatment model, and typically is associated with a medical school or teaching hospital. Such centers offer treatment of both acute and chronic pain using a dedicated, interdisciplinary staff working in a team setting. Staff specialize in pain

treatment. Unlike the multidisciplinary pain clinic, pain centers also must engage in active pain-related research and staff education. Pain centers are most appropriate for individuals with moderate to severe chronic pain syndromes, and for those with less severe pain syndromes but very complex and refractory pain problems. They also are most appropriate for individuals with chronic pain whose rehabilitation is complicated by concurrent medical or emotional problems that require closer monitoring and the immediate availability of emergent and supportive services.

CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD. SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| | ARMY/RA | |

| 4a. GRADE, RATE OR RANK | b. PAY GRADE | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) |
|---|---|---|---|
| SSG | E06 | | 00000000 |

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| SIOUX FALLS, SOUTH DAKOTA | |

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | b. STATION WHERE SEPARATED |
|---|---|
| 0612QMQM AIRDROP S FC | FORT BRAGG, NC 28310-5000 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | NONE |
|---|---|---|
| N/A | AMOUNT: $400,000.00 | |

| 11. PRIMARY SPECIALTY (List number, title and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| 92R3P PARACHUTE RIGGER - 8 YRS 3 MOS//NOTHING FOLLOWS | a. DATE ENTERED ALL THIS PERIOD | 2001 | 03 | 22 |
| | b. SEPARATION DATE THIS PERIOD | 2009 | 07 | 07 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 0008 | 03 | 16 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 0000 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 0004 | 02 | 02 |
| | f. FOREIGN SERVICE | 0001 | 05 | 17 |
| | g. SEA SERVICE | 0000 | 00 | 00 |
| | h. EFFECTIVE DATE OF PAY GRADE | 2005 | 04 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|---|
| BRONZE STAR MEDAL//ARMY COMMENDATION MEDAL (2ND AWARD)//ARMY ACHIEVEMENT MEDAL (2ND AWARD)//ARMY SUPERIOR UNIT AND//ARMY GOOD CONDUCT MEDAL (3RD AWARD)//NATIONAL DEFENSE SERVICE MEDAL//GLOBAL WAR ON TERRORISM EXPEDITIONARY MEDAL//NON COMMISSIONED OFFICER PROFESSIONAL DEVELOPMENT//CONT IN BLOCK 18 | AIRDROP LOAD INSPECTOR, 1 WEEK, 2007//BASIC NCO CRS (BNCOC), 3 WEEKS, 2006//PE LDRSHP DEV CRS, 4 WEEKS, 2002//SLING LOAD INSP. CERT, 1 WEEK, 2006//UNIT PREV LDR (UPL), 1 WEEK, 2003//NOTHING FOLLOWS |

| 15a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | YES | X | NO |
|---|---|---|---|
| b. HIGH SCHOOL GRADUATE OR EQUIVALENT | X | YES | NO |

| 16. DAYS ACCRUED LEAVE PAID 0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO | X |
|---|---|---|---|---|

18. REMARKS //////////////////////////////////////////////////////////
IMMEDIATE REENLISTMENTS THIS PERIOD -- 20010322-20030422, 20030423-20060301//SERVED IN A DESIGNATED IMMINENT DANGER PAY AREA//SERVICE IN IRAQ 20050423-20060422//SERVICE IN KUWAIT 20030502//DISABILITY SEVERANCE PAY -- $72204.00//BLOCK 1: OTHER NAME(S) OF RECORD: ... //MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//MEMBER IS ENTITLED TO NO INVOLUNTARY SEPARATION PAY//CONT FROM BLOCK 13: RIBBON//ARMY SERVICE RIBBON //OVERSEAS SERVICE RIBBON//PARACHUTIST BADGE//AIR ASSAULT BADGE//DRIVER AND MECHANIC BADGE - MECHANIC//PARACHUTE RIGGER BADGE//GERMAN ARMED FORCES PARACHUTIST BADGE - BRONZE//NOTHING FOLLOWS

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) | b. NEAREST RELATIVE (Name and address - include ZIP Code) |
|---|---|

| DIRECTOR OF VETERANS AFFAIRS | X | YES | NO |
|---|---|---|---|

| 20. MEMBER REQUESTS COPY ... NC | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | JACQUELINE BEARD, HUMAN RESOURCE ASST SUPERVISOR |

SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
|---|---|
| DISCHARGE | HONORABLE |
| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
| AR 635-40 , CHAP 4 | JFI | 3 |

| 28. NARRATIVE REASON FOR SEPARATION | 30. MEMBER REQUESTS COPY 4 (Initials) |
|---|---|
| DISABILITY, SEVERANCE PAY, COMBAT RELATED | |
| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD) | |
| NONE | MEMBER -.. |

DD FORM 214-AUTOMATED, FEB 2000

PREVIOUS EDITION IS OBSOLETE. GENERATED BY TRANSPROC

Case 1:20-cv-00784-WO-LPA    Document 61-1    Filed 09/09/24    Page 61 of 61