**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) | |
| LESLIE CARICO, ) | |
| ) | |
|        Plaintiff, ) | |
| ) | |
|        v. ) | 1:20cv784 |
| ) | |
| VETERANS GUARDIAN VA CLAIM ) | |
| CONSULTING, LLC, *et al.*, ) | |
| ) | |
|        Defendants. ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) (Docket Entry 49) (the "Motion to Dismiss") and the relator's Motion for Leave to File Second Amended Complaint (Docket Entry 61) (the "Motion to Amend"). For the reasons that follow, the Court should grant in part and deny in part both motions.

**BACKGROUND**

**I. Procedural History**

This case began when Leslie Carico (the "Relator"), on behalf of the United States of America, filed her original complaint under seal, naming Scott Greenblatt and Veterans Guardian VA Claim Consulting, LLC ("Veterans Guardian") as the defendants. (*See* Docket Entry 1.) Relator filed the complaint in the United States District Court for the Eastern District of New York (*see* Docket

Entry 1), but, upon motion from the United States, that court transferred the case to this Court (see Docket Entries 4-6). Relator subsequently filed the First Amended Complaint (the "FAC"), adding William Taylor and Gregory A. Villarosa as defendants. (See Docket Entry 18.) The United States filed a Notice of Election to Decline Intervention (Docket Entry 37), which the Court granted while also directing Relator to serve Defendants or to file a voluntary dismissal within 90 days (see Docket Entry 38).

Relator filed a Motion for Extension of Time to Serve Complaint (Docket Entry 39), which the Court (per the undersigned Magistrate Judge) denied (see Text Order dated July 26, 2024). Relator subsequently served Defendants, who collectively filed the instant Motion to Dismiss (Docket Entry 49), to which Relator responded in opposition (see Docket Entry 60), after which Defendants replied (see Docket Entry 62). Relator also filed the instant Motion to Amend (Docket Entry 61), with a proposed Second Amended Complaint (Docket Entry 61-1) (the "SAC"). The SAC removes a claim under 31 U.S.C. § 3729(a)(1)(G) and removes Defendant Villarosa from Count IV (previously Count V). (Compare Docket Entry 18, ¶¶ 98-102, with Docket Entry 61-1, ¶¶ 109-13.) In addition, the SAC purportedly "provide[s] limited clarifying additions or edits to the factual allegations in the [FAC]." (Docket Entry 64 at 2.) Defendants oppose the instant Motion to

2

Amend. (See Docket Entry 63.) Relator has replied. (See Docket Entry 64.)

## II. Relator's Allegations

Pursuant to the False Claims Act (the "FCA"), 31 U.S.C. § 3729 et seq., and on behalf of the United States government, Relator seeks to recover losses from "thousands of fraudulent claims for payment for disability benefits." (Docket Entry 61-1, ¶ 2.)

### A. Defendants

The SAC identifies Defendant Veterans Guardian as a North Carolina LLC (id., ¶ 15), which provides "'prefiling consulting services' to veterans seeking to increase their monthly [] disability payments" from the Department of Veteran's Affairs (the "VA") (id., ¶ 4). According to the SAC, Defendants Greenblatt and Taylor co-founded Defendant Veterans Guardian. (See id., ¶¶ 16, 17). Defendant Greenblatt serves as the Chief Executive Officer, who "[a]t all relevant times . . . direct[ed] the day-to-day operations of [Defendant Veterans Guardian] and [] formulat[ed] and enforc[ed] [its] policies" (id., ¶ 16), while Defendant Taylor acts as Chief Operating Officer, "in charge of managing the [c]ompany's business and financial operations" (id., ¶ 17). The SAC names Defendant Villarosa as a psychologist who examines patients referred by Defendant Veterans Guardian in exchange for a $295 fee. (See id., ¶¶ 18, 59.)

3

**B. VA Disability Benefits & Defendant Veterans Guardian's Business Model**[1]

The VA provides disability compensation payments to veterans disabled as a result of injury or disease incurred or aggravated in the line of duty. (See id., ¶ 22.) The amount of compensation a veteran receives varies based on their disability "rating," which "correspond[s] to how much the disability decreases [the veteran's] overall health and ability to function." (Id., ¶ 23 (internal quotation marks omitted).) To receive disability compensation, a veteran must file a claim consisting of "official government forms, medical records, and any other supporting documentation of a qualifying disability." (Id., ¶ 31.) The VA assesses disability claims to determine the amount of compensation awarded to a veteran. (See id., ¶¶ 23-24, 28, 31-32.) Mental disorders can qualify as disabling conditions. (See id., ¶ 29.) VA standards provide that:

> When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination.

(Id. (block quoting 38 C.F.R. § 4.126).)[2]

_____

1 The summary that follows draws from the SAC.

2 The SAC contains a typographical error misattributing this quotation to 38 C.F.R. § 4.16. (See id.)

Defendant Veterans Guardian describes itself as a "medical claims consulting firm for veterans." (Id., ¶ 48 (internal quotation marks omitted).) Broadly, Defendant Veterans Guardian purports to help veterans increase their disability payments by preparing disability applications and submitting those applications to the VA on the veterans' behalf. (See id., ¶¶ 4, 48, 74.) As part of its consulting process, Defendant Veterans Guardian refers each of its clients to Defendant Villarosa's office for a psychological evaluation to supplement their disability application. (See id., ¶¶ 59-64.) Following the evaluation, Defendant Veterans Guardian's staff complete the application packages, send them to the clients for signature, and then submit the signed application packages to the VA. (See id., ¶¶ 69, 71, 74.) Each completed application package includes, inter alia, a Mental Health Form and a Beck Depression Index form. (See id., ¶ 71.)

Defendant Villarosa's office completes VA Form 21-0960P-2 "Mental Disorders (Other Than PTSD and Eating Disorders) Disability Benefits Questionnaire" (the "Mental Health Form") as part of its psychological evaluation. (See id., ¶ 64.) This form serves to "establish that the veteran suffers from depression, that it is impacting his ability to function[,] and that the depression was caused by injuries suffered during his[] military experience." (Id.) The Mental Health Form requires that a "licensed psychiatrist[], doctorate level psychologist[,] or mental health

5

provider[] possessing a similar level of academic and clinical experience" complete the evaluation. (Id., ¶ 62.)

Additionally, Defendant Veterans Guardian "provide[s a Beck Depression Inventory ('BDI') form] to each veteran [] diagnosed with depression and instruct[s] them to complete it on their own." (Id., ¶ 70.) The BDI "is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression." (Id.) Veterans rate each item with a score ranging from 0 to 3, with a maximum possible score of 63. (See id.)

Upon completion of a veteran's benefit application package, Defendant Veterans Guardian mails the package to the veteran for their signature. (See id., ¶ 71.) Then, Defendant Veterans Guardian sends each signed application package to the VA's mail processing center in Janesville, Wisconsin, via eFax. (See id., ¶ 74.) Defendant Veterans Guardian does not indicate its involvement in the preparation or submission of the applications; "[i]n short, its entire role [i]s concealed." (Id.) In exchange for its services, "[Defendant] Veterans Guardian takes a commission calculated as five months' worth of the increase in disability payment attributable to the [] application for increased benefits." (Id., ¶ 5.)

## C. Defendants' Alleged Fraud Scheme

Relator allegedly worked at Defendant Veterans Guardian as a document control specialist from approximately January 2019 through

6

August 2019.  (See id., ¶ 14.)  The SAC alleges that Defendant
Veterans Guardian, under Defendants Greenblatt's and Taylor's
direction and with Defendant Villarosa's assistance, has submitted
"thousands of fraudulent claims for payment for disability payments"
(see id., ¶ 2), through, inter alia, the following means:

As part of the intake process with Defendant Veterans Guardian,
claims strategists, who "generally had no background in diagnosing
mental illness," would "speak[] with the veteran[s] for several
minutes" and then "decide which diagnosis the veteran[s] should
[receive]."  (Id., ¶ 54.)  "Virtually every veteran was designated
as either depressed . . . or suffering from Post Traumatic Stress
Disorder [('PTSD')]" (id.), and this initial diagnosis "determined
the trajectory of the entire process of preparing the veteran's
disability application package" (id., ¶ 94(b)).  After the initial
intake, Defendant Veterans Guardian's employees (named in the SAC)
helped prepare veterans for their clinical evaluations with
Defendant Villarosa.  (See id., ¶ 63.)  The named employees would
"direct the veteran[s] to look tired and shabby," "advise [them] not
to shave and to use a cane or wheelchair if they had one," and
"direct[ them] to use certain buzz words or phrases in the course
of responding to questions[,] such as 'depressed,' 'sad,' and 'no
motivation.'"  (Id.)  In addition, named employees of Defendant
Veterans Guardian "instructed [other employees] on how to lift a
signature from another document and apply it to [an] application"

7

(id., ¶ 73), and employees typically used this method of forgery to file appeals (see id.).

When veterans went to Defendant Villarosa's office, other individuals who worked with him, including his wife and daughter, also met with veterans to conduct the psychological evaluations. (See id., ¶ 61.) Specifically, Ross Whitmore, who later left his job at Defendant Villarosa's office to work for Defendant Veterans Guardian, "conducted veteran interviews and falsely held himself out to veterans as a psychologist" (id.), although he "was not a psychologist, nor did he have a background in diagnosing or treating mental health issues" (id.). In addition, Defendant Villarosa's assistant "auto-populate[d] much of the information . . . in the Mental Health Form," including "the diagnosis and diagnosis code." (Id., ¶ 65.) In particular, for the section of the form requiring psychologists to check each of thirty-one listed symptoms applicable to the patient, the assistant auto-populated each form with "the exact same checkmarks . . . for every patient." (Id.) Another section asking for "all other symptoms attributable to their mental disorder[] was auto-populated with the same additional symptoms for each [Defendant] Veterans Guardian client." (See id.) And, at the beginning of Relator's tenure, Relator or another document control specialist, rather than Defendant Villarosa, would complete the "medical opinion" and "medical rationale" portions of the form after receiving notes from Defendant Villarosa or his secretary. (See

id.) The completed mental health forms were "usually auto-signed by [Defendant] Villarosa[,] . . . even when another individual [] conducted the examination." (Id., ¶ 67.) For example, the SAC includes, as Exhibit 1, a Mental Health Form purportedly completed by Whitmore but signed by Defendant Villarosa. (See id.; see also id. at 37-61.)[3]

Defendant Villarosa bore the primary responsibility for assigning each veteran's disability level based on their psychological illness. (See id., ¶ 67.) Notably, each patient's disability level "was always 50% or more," and Relator could never "discern a rational relationship between" each veteran's assigned disability level and the veteran's symptoms. (Id.) A rating of "50% was considered a 'safe' minimum because the VA often assigned a 50% level and it was . . . achievable even if the client's case was weak." (Id.) Additionally, at one point "[d]uring Relator's tenure, [the VA denied] a veteran's application for increased disability benefits . . . because the Global Assessment of Function (['']GAF['']) score, a part of the veteran's application indicating his level of disability assigned by the physician, was too low and thus inconsistent with the remainder of the application." (Id., ¶ 68.) This denial led to a conference call between Defendant Villarosa, Defendant Greenblatt, and Relator in which "they

---

3 Docket Entry page citations utilize the CM/ECF footer's pagination.

discussed how denials based on GAF score inconsistency could be avoided in the future." (Id.)  Defendants Villarosa and Greenblatt decided that, moving forward, an applicant's GAF score "would no longer be made low enough to place the applicant in the 'serious symptoms' category[,] thus avoiding VA scrutiny.  The strategy was to place the veteran in the moderate category of disability, regardless of the veteran's actual ability to function per the GAF scoring system."  (Id.)

Finally, when veterans returned their completed BDI forms to Defendant Veterans Guardian with a score below 25 (for veterans diagnosed with depression) or below 30 (for veterans diagnosed with PTSD), "document control specialists, such as Relator, were instructed by Defendant Greenblatt and Operations Manager, Mike Pierce, to increase the scores in order to get above that threshold."  (Id., ¶ 70.)  "In Relator's experience, forms were changed well over 50% of the time."  (Id.)  The instructions to employees included a directive not to change the BDI's suicidal thoughts score, "because an assertion that [a veteran] experienc[ed] suicidal thoughts can trigger an automatic 100% disability with respect to mental health and an expectation that the veteran['s] other answers on the form would be consistent with such an answer."  (Id.)  When veterans "sometimes complained about the fact that their BDI score had been increased," Defendant Veterans Guardian's employees would change the scores back to what the client originally

10

entered, get the client's approval and signature, then "raise the BDI numbers to the higher, fabricated numbers without disclosing this to the veteran."  (Id., ¶ 71.)

According to the SAC, around May 2019, "Relator began to express her concern over [Defendant Veterans Guardian's] dishonest methods" of preparing disability applications.  (Id., ¶ 91.)  She allegedly "expressed her views to [a] coworker who then reported Relator's views to [Defendant] Taylor." (Id.)  In addition, Relator allegedly "began refusing to forge signatures and questioning the validity of diagnoses," and even "researched and printed out peer-reviewed [psychology] studies" to point out diagnostic errors to Defendants Greenblatt and Taylor.  (Id.)  Shortly thereafter, per the SAC, Relator "was called out for her disloyalty" in a company-wide meeting and assigned another employee to "watch" Relator's documents.  (Id.)  Relator then allegedly "told [Defendant] Taylor she was tired of being harassed and that she was going to expose the company as a fraud" (id., ¶ 92), whereupon "[h]e promptly fired her" (id.).

## STANDARD OF REVIEW

Given the procedural posture of this case and Defendants' refusal of consent, Relator "may amend [her] pleading only with . . . the [C]ourt's leave.  The [C]ourt should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Under this standard, the Court has discretion, "but outright refusal to grant

11

the leave without any justifying reason appearing for the denial is not an exercise of discretion." Foman v. Davis, 371 U.S. 178, 182 (1962). The United States Court of Appeals for the Fourth Circuit has further explained that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (internal citation and quotation marks omitted). "An amendment is futile if the amended claim would fail to survive a motion to dismiss pursuant to [Rule] 12(b)(6)." Hall v. Greystar Mgmt. Servs., L.P., 637 F. App'x 93, 97 (4th Cir. 2016).

A Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, in reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of Appeals of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In addition to meeting the plausibility standard of Iqbal, fraud claims under the [FCA] must be pleaded with particularity pursuant to [Federal] Rule [of Civil Procedure] 9(b)." United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "This particularity requirement is often called the fraud's 'who, what, when, where, and how.'" United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 195 (4th Cir. 2022). Although Rule 9(b) establishes a "stringent pleading standard," United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 197 (4th Cir. 2018),

> [a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts.

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999). This guidance accounts for the "clear intent of Rule 9(b)[, which] is to eliminate fraud actions in which all the facts

13

are learned through discovery after the complaint is filed." Id.
at 789 (internal quotation marks omitted).

**DISCUSSION**

## I. Relator's Motion to Amend

The SAC asserts three FCA claims against Defendants: a
"presentment claim" under 31 U.S.C. § 3729(a)(1)(A), a "false record
or statement claim" under 31 U.S.C. § 3729(a)(1)(B), and a
conspiracy claim under 31 U.S.C. § 3729(a)(1)(C). (See Docket Entry
61-1, ¶¶ 101-07.)  The SAC also asserts a fourth claim against
Defendants Veterans Guardian, Greenblatt, and Taylor for retaliation
under 31 U.S.C. § 3730(h). (See id., ¶¶ 109-13.)  The SAC removes
a "reverse false claim" count under 31 U.S.C. § 3729(a)(1)(G), as
well as the retaliation claim as to Defendant Villarosa. (Compare
id., ¶¶ 100-13, with Docket Entry 18, ¶¶ 89-104.)  Defendants
contend that the Court should deny the instant Motion to Amend as
futile, in bad faith, and as prejudicial to them. (See Docket Entry
63 at 8.)

## A. Futility

## 1. FCA Fraud Claims

The SAC's first count sets forth an FCA "presentment claim,"
Nicholson, 42 F.4th at 193, alleging that Defendants "knowingly
presented, or caused to be presented, false or fraudulent claims for
payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A)"
(Docket Entry 61-1, ¶ 101 (internal brackets and quotation marks

14

omitted)).  Count II sets forth a false-record-or-false-statement claim, see Nicholson, 42 F.4th at 193, alleging that Defendants "knowingly made, used, or caused to be made or used, a false record or statement that was material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B)" (Docket Entry 61-1, ¶ 104 (internal brackets and quotation marks omitted)).

"Roughly speaking, a presentment claim alleges that a defendant knowingly submitted a false claim to the government themselves.  A false-record-or-statement claim alleges that a defendant knowingly made a false statement or produced a false record material to a false claim that was submitted to the government by someone else." Nicholson, 42 F.4th at 193.  Both claims require four elements: (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." Harrison, 176 F.3d at 788.

"To satisfy th[e] first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008).  In other words, "a false statement encompasse[s] any words or conduct that amount to an assertion not in accordance with the truth." United States ex rel. Wheeler v. Acadia Healthcare Co., Inc., 127 F.4th 472, 487 (4th Cir. 2025)

15

(internal brackets and quotation marks omitted).  Notably, the FCA does not provide a mechanism to "correct[] regulatory problems;" rather, the FCA imposes liability only if "compliance with [a] statute[] or regulation[] was a prerequisite to gaining a benefit, and the defendant certified such compliance."  United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 704 (4th Cir. 2014).

Turning to the next element, liability under the FCA only attaches if the defendant possessed the requisite scienter.  See, e.g., Harrison, 176 F.3d at 788.  To that end, the FCA requires relators to allege defendants "ha[d] actual knowledge of the information," or acted with "deliberate ignorance" or "reckless disregard" as to "the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  Importantly, that standard "require[s] no proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B), and "knowledge[] and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b).

Next, the FCA requires Relator to allege factual matter establishing the materiality of Defendants' false statement(s) or course of conduct.  See United States ex rel. Taylor v. Boyko, 39 F.4th 177, 190 (4th Cir. 2022).  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  To plead materiality with particularity, as required by Rule 9(b), "a relator's complaint must contain specific

16

facts regarding *how* the fraudulent conduct or false statement influenced the government's decision to pay." Taylor, 39 F.4th at 190 (internal quotation marks, citations, and brackets omitted) (emphasis in original). Additionally, in cases where a relator alleges fraud under an implied-certification theory based on regulatory noncompliance, "failure to follow a 'minor or insubstantial' requirement will not suffice to show materiality. Instead, the provision at issue must be 'so central' to the services provided that the Government 'would not have paid these claims had it known of these violations.'" Id. (quoting Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 194, 196 (2016)). As relevant here, "the very act of falsifying records to feign compliance with requirements suggests that [the defendant] thought that those requirements were material." Wheeler, 127 F.4th at 491 (internal quotation marks omitted).

Finally, "a central question in all FCA cases is whether the defendant ever presented a false or fraudulent claim to the government, resulting in a 'call upon the government fisc.'" Grant, 912 F.3d at 196 (quoting Harrison, 176 F.3d at 785-86). "[T]here are two ways to adequately plead presentment under Rule 9(b)." Id. at 197. First, Relator "can allege with particularity that specific false claims actually were presented to the government for payment," id., "by alleging a representative example describing the time, place, and contents of the false representations, as well as the

17

identity of the person making the misrepresentation and what he obtained thereby," Nicholson, 42 F.4th at 194. Alternatively, Relator can allege "a pattern of conduct that would *necessarily* have led to submission of false claims." Id. (emphasis in original).

Plaintiffs relying on the "pattern of conduct" method to establish particularity must set forth sufficient "indicia of reliability" to support their allegation that presentment to the United States of an actual false claim occurred. See Nathan, 707 F.3d at 456-57. This standard does not "require[] a relator to produce documentation [] at the outset of the suit," but plaintiffs must "connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment." Grant, 912 F.3d at 199. To sufficiently "connect the dots," a relator generally must explain how the defendant's alleged fraud, together with the defendant's business model or billing structure, led to government payment for materially false claims. See, e.g., Wheeler, 127 F.4th at 493 (4th Cir. 2025) (finding that the relator pleaded presentment with particularity when "[i]t would stretch the imagination for [the defendant's] practitioners continually to record services that were not provided, but to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed") (internal quotation marks omitted); Grant, 912 F.3d at 198 ("[T]he [complaint] fails to allege how, or even whether, the bills for these fraudulent

18

services were presented to the government and how or even whether the government paid [the defendant] for the services. Merely alleging fraudulent conduct and an umbrella payment, without more, is insufficient.").

Defendants argue that the Court should deny the instant Motion to Amend as futile because the SAC fails to allege fraud with particularity and, alternatively, it fails to "plausibly plead the FCA's falsity, knowledge[,] and materiality elements." (Docket Entry 63 at 8.) Relator conversely contends that the SAC alleges a pattern of conduct that would necessarily have led to the submission of false disability compensation claims to the government for payment. (See Docket Entry 60 at 23; Docket Entry 64 at 2.) Taking Relator's allegations as true, the SAC alleges with particularity that Defendants violated the FCA by, inter alia, routinely altering clients' BDI forms to surpass a specific score threshold (see Docket Entry 61-1, ¶ 70) and, in Defendant Villarosa's case, signing Mental Health Forms for psychological evaluations actually conducted by Whitmore, a non-clinician, and auto-populated with the same symptoms for every veteran (see id., ¶¶ 61, 65, 67).

First, the SAC adequately alleges falsity with regard to the BDI forms. The SAC describes the BDI as a "self-report rating inventory" that Defendant Veterans Guardian's employees "instruct [veterans] to complete on their own." (Id., ¶ 70.) Changing self-

19

reported scores to surpass a specific threshold, in some cases over veterans' objections and without their consent (as alleged in the SAC) (see id.), creates an objectively false record. The SAC also alleges factual matter establishing that Defendant Greenblatt had "actual knowledge," 31 U.S.C. § 3729(b)(1)(A), of the falsity of the information in the altered BDI forms, as he allegedly instructed Defendant Veterans Guardian's employees to raise the scores (see Docket Entry 61-1, ¶ 70).

The SAC likewise sufficiently alleges falsity regarding the Mental Health Forms. In that regard, the SAC alleges that Defendant Villarosa signed forms prepared by Whitmore, who "was not a psychologist" and lacked any "background in diagnosing or treating mental health issues." (Id., ¶ 61.) Additionally, the SAC alleges that Defendant Villarosa's office auto-populated checklists on the forms with the same symptoms for every veteran. (See id., ¶ 65.) Those allegations lead to a plausible inference that Defendant Villarosa had "actual knowledge" regarding his creation of a false document when he signed a form relating to an examination he did not conduct. Morever, the SAC's allegations support an inference that Defendant Villarosa acted with at least "deliberate ignorance" or "reckless disregard" as to "the truth or falsity of the information" in the Mental Health Forms, 31 U.S.C. § 3729(b)(1), by auto-populating the same symptoms for every client Defendant Veterans Guardian referred to him (see Docket Entry 61-1, ¶ 65).

20

The SAC also contains sufficient allegations to establish the materiality of the false BDI and Mental Health Forms to the VA's disability determinations. Defendants argue that Relator did not "set forth any facts supporting the materiality of any specific representation that Defendants purportedly made." (Docket Entry 50 at 24-25 (internal emphasis omitted).) In fact, the SAC alleges, inter alia, that "[t]he amount of VA [d]isability [c]ompensation payment varies substantially depending primarily on disability rating" (Docket Entry 61-1, ¶ 28), which "correspond[s] to how much the disability decreases [the veteran's] overall health and ability to function" (id., ¶ 23 (internal quotation marks and brackets omittted)). Per the SAC, VA standards further provide that, "[w]hen evaluating a mental disorder, . . . [t]he rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment . . . ." (Id., ¶ 29.)

In addition, the SAC alleges that the BDI "measures characteristic attitudes and symptoms of depression" (id., ¶ 70), which undeniably bear on a veteran's "social impairment" (id., ¶ 29 (quoting 38 C.F.R. § 4.126)), and "ability to function" (id., ¶ 23). And more significantly, the SAC alleges that Defendant Veterans Guardian instructed employees to raise clients' BDI scores to a specific threshold (25 for depression and 30 for PTSD) and to not change clients' BDI score for suicidal thoughts "because an assertion that one is experiencing suicidal thoughts can trigger an

21

automatic 100% disability . . . and an expectation that the veteran's other answers on the form would be consistent with such an answer." (Id.) Those allegations suffice to show that the VA makes decisions about how to award disability compensation based on specific components of the BDI form—namely, the suicidal thoughts score and a threshold score of 25 or 30, depending on a veteran's diagnosis.

The SAC similarly establishes the materiality of the Mental Health Forms to the VA's disability determination. Specifically, the SAC alleges that the VA relies on the Mental Health Forms "to establish that the veteran suffers from depression [or PTSD], that it is impacting his ability to function, and that the depression [or PTSD] was caused by injuries suffered during his/her military experience." (Id., ¶ 64.) The Mental Health Forms also allegedly "limit[] the categories of health providers who can conduct an initial examination of a veteran for a mental disorder," and Whitmore "did not satisfy the federal requirements for conducting these examinations." (Id., ¶ 62.) A purported medical opinion assessing a veteran's ability to function and attributing their mental health issues to military injuries does not constitute a minor or insubstantial misrepresentation, but rather qualifies as central to the VA's disability determinations, which require consideration of "all the evidence of record" (id., ¶ 29) to assess "how much the disability decreases [the veteran's] overall health

22

and ability to function" (id., ¶ 23 (internal quotation marks and brackets omitted)). Furthermore, "the very act of falsifying records to feign compliance with [the VA's] requirements suggests that [Defendant Villarosa] thought that those requirements were material." Wheeler, 127 F.4th at 491.

Finally, the SAC sufficiently alleges "a pattern of conduct that would necessarily have led to submission of false claims," Nicholson, 42 F.4th at 194 (internal quotation marks and emphasis omitted), based on the materially false BDI and Mental Health Forms. First, the SAC explains Defendant Veterans Guardian's business model by (A) describing its purpose as "provi[sion of] prefiling consulting services to veterans seeking to increase their monthly VA disability payments" (Docket Entry 61-1, ¶ 4 (internal quotation marks omitted)); (B) alleging that complete application packages include a Mental Health Form and a BDI Form (id., ¶ 71); and (C) asserting that Defendant Veterans Guardian "sent each application package via eFax to th[e VA's centralized] mail processing center in Janesville, Wisconsin" (id., ¶ 74). Taking those allegations together with the SAC's specific allegations regarding BDI score increases, auto-populated Mental Health Forms, and psychological examinations conducted by Whitmore, Relator "connects the dots," Grant, 912 F.3d at 199, between Defendants' materially fraudulent disability applications and their submission to the VA. The allegations also provide Defendants sufficient notice regarding "the

23

particular circumstances for which [they] will have to prepare a defense at trial," Harrison, 176 F.3d at 784.

In sum, the SAC does not fail as futile as to Counts I and II.[4]

## 2. FCA Conspiracy Claims

Count III of the SAC sets forth a claim for conspiracy to violate the FCA, pursuant to 31 U.S.C. § 3729(a)(1)(C). (See Docket Entry 61-1, ¶¶ 106-08.) To plead a claim for FCA conspiracy, "Relator must allege with particularity facts (1) to support the

---

4   The SAC also alleges that Defendant Veterans Guardian submitted a fraudulent application to the Small Business Administration (the "SBA") for a $485,300 Paycheck Protection Program ("PPP") loan, which the SBA approved on April 15, 2020. (Docket Entry 61-1, ¶¶ 9, 98.)   Specifically, the SAC alleges Defendant Veterans Guardian falsely certified that "the current economic uncertainty makes this loan necessary to support the ongoing operations of the applicant" (id., ¶ 45 (internal quotation marks omitted)). (See id., ¶ 98.) Defendants argue the SAC does not plausibly allege falsity because the SBA created a "safe harbor" guideline on May 13, 2020, that provided: "Any borrower that, together with its affiliates, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." (Docket Entry 50 at 15 (internal quotation marks omitted).) The SBA codified this safe harbor in an Interim Final Rule that took effect on January 14, 2021. See Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692, 3692-94, 3706 n.87 (Jan. 14, 2021). The parties disagree about whether the Court should consider the safe harbor because the SBA did not issue it until after the SBA approved Defendant Veterans Guardian for its loan. (See Docket Entry 60 at 20; Docket Entry 62 at 8 n.4.) The Court need not resolve that issue at this time because "[Federal Rule of Civil Procedure] 12(b)(6) speaks of a motion to dis[miss] 'a claim,' not part of a claim." Abraham P. v. Los Angeles Unified Sch. Dist., No. CV 17-3105, 2017 WL 4839071, at *6 n.7 (C.D. Cal. Oct. 5, 2017). As discussed herein, the SAC sufficiently alleges an FCA presentment and false records claim based on the disability application scheme.

24

formation of an unlawful agreement between the conspirators to get a false claim paid, and (2) at least one overt act in furtherance of the conspiracy." United States ex rel. Ahumada v. National Ctr. for Emp't of the Disabled, No. 1:06cv713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013), aff'd sub nom. United States ex rel. Ahumada v. NISH, 756 F.3d 268 (4th Cir. 2014). As to the first element, Relator must allege that "the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 672-73 (2008). Additionally, an FCA conspiracy claim "rises and falls with the individual [FCA] claims." United States ex rel. Godfrey v. KBR, Inc., 360 F. App'x 407, 413 (4th Cir. 2010).

Defendants contend that the SAC "does not plead the specifics of a conspiracy, such as when the agreement was made or the content of any such agreement when it was allegedly made." (Docket Entry 62 at 11 n.5; accord Docket Entry 63 at 19-20.) As relevant to the conspiracy claim, the SAC alleges that Relator participated in a conference call with Defendants Greenblatt and Villarosa in which they developed a "strategy . . . to place [] veteran[s] in the moderate category of disability, regardless of the veteran's actual ability to function per the GAF scoring system." (Docket Entry 61-1, ¶ 68.) They allegedly developed this strategy to avoid future denials based on GAF score inconsistency and to "avoid[] VA

25

scrutiny." (Id.) Although the SAC does not allege specifically when this meeting took place, it alleges that it took place "during Relator's tenure" (see id.), which spanned the period from "approximately January 2019 until August 2019" (id., ¶ 14), which suffices, see, e.g., United States ex rel. Devarapally v. Ferncreek Cardiology, P.A., No. 5:17-CV-616, 2023 WL 2333872, at *6 (E.D.N.C. Mar. 2, 2023) (finding the relator alleged an FCA conspiracy with particularity when, inter alia, the relator alleged the defendants "had a 2014 meeting" in which they agreed to their fraudulent scheme).

The SAC also sufficiently alleges Defendants "had the purpose of 'getting' the false [disability applications] to bring about the [VA]'s payment of a false or fraudulent claim." Allison Engine Co., 553 U.S. at 672-73. The SAC alleges that Defendants developed a strategy to avoid denials based on inconsistency in the Mental Health Forms and to "avoid[] VA scrutiny" (Docket Entry 61-1, ¶ 68), which tends to show Defendants agreed to use false statements to get the VA to approve disability compensation applications. Lastly, for reasons previously detailed, Relator has adequately pled that Defendants' actions violated the FCA with regards to VA disability applications; that determination allows Relator to clear the overt acts element of the FCA conspiracy claim. See Godfrey, 360 F. App'x at 413 ("[T]he [FCA] conspiracy claim rises and falls with the individual [FCA] claims."); United States ex rel. Hedley v. Abhe &

26

<u>Svoboda, Inc.</u>, 199 F. Supp. 3d 945, 956 (D. Md. 2016) (finding that where "[r]elators have sufficiently alleged the underlying [FCA] violations, . . . they have sufficiently alleged a related conspiracy").

Accordingly, the SAC does not fail as futile as to Count III.

### 3. FCA Retaliation Claim

The SAC's fourth count sets forth a claim for retaliation against Defendants Veterans Guardian, Greenblatt, and Taylor under the FCA, pursuant to 31 U.S.C. § 3730(h). (<u>See</u> Docket Entry 61-1, ¶¶ 109-13.)[5] "Unlike [] substantive FCA claims, retaliation claims under [Section] 3730(h) are not subject to Rule 9(b)'s heightened particularity requirement." <u>Grant</u>, 912 F.3d at 200. "Instead, [Relator] need only satisfy Rule 8(a)'s notice-pleading standard," <u>id.</u>, which requires that she "plead[] sufficient facts to support a 'reasonable inference that [Defendants are] liable for the misconduct alleged,'" <u>id.</u> at 196 (quoting <u>Iqbal</u>, 556 U.S. at 678). "Accordingly, to sufficiently plead a [Section] 3730(h) retaliation claim . . . [Relator] must allege facts sufficient to support a reasonable inference of three elements: (1) [s]he engaged in protected activity; (2) h[er] employer knew about the protected activity; and (3) h[er] employer took adverse action against h[er] as a result." <u>Id.</u> "Protected activity" consists of any act "in

_____

5  The FAC brought this claim against Defendant Villarosa as well, but the SAC drops him from the retaliation claim. (<u>Compare</u> <u>id.</u>, <u>with</u> Docket Entry 18, ¶¶ 100-04.)

furtherance of an FCA action (the 'first prong'), or other efforts to stop [one] or more FCA violations (the 'second prong')." Id. (internal quotation marks and brackets omitted). Furthermore:

> In interpreting the second prong, [courts] apply an objective reasonableness standard. That is, [a] belief is objectively reasonable when the plaintiff alleges facts sufficient to show that [s]he believed h[er] employer was violating the FCA, that this belief was reasonable, that [s]he took action based on that belief, and that h[er] actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not lead to a viable FCA action[,] they must still have a nexus to an FCA violation.

Skibo on behalf of United States v. Greer Lab'ys, Inc., 841 F. App'x 527, 534 (4th Cir. 2021) (internal quotation marks, brackets, and ellipses omitted).

Defendants argue first that the SAC does not allege Relator engaged in a protected activity because "Relator does not plead sufficient facts from which an objective person would believe an FCA violation occurred." (Docket Entry 50 at 28.) To the contrary, for reasons previously demonstrated, the SAC pleads sufficient facts, which Relator discovered during her employment at Defendant Veterans Guardian, to meet Rule 9(b)'s stringent particularity requirement. The SAC further alleges that Relator took action to stop the FCA violations by, inter alia, "refusing to forge signatures[, ] questioning the validity of diagnoses," and "research[ing] and print[ing] out peer-reviewed studies in psychology journals" that she used "to point out to [Defendant Taylor, Defendant Greenblatt, and other of Defendant Veterans Guardian's employees] the diagnosis

28

errors that Defendants were making according to the Diagnostic and Statistical Manual of Mental Disorders (DSM-5)." (Docket Entry 61-1, ¶ 91.) As such, Relator has plausibly alleged she engaged in protected activity per the second prong.

Next, Defendants argue that "Relator does not plausibly plead that Defendants knew [she] was participating in protected activity." (Docket Entry 50 at 28.) The Court views this element from the employer's perspective, and it "turns on whether the employer is aware of the employee's conduct" and whether "the employer [is] on notice that litigation is a reasonable possibility." United States ex rel. Parks v. Alpharma, Inc., 493 F. App'x 380, 388 (4th Cir. 2012). The SAC certainly alleges that Defendants Veterans Guardian, Greenblatt, and Taylor knew of Relator's conduct, as, inter alia, Relator told Defendants Greenblatt and Taylor about the diagnostic errors, and she told Defendant Taylor "that she was going to expose [Defendant Veterans Guardian] as a fraud." (Docket Entry 61-1, ¶¶ 91-92.) Relator also expressed "concerns over [Defendants'] dishonest methods" to a co-worker, "who then reported Relator's views to [Defendant] Taylor," and Relator was "called out for her disloyalty" during a company-wide meeting in June 2019. (See id., ¶ 91.) Taken together, Relator's complaints to Defendants Greenblatt and Taylor, their knowledge of her perceived "disloyalty," and her threat to "expose" Defendant Veterans Guardian

29

as a fraud sufficiently allege Defendants' notice of the reasonable possibility of FCA litigation.

Finally, Defendants contend that Relator "fails to plausibly plead the third element [of retaliation] because she asserts no facts showing that but for her alleged involvement in protected activity, adverse employment action would not have been taken against her." (Docket Entry 50 at 29.) But, "[i]n the absence of direct evidence of causation, close temporal proximity between protected activity (or an employer's knowlege of protected activity) and an adverse employment action may give rise to an inference of causation." United States ex rel. Complin v. North Carolina Baptist Hosp., 818 F. App'x 179, 185 (4th Cir. 2020). In particular, a relator's "termination, following close on the heels of h[er] numerous complaints, represents the ultimate action that an employer can take against a reasonable worker for whistleblowing." Grant, 912 F.3d at 203. Here, the SAC alleges that Defendant Taylor "promptly fired [Relator]" in July 2019 after she complained about diagnostic errors and told Defendant Taylor that "she was going to expose [Defendant Veterans Guardian] as a fraud." (Docket Entry 61-1, ¶ 92.) At the pleading stage, Relator's termination following those complaints sufficiently alleges that Defendants Veterans Guardian, Greenblatt, and Taylor terminated her because of her protected activity.

30

However, the Court's inquiry does not end there. Defendants argue that "Relator cannot plead a wrongful retaliation claim against [Defendants] Greenblatt and Taylor" (Docket Entry 50 at 29), because "she does not allege she had an employment, contractual, or agency relationship with [them]" (id. at 29-30). Relator counters that Defendants Greenblatt and Taylor qualify as proper parties to the claim due to the 2009 amendment to Section 3730(h). (See Docket Entry 60 at 26.)

Section 3730(h), as amended in 2009, creates a cause of action for "[a]ny employee, contractor, or agent":

> discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section . . . .

31 U.S.C. § 3730(h)(1). That statutory text does not identify what entities may face liability under this provision. See id. The previous version of Section 3730(h) created a cause of action for "[a]ny employee":

> discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment *by his or her employer* because of lawful acts done by the employee on behalf of the employer or others in furtherance of an action under this section . . . .

31 U.S.C. § 3730(h) (1994) (emphasis added). Under that prior version of the statute, "courts appropriately and uniformly recognized that only employers, not individual corporate employees, could be sued under the FCA's whistleblower provision." Irving v.

31

PAE Gov't Servs., Inc., 249 F. Supp. 3d 826, 832 (E.D. Va. 2017) (collecting cases).

Relator argues that Congress's omission of the term "employer" in the current version of Section 3730(h) "unambiguous[ly] . . . permits individual liability." (Docket Entry 60 at 26-27.) To support her contention, Relator cites two district court opinions which decline to dismiss such claims against individuals. (See id. (citing Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd., No. 3:15cv72, 2015 WL 4937461, at *7-8 (E.D. Va. Aug. 18, 2015); Weihua Huang v. Rector & Visitors of Univ. of Va., 896 F. Supp. 2d 524, 548 n.16 (W.D. Va. 2012))). Suggesting that "courts have split over this issue," Relator asks the Court to "adopt the approach of [these] two sister courts within the Fourth Circuit and address the issue at summary judgment." (Id. at 26.) Defendants, on the other hand, point out that "multiple appellate courts and the 'overwhelming' majority of district courts have concluded that plaintiffs cannot bring such lawsuits." (Docket Entry 62 at 15 n.7 (quoting Brach v. Conflict Kinetics Corp., 221 F. Supp. 3d 743, 748-50 (E.D. Va. 2016), and citing United States ex rel. Del Signore v. Nokia of Am. Corp., No. 23-1973, 2024 WL 503953, at *2 (7th Cir. Feb. 9, 2024), United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp., 915 F.3d 1158, 1167 (8th Cir. 2019), and Howell v. Town of Ball, 827 F.3d 515, 529-30 (5th Cir. 2016)).

32

The Court should side with Defendants on this point. To begin, the two cases cited by Plaintiff provide no real support for her construction of this provision. In Fitzsimmons, the district court declined to address the issue at the motion to dismiss stage due to a lack of binding precedent from the Fourth Circuit, disagreement among courts within the Fourth Circuit, and the absence of a specific statutory analysis offered by either party. See Fitzsimmons, 2015 WL 4937461, at *7-8. Instead, the court "kicked the proverbial can down the road, deferring any ruling until the summary judgment stage," Irving, 249 F. Supp. 3d at 834, but "the parties settled the matter, thereby negating the need for the court to decide whether [Section] 3730(h) provides for individual liability," id. In Huang, on a motion for summary judgment, the district court stated in a footnote that the 2009 amendment "left the universe of defendants undefined and wide-open," but declined to rule on the issue because, inter alia, the defendants did not raise the issue in their motion. See Huang, 896 F. Supp. at 548 n.16. Defendants here do raise the issue, and the Court therefore should reach the issue, as have other courts. See, e.g., Irving, 249 F. Supp. 3d at 830-35; United States ex rel. Rauch v. Oaktree Med. Ctr., P.C., No. 6:15-cv-01589, 2020 WL 1065955, at *9-12 (D.S.C. Mar. 5, 2020); Brach, 221 F. Supp. 3d at 748-50.

In doing so, the Court should note, as Defendants point out, that the "overwhelming majority of courts," Brach 221 F. Supp. 3d

33

at 748, 748 n.9 (collecting cases), including the Fifth Circuit, the Eighth Circuit, and district courts within and outside the Fourth Circuit, all relied on similar reasoning to find that the 2009 amendment does not extend liability to individual supervisors. See, e.g., Howell, 827 F.3d at 529-30; Strubbe, 915 F.3d at 1167; Irving, 249 F. Supp. 3d at 830-35; Rauch, 2020 WL 1065955 at *9-12; Rangarajan v. Johns Hopkins Health Sys. Corp., Civ Action No. 12-1953, 2014 WL 6666308, at *4-6 (D. Md. Nov. 21, 2014); Aryai v. Forfeiture Support Assocs., 25 F. Supp.3d 376, 385-88 (S.D.N.Y. 2012). Importantly, "Congress is presumed to enact legislation with knowledge of the law; that is with the knowledge of the interpretation that courts have given to an existing statute." United States v. Langley, 62 F.3d 602, 605 (4th Cir. 1995). "Thus, it is proper to consider that Congress acts with knowledge of existing law, and that absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction." Id. (internal quotation marks omitted).

As the Fifth Circuit explained:

[V]iewing the changes to [Section] 3730(h) as a whole, it is clear that the reference to an "employer" was deleted to account for the broadening of the class of FCA plaintiffs to include "contractors" and "agents," not to provide liability for individual, non-employer defendants. . . . Before the passage of the 2009 amendments, federal courts uniformly held that the FCA created a cause of action against only a plaintiff's employer. Adopting [the plaintiff's] argument [regarding the 2009 Amendment to Section 3730(h)] means concluding

34

> that Congress overturned this precedent, not by the
> insertion of express language expanding liability, but
> only by mere implication.

_Howell_, 827 F.3d at 529-30 (internal quotation marks and citations omitted); _see also_ _Strubbe_, 915 F.3d at 1167 ("Because Congress did not amend the FCA to impose individual liability, the FCA does not impose individual liability for retaliation claims.").

Based on the foregoing effectively unanimous, persuasive authority and Relator's failure to offer any convincing counter-argument, the Court should conclude that the SAC fails as futile as to Count IV against Defendants Greenblatt and Taylor, but not against Defendant Veterans Guardian.[6]

## B. Bad Faith

Even absent futility, the Court may deny leave to amend when "there has been bad faith on the part of the moving party." _Johnson v. Oroweat Foods Co._, 785 F.2d 503, 509 (4th Cir. 1986). The Fourth Circuit recently noted that bad faith "is a difficult term to define," but includes "outright lying, deceiving, playing unjustifiable hardball, slacking off, intentionally causing confusion, [] stubbornly refusing to follow rules[, or] something as mundane as noticing someone's mistake and saying nothing about it." _Nicholson_, 42 F.4th at 198. Additionally, "[d]elay alone is

---

6 Given (as previously documented) that the SAC dropped Count IV as to Defendant Villarosa, this count should only proceed as to Defendant Veterans Guardian.

not enough to deny leave to amend, though it is often evidence that goes to prove bad faith and prejudice." Id. at 197.

Defendants rely on the Fourth Circuit's ruling in Nicholson to argue that "Relator has acted in bad faith by withholding allegedly important facts regarding purported symptoms and diagnoses for specific veterans for an extended period of time." (Docket Entry 63 at 20.) However, comparing the substance of Relator's proposed amendments in this case to the relator's proposed amendments in Nicholson, Relator's actions do not rise to the same level. In Nicholson, the relator's amendments, inter alia, "chang[ed] substantive facts from one filing to the next and pursu[ed] claims with the knowledge they [were] not supported by law." United States ex rel. Nicholson v. MedCom Carolinas, Inc., No. 1:17cv34, 2021 WL 981240, at *9-10 (M.D.N.C. Mar. 16, 2021), aff'd, Nicholson, 42 F.4th at 189. Additionally, the relator did not move to amend until after the entry of a ruling on the defendant's motion to dismiss. See id. Relator's case did remain pending three years longer than the complaint in Nicholson, but "[d]elay alone is not enough to deny leave to amend," Nicholson, 42 F.4th at 197. And, unlike in Nicholson, Relator dismissed a claim that she conceded lacked merit, removed one defendant from another claim, and moved to amend before the Court ruled on the Motion to Dismiss. (See Docket Entry 61-1.) Relator's additional allegations also do not change substantive facts in the FAC in the same way as did the relator's belated,

36

proposed amendment in <u>Nicholson</u>, but instead only more modestly expand upon the prior allegations by adding some examples. (<u>Compare</u> Docket Entry 61-1, ¶¶ 3, 6, 63, 65, 67, 68, 79-90, <u>with</u> Docket Entry 18, ¶¶ 3, 6, 63, 65, 67, 68-90 (lacking the examples in paragraphs 68 and 79-90 of the SAC).) Although Relator arguably should have presented the additional allegations prior to proffering the SAC, the circumstances in totality do not support a finding that she acted in bad faith.

## C. Prejudice

Finally, the Court may deny leave to amend when "the amendment would be prejudicial to the opposing party." <u>Johnson</u>, 785 F.2d at 509. "[P]rejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party . . . where the amendment is offered shortly before or during trial." <u>Johnson</u>, 785 F.2d at 510. Defendants would have the Court find them "prejudiced by Relator's unjustified delay in this action" given that "four-and-a-half years have passed since the original complaint was filed." (Docket Entry 63 at 22.) The record does not support a finding of prejudice for several reasons. First, as Relator points out, "[a]s in any FCA case, the amount of time before unsealing is attributable exclusively to the government," and "less than six months" passed following unsealing before Relator filed the Motion to Amend. (Docket Entry 64 at 6.) Second, the SAC does not raise a new legal

37

theory; instead, it dismisses a count. (<u>Compare</u> Docket Entry 18, <u>with</u> Docket Entry 61-1.) Finally, the parties have not started discovery and the Court has neither entered a scheduling order nor set a trial date, circumstances which weigh against any finding of prejudice to Defendants. <u>See, e.g.</u>, <u>Laber</u>, 438 F.3d at 404 ("An amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred.").

## II. Defendants' 12(b)(5) Motion to Dismiss

Based on the recommendation that the Court grant the instant Motion to Amend, the Court should deny the Rule 12(b)(6) portion of the instant Motion to Dismiss as moot as to all counts and parties, with the exception of Count IV against Defendants Greenblatt and Taylor. Beyond that, in a single footnote in the "Statement of Facts" section of the brief supporting the Motion to Dismiss, Defendants alternatively move to dismiss Defendants Greenblatt and Villarosa pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process. (<u>See</u> Docket Entry 50 at 11 n.1.) Defendants' entire argument appears as follows: "Despite this Court directing Relator to 'either serve the FAC upon [] Defendants or file a voluntary dismissal' by 07/29/2024, Relator failed to timely serve [Defendants] Greenblatt and [] Villarosa. Claims against these Defendants should be dismissed pursuant to Fed[eral] R[ule of]

38

Civ[il] P[rocedure] 12(b)(5)." (<u>Id.</u> (quoting Text Order dated July 26, 2024) (internal citations and brackets omitted).).

As relevant here, "[i]t is not the Court's job to undertake the analysis and legal research needed to support a perfunctory argument, nor should a party expect a court to do the work that [the party] elected not to do." <u>Hill v. Carvana, LLC</u>, No. 1:22CV37, 2022 WL 1625020, at *5 (M.D.N.C. May 23, 2022) (internal citation and quotation marks omitted). To that end, "a brief's argument section *must contain* the [movant's] contentions and the reasons for them, with citations to the authorities and parts of the record on which the [movant] relies." <u>Hensley on behalf of N.C. v. Price</u>, 876 F.3d 573, 580 n.5 (4th Cir. 2017) (internal quotation marks, brackets, and ellipsis omitted) (emphasis in original). If a party "fail[s] to develop its argument–even if its brief takes a passing shot at the issue," the party waives the argument. <u>Grayson O Co. v. Agadir Int'l, LLC</u>, 856 F.3d 307, 316 (4th Cir. 2017) (internal quotation marks and brackets omitted).

Here, Defendants take only a "passing shot" at arguing for dismissal of Defendants Villarosa and Greenblatt pursuant to Rule 12(b)(5). The Court thus should deny the instant Motion to Dismiss as to Rule 12(b)(5).

## CONCLUSION

For the foregoing reasons, the instant Motion to Amend does not fail as futile, except as to Count IV against Defendants Greenblatt

39

and Taylor.  Nor does the record establish bad faith by Relator or prejudice to Defendants.

**IT IS THEREFORE RECOMMENDED** that the instant Motion to Amend (Docket Entry 61) be **DENIED IN PART**, as to Count IV against Defendants Greenblatt and Taylor, and **GRANTED IN PART** as to all other counts and parties.

**IT IS FURTHER RECOMMENDED** that the instant Motion to Dismiss (Docket Entry 49) be **GRANTED IN PART** as to Count IV against Defendants Greenblatt and Taylor and **DENIED IN PART** as to all other counts.

This 25th day of February, 2025.


<pre>
               /s/ L. Patrick Auld
              L. Patrick Auld
         United States Magistrate Judge
</pre>